## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

VALENTINE FERTITTA,

                              Plaintiff,

v.

MERRICK GARLAND, in his official capacity
as Attorney General of the United States of
America,

                              Defendant.

Civil Action No. _____

Jury Trial Demanded

## **COMPLAINT**

Plaintiff, Valentine Fertitta ("Mr. Fertitta"), by and through his undersigned attorneys,

brings this Complaint against the United States Department of Justice ("Defendant") and alleges

as follows:

### I. NATURE OF THIS ACTION

1.      This case is brought pursuant to the Rehabilitation Act of 1973, as amended, 29

U.S.C. § 791, *et seq.* ("Rehabilitation Act").

### II.   JURISDICTION, VENUE & EXHAUSTION OF ADMINISTRATIVE REMEDIES

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

3.      The United States District Court for the District of New Mexico is a proper venue

for this action because Defendant maintains a place of business in this judicial district and the

acts/omissions alleged in this complaint occurred in this District. *See* 28 U.S.C. § 1391(b).

4.      Mr. Fertitta exhausted his administrative remedies by contacting an EEO counselor

(June 23, 2021) with 45 days of first learning (May 17, 2021) that his application for a promotion

1

(Primary Relief Supervisor (PRS)) had been denied and then filing a formal written complaint on or around October 22, 2021.

5.      Neither Mr. Fertitta nor his lawyers ever received a final decision on his complaint, and more than 180 days have passed since the complaint was filed.

### III.    PARTIES

6.      The defendant, Merrick Garland, is the Attorney General of the United States of America and is sued in his capacity as head of a department in the executive branch of the Federal Government within the meaning of 29 U.S.C. §§ 791 and 794.

7.      Mr. Fertitta is Special Agent of the Federal Bureau of Investigation and worked for the FBI in New Mexico at all times relevant to this lawsuit. At all times relevant to this lawsuit Mr. Fertitta was a member of the U.S. Marine Corps Reserves (USMCR).

### IV.    FACTS

8.      Mr. Fertitta is a Major in the USMCR. Mr. Fertitta is also a veteran of the wars in Iraq and Afghanistan. While serving in Iraq, in 2004, he was injured in an explosion. One of his superiors died during that event.

9.      Mr. Fertitta was hired by the FBI in 2014. From the date of this hire until mid-2021 his performance reviews were satisfactory or higher. In fact, Mr. Fertitta received performance awards in the four previous years.

10.     In 2017, Mr. Fertitta was diagnosed with Post Traumatic Stress Disorder ("PTSD") stemming from his three combat deployments (two to Iraq, one to Afghanistan).

11.     The Agency was made aware of Mr. Fertitta's PTSD diagnosis on or around mid-2018 during a required Agent "Fit For Duty" (FFD) medical examination.

12.     During the October 2020 timeframe supervisory special agent ("SSA") Percy Giles

became Mr. Fertitta's supervisor. At all times relevant to this case Mr. Giles worked in the FBI's Albuquerque (AQ) office.

13.     On or around November 16, 2020, the USMCR ordered Mr. Fertitta to duty to attend a medical screening. At that screening it was discovered that Mr. Fertitta had outstanding medical issues, stemming from the above-referenced combat deployments that needed to be treated. The single medical screening combined with annual reserve required drills required Mr. Fertitta to be absent from the workplace for approximately 30 days during the period from November 16, 2020, through April 22, 2021.

14.     In late-November 2020, Mr. Fertitta and SSA Giles met in SSA Giles' office. During that meeting Mr. Fertitta's military reserve service (which includes leaving the Agency to attend military-mandated medical appointments) came up. As part of that conversation, Mr. Fertitta told SSA Giles that his USMCR status required that he miss approximately seven weeks each year, including military mandated medical appointments. In response, SSA Giles asked Mr. Fertitta how he was able to mitigate the impact his military reserve duty (which included medical appointments to address service-related injuries) had on his FBI duties.

15.     The medical issue the USMCR identified as needing treatment related to hearing loss and a vision anomaly that caused Mr. Fertitta to be designated "Not medically ready" for the first time in his near 23-year career. This designation can be cause for involuntary medical separation from military service.  This is a disability because it affects the "major life activity" of hearing.

16.     On March 20, 2021, Mr. Fertitta was required to travel to Walter-Reed Army Medical Center for the advanced hearing tests. These tests were conducted on March 22, 2021. Due to the travel involved in coming from New Mexico to Maryland, Mr. Fertitta remained in the

area until he was assured no further tests were required to attain a status of "Fully Medically Ready". This was the only way to get the adverse medical designation removed. All told this resulted in six days of medical absence from the FBI.

17.     On March 1, 2021, Mr. Fertitta's optometrist through the Veterans Health Administration ("VA") found an anomaly in Mr. Fertitta's pupils indicating a possible brain bleed or pending aneurism. The optometrist recommended an immediate follow up diagnostic imaging of Mr. Fertitta's brain.

18.     On March 2, 2021, Mr. Fertitta traveled to the Albuquerque VA Medical Center for a follow consult with his doctor. An emergency CT scan was subsequently scheduled for March 8, 2021. On approximately March 12, 2021, Mr. Fertitta was notified by the VA that the scan did not indicate any such injury and the anomaly was innocuous.

19.     Mr. Fertitta's military mandated medical treatment absences occurred on or about December 7, 10, 11, 14, 15, 16, 17, 18, 21, 22; January 6, 7, 14; February 19; March 1, 2, 5, 6, 8, 12, 19, 22, 23, 24, 25, 26; April 6 and 8.

20.     On January 14, 2021, SSA Giles told Mr. Fertitta that Assistant Special Agent in Charge ("ASAC") Amy Kaskel was upset that Mr. Fertitta was out of the office. SSA Giles told Mr. Fertitta that it was ASAC Kaskel's expectation that he conduct FBI work while on military reserve status regardless of whether these military caused absences related to treating Mr. Fertitta's disability impairments.

21.     On January 15, 2021, Mr. Fertitta informed SSA Giles, via email, that the ASAC's directive violated federal law:

**From:** Fertitta, Valentine J. IV (AQ) (FBI)
**Sent:** Friday, January 15, 2021 8:30:41 AM
**To:** Giles, Percy E. III (AQ) (FBI) <pegiles@fbi.gov>
**Subject:** Duty Status

Sir,

I should have reached out upon receiving the CP email to confirm and point out my status at the time of the meeting.

In any case, if the ASAC has any further questions as to my duty status at the time of the meeting yesterday I have attached the evidence of status and can supply her with a letter from my command if she insists.

For her to assert that I should conduct FBI work while in drilling status would violate OPM policy and US law. I do my best to separate these responsibilities to ensure I do no run afoul of either.

Thank you for your time talking this through last night.

V/r
SA V. Fertitta

22.     Mr. Fertitta's January 15, 2021 email constitutes an action to enforce his right, under, *inter alia,* the Rehabilitation Act, to leave work to get medical treatment.

23.     On April 22, 2021, a job posting - known in the FBI as a canvass - was sent to all agents in the AQ Division advertising multiple open Relief and Primary Relief Supervisor (PRS) positions.

24.     Mr. Fertitta applied for a PRS position on May 5, 2021. SSA Giles knew of Mr. Fertitta's May 5, 2021 application. SSA Giles, with the support of ASAC Kaskel, refused to forward Mr. Fertitta's application to the Local Career Board ("LCB") in violation of FBI Unified Relief Supervisor Policy Guide 1074 § 4.3.3.

25.     Unified Relief Supervisory Policy Guide 1074 § 4.3.3 makes clear that Mr. Fertitta's rating official (Giles) "*must* approve the EC for serialization and forward it to the FBIHQ division/FO head within 10 business days" of May 5, 2021.  The application period closed on May 7, 2021 with no applicants for the position being forwarded to the LCB for the PRS positions at the Santa Fe Resident Agency ("SFRA").

26.     On May 10, 2021, SSA Giles made an entry into SENTINEL - the FBI automated case management system - stating Mr. Fertitta's PRS application was denied. Mr. Fertitta, however, did not read SSA Giles's May 10, 2021 entry until May 17, 2021, as he was on family

related sick leave in Baltimore, MD (his father had been involved in a near fatal car accident) and did not have access to SENTINEL until May 17, 2021. The Sentinel system resides on a classified network not accessible outside of FBI buildings.

27.     Unable to resolve the policy violation with SSA Giles and ASAC Kaskel, Mr. Fertitta requested a meeting with the Albuquerque (AQ) Division Special Agent in Charge (SAC) Raul Bujanda.

28.     On May 26, 2021, Mr. Fertitta met with SAC Bujanda and provided him with the details and background pertaining to the canvass. This included the family childcare challenges faced by the dual agent couple that precluded Mr. Fertitta applying to positions a significant distance from SFRA. Mr. Fertitta requested that his application be moved forward and presented to the LCB for consideration. During this conversation Mr. Fertitta told SAC Bujanda that SSA Giles and ASAC Kaskel's blocked his relief supervisor position violated FBI regulation, i.e. Unified Relief Supervisory Policy Guide 1074 § 4.3.3. SAC Bujanda responded words to the effect of, "You are owed some answers."

29.     Due to FBI required training and the above-mentioned family medical emergency Mr. Fertitta was out of the office during the June 1 to June 14, 2021 timeframe.

30.     On June 15, 2021, SSA Giles summoned Mr. Fertitta to his (Giles) office. Upon arrival SSA Giles asked, with a smirk, "How did your meeting with the SAC go?" SSA Giles then berated Mr. Fertitta for his "poor judgment" around his attempt to apply for the PRS position without SSA Giles' permission and seeking assistance from the SAC in correcting the regulatory violation. SSA Giles then ranked Mr. Fertitta as an "inconsistent performer" for the first time in nearly eight years of FBI service.

31.     Also, on June 15, 2021, SSA Giles gave Mr. Fertitta a "inconsistent" Performance

Appraisal Rating (PAR). Mr. Fertitta had never received an "inconsistent" PAR up to this point.

32.     A rating of "inconsistent" effectively stops an employee's career progression. If an employee is rated "inconsistent", they are not eligible to apply to career boards, promotional opportunities, or collateral duties. SSA Giles stated that the basis for the "inconsistent" PAR was that Mr. Fertitta applied for the relief supervisor position over the objections of SSA Giles and ASAC Kaskel.  Furthermore, SSA Giles then classified the PAR "SECRET//NOFORN utilizing the U.S. Government's classification system to further hinder any recourse sought by Mr. Fertitta.

33.     Mr. Fertitta's year-end performance rating covering the entirety of the year, including the previous period marked SECRET//NORFORN, was marked UNCLASSIFIED and omitted mention of Mr. Fertitta's failed attempt at applying for the position.  As of December 7, 2022, the derogatory PAR remains in FBI's performance evaluation system.

34.     On June 23, 2021, Mr. Fertitta (a non-attorney who was not represented by counsel at the time) emailed the Agency's EEO Counselor (EEO_Counseling@fbi.gov) to seek guidance as to the correct venue to file a complaint about SSA Giles' May 2021 denial of Mr. Fertitta's PRS application.

35.     In the context of addressing Mr. Fertitta's June 23, 2022 email, the EEO counselor did not inquire as to the factual bases of Mr. Fertitta's inquiry.  Instead, the EEO Counselor erroneously sent Mr. Fertitta to the U.S. Department of Labor.

36.     On June 25, 2021, Mr. Fertitta met with SSA Giles, ASAC Kaskel and SAC Bujanda.  During the meeting Mr. Fertitta requested: (1) advancement of the application for PRS at SFRA, (2) removal of the false statements made in the retaliatory performance appraisal check-in; and, (3) a change of SSA and ASAC due to the continuing deterioration of supervisor/subordinate relations.  At this meeting, the SAC speculated that the reason that Mr.

Fertitta's PRS application was blocked was because it was complicated to move personnel between the Albuquerque FBI Headquarters (HQ) Office and the Santa Fe Resident Agency ("RA") Office.

37.     The SAC's professed "non-discriminatory" explanation did not sit well with Mr. Fertitta because (a) the Santa Fe Office is 49 miles from the HQ office, and (b) agents have regularly been shifted between these offices.  Indeed, in the June/July 2021 timeframe two agents (more on that below) were shifted from the Albuquerque RA to the Santa Fe RA.

38.     To Mr. Fertitta's knowledge, those agents were not required to use the Office of Preference ("OP") to facilitate the move. The meeting ended with the SAC declining to move the PRS application forward, declining to remove or address the false statements in his performance check-in, and stating he would consider changing Mr. Fertitta's chain of command but not without more deliberation.

39.     In June 2021, Mr. Fertitta began experiencing stress-related absences from work as the Agency's retaliatory acts exacerbated his combat-caused PTSD.

40.     From November 3, 2021 to April 22, 2022, Mr. Fertitta took approximately 450.5 hours of Sick Leave - Without Pay to treat the PTSD now exacerbated by the Agency's acts/omissions.  This total does not include paid hours of sick leave taken prior to Mr. Fertitta exhausting all accrued sick leave.

41.     On July 5, 2021, the USMCR involuntarily recalled Mr. Fertitta to military duty for approximately 45 days to support the U.S. Navy's "Large Scale Exercise 2021" - the largest naval exercise in 50 years.

42.     Agency management was made aware of Mr. Fertitta's pending absence in the meeting of June 27, 2021.  Mr. Fertitta military absence from the workplace was from July 5, 2021, through August 15, 2021.

43.     Upon returning home, Mr. Fertitta learned that he had contracted COVID 19 during the exercise.  Mr. Fertitta's military and COVID related absence from the workplace was from July 5, 2021 through August 31, 2021.

44.     The Agency did not fill the PRS position that was first canvassed in April 2021.

45.     On August 4, 2021, a *second* canvass for the above referenced PRS position was released. This second canvass occurred while Mr. Fertitta was on military orders. Mr. Fertitta would have likely missed the window to apply had the Division's Executive Management's secretary not contacted him to notify him of the job posting being released.

46.     While still on military orders on August 7, 2021, Mr. Fertitta requested and received authorization from his military chain of command to travel 100 miles round trip to the nearest FBI office to submit his application on the FBI's SENTINEL system.  Despite Mr. Fertitta's good faith efforts, SSA Giles refused to forward his application.

47.     On or around August 9, 2021, while Mr. Fertitta was still on military duty, SSA Giles again rejected Mr. Fertitta's application via email.  SSA Giles' new reasoning for rejecting the application was that Mr. Fertitta did not submit a Supervisor Development Program (SDP) rating form with the application. Mr. Fertitta assessed SSA Giles' reasoning as pretextual because, *inter alia,* Mr. Fertitta possessed a completed SDP with high ratings.

48.     SSA Giles refused to forward Mr. Fertitta's application to the LCB without a newly created SDP rating form.  The new SDP rating form from SSA Giles marked Mr. Fertitta as "Needs Improvement" in nearly every category.  This was in stark contrast to the positive ratings Mr. Fertitta received as part of his earlier SDP program in late 2019 and early 2020 a timeframe that involved Mr. Fertitta actually serving in a relief supervisor position.

49.     On August 31, 2021, the LCB convened to review applications for positions listed

in the canvass released on August 4, 2021 to include the PRS position for SFRA. Again, Mr. Fertitta's application was blocked and not considered by the LCB. Mr. Fertitta later discovered that ASAC Kaskel falsely informed the LCB that Mr. Fertitta's application could not be considered because he was not administratively assigned to SFRA.

50.     On September 2, 2021, Mr. Fertitta informed SSA Giles and ASAC Kaskel that he invoked the EEO process so as to get his PRS application considered by the LCB.

51.     The retaliation continued. Ultimately (and only after being told that the EEO process was invoked) Mr. Fertitta's application was presented to an LCB. This LCB convened on September 21, 2021 solely for the purpose of reviewing Mr. Fertitta's application.

52.     On September 22, 2021, the Agency informed Mr. Fertitta that he was selected to serve as a PRS but the PRS was for an entity located in Santa Fe that Mr. Fertitta did not work with on a regular basis.

53.     This arrangement (a PRS supervising an entity in a different geographical location, here a city 49 miles away) was a departure from the previous 17 years of Agency precedence wherein the PRS always served with and was geographically co-located with the SFRA squad to ensure they had the requisite knowledge to perform the duties of PRS.

54.     On October 15, 2021, Mr. Fertitta had a conversation with retired former SFRA SSRA, Mark Buie about the above-referenced arrangement.

55.     SSRA Buie stated that the Agency's current arrangement sets the squad and a PRS up for failure and detailed multiple specific examples.

56.     Mr. Buie also remarked words to the effect of "Who did you piss off?" and "Why are they f—king with you?"

57.     On October 14, 2021, SAC Bujanda stated that Mr. Fertitta should use his once-in-

a-career OP (Office of Preference) selection to get moved to SFRA.  However, as described below numerous agents in AQ Division have received interdivision transfers in 2021-2022 without being required to use their OP.  Upon information and belief, none of those individuals have made EEO claims against the FBI whereas Mr. Fertitta has. Indeed, FBI Employee Transfer Policy Guide 1138PG - § 4.4.6., provides in relevant part "Intradivisional transfers for situations in which transfers do not meet the 50-mile rule, FBIHQ division and FO heads can initiate no-cost intradivisional transfers.  Intradivisional transfers in FOs may include (1) transfers from headquarters city (HQC) offices to RAs, (2) RAs to HQC, and (3) RAs to RAs. Such requests must be made via HR Source.  SAs and IAs receiving such transfers do not exhaust their OPs."

58.     In forcing Mr. Fertitta to use the OP to move from Albuquerque to Santa Fe, the Agency was requiring that he use a benefit valued ranging between $ 20,000-$ 50,000 depending on distance of the move, home value, and other specific move benefits provided to FBI employees.

59.     As of the date of this Complaint, Mr. Fertitta has not served any period as the Relief Supervisor for SFRA, the position to which he was appointed. The retaliatory decision has resulted in his having the job on paper but not actually doing the job.

60.     In a meeting held on November 9, 2021 with SSRA Luther Seals (the SSRA for SFRA), Mr. Fertitta asked why the SAC would not allow him to work out of the SFRA to which SSRA Seals responded that SAC Bujanda said words to the effect of, "We don't want to reward people for making complaints."

61.     Between July 2021 and March 2022, SAC Bujanda allowed four other agents to move from the Albuquerque RA to the Santa Fe RA (two agents), Farmington RA (one agent), and Las Cruces (one agent) but did not require those agents to use their OP.  To the best of Mr. Fertitta's knowledge, none of those four agents made an EEO complaint nor were required to leave

11

work on a regular basis for medical treatment.

62.     On October 22, 2021, Mr. Fertitta filed his DOJ-211 EEO complaint.

63.     On November 3, 2021, Agency Nurse Amanda Price told Mr. Fertitta that he needed to have a mental evaluation to determine his fitness to access to national security information, ability to use a weapon, and to see if Mr. Fertitta was a danger to himself and others. Mr. Fertitta found this request odd because the Agency had declared him fit for duty on September 9, 2021.

64.     Ms. Price told Mr. Fertitta that, although the Agency was previously aware of Mr. Fertitta's PTSD, the diagnosis was "now an issue."

65.     An FBI Human Resources Division Policy Memo of May 2021, titled "Mental Health and Wellness Lines of Effort" specifically states FBI Agents seeking medical or mental health assistance, including the taking of medications, related to military, combat, and/or first responder service are not required to be reported to the FBI.

66.     On January 12, 2022, Ms. Price directed Mr. Fertitta to complete form FD-948: Certificate of Essential Duty Status. Mr. Fertitta called Ms. Price to get context behind the request. Ms. Price responded that she was "afraid to put anything in writing" but that an unidentified "ASAC" made a request (through Ms. Price's boss) because the Agency management doubted the necessity of Mr. Fertitta's medical absences.

## V.     VIOLATIONS OF THE REHABILITATION ACT

67.     Plaintiff realleges and incorporates by reference the foregoing allegations of the Complaint.

### (Count I – Discrimination)

68.     To create a jury issue on disparate treatment under the Rehabilitation Act a

plaintiff must show "he suffered an adverse employment action because of his disability. *Brown v. Austin*, 13 F.4th 1079, 1092 (10th Cir. 2021). An adverse employment action is one that causes a significant change in employment status or benefits. *Id.* The "disability" prong of a Rehabilitation Act discrimination claim includes both a disability as well as a "record of impairment." *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1132 (10th Cir. 2003) ("[T]he record-of-impairment standard is satisfied only if she actually suffered [an impairment] that substantially limited one or more of her major life activities.").

69.    Here Mr. Fertitta has a record of impairment as it relates to the VA medical treatment from approximately July 2018 to the present to treat his hearing disability.

70.    Mr. Fertitta's hearing impairment is permanent. It significantly affects the major life activity of hearing.  Indeed, Mr. Fertitta's hearing disability was so severe that the military saw fit to order him to military duty to treat that disability for 9 separate days over a four-month period spanning December 2020 through March 2021.  This does not include sick leave days taken by Mr. Fertitta days prior to and during this period when receiving treatment at the VA Medical Center.

71.    Mr. Fertitta informed Mr. Giles of his hearing disability verbally on or about December 20, 2020, December 28, 2020, and again via email on or about January 4, 2021.

72.    On or about December 20, 2020, Mr. Fertitta also told Mr. Giles that he needed to be on active military duty to obtain treatment for those disabilities.

73.    Mr. Giles, having a documented history of being preoccupied with "stats" or statistical accomplishments,  presumably felt  Mr. Fertitta's absence would have a negative impact on the HUMINT Squad's perceived performance denied Mr. Fertitta's May 2021 PRS application.

13

74.     Mr. Giles denied Mr. Fertitta's May 2021 PRS application (and subsequent applications) because of his disability or record of impairment.

75.     Defendant's acts/omissions cased Mr. Fertitta damages in an amount to be proven at trial.

### (Count II – Retaliation)

76.     To state a claim for retaliation under the Rehabilitation Act the plaintiff must show "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1051 (10th Cir. 2011) (quoting *Proctor v. UPS*, 502 F.3d 1200, 1208 (10th Cir. 2007)). "Regarding the second element, an adverse action is generally one that causes a significant change in employment status or benefits." *Brown v. Austin*, 13 F.4th 1079, 1090 (10th Cir. 2021).

77.     Here, Mr. Fertitta engaged in protected activity on September 2, 2021 by telling management he initiated the EEO process and was retaliated against when the Agency engaged in adverse treatment by giving him the PRS job but required he supervise his new charges from a place nearly 50 miles away.

78.     To move closer to his squad, the Agency required Mr. Fertitta to use his OP, a value of $ 20,000.00, whereas the Agency did not require four similarly situated Agents to use their OP in order to move from Albuquerque to other RAs in New Mexico.

79.      Mr. Fertitta again engaged in protected activity on October 22, 2021 when he made his formal EEO complaint and the Agency retaliated in November 2021 and January 2022 by seeking additional medical information. This additional medical information can adversely

effect an FBI Agent's career because the issuing of a security clearance is at the discretion of each issuing "sponsor" (DOJ for FBI, DoD, CIA, etc).

80.    The Agency's request for these records right after Mr. Fertitta's official complaint was a clear message to warn him that he should not complain or he would be unemployable. A sponsor's interpretation of medical records is highly subjective and can result on the removal of a clearance for which there is no judicial recourse. In turn, the loss of a clearance effectively eliminates an agent's ability to be employed anywhere inside or outside the FBI in a national security capacity. Additionally, any related employment outside the FBI will ask as part of the application process about the status of security clearance.

81.    These unwarranted and retaliatory medical record requests also caused Mr. Fertitta to make multiple trips to the VA to determine how to deal with the requests which, in turn, required him to miss work and use of more sick time.

82.    The Agency recognizes that making a request for medical information is an adverse action.

83.    Defendant's acts/omissions cased Mr. Fertitta damages in an amount to be proven at trial.

## VI.    PRAYER FOR RELIEF

Mr. Fertitta respectfully prays for:

A.    Compensation for all injury and damages suffered by Mr. Fertitta including, but not limited to, economic damages in the amount to be proven at trial including back pay, pre and post judgment interest, negative tax consequences of any award, and general damages as provided by law;

B.    Plaintiff's reasonable attorney, expert fees, and costs, as otherwise provided by

law; and,

  C.  For such other and further relief as this Court deems just and equitable.

## VII. JURY DEMAND

  Plaintiff hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the

Federal Rules of Civil Procedure

  Respectfully submitted this 20th day of December 2022.

      Respectfully submitted,

      Attorneys for Plaintiff VALENTINE FERTITTA


     ROSARIO D. VEGA LYNN LAW OFFICES, LLC

     By:  */s/ Rosario D. Vega Lynn*
     Rosario D. Vega Lynn
     PO Box 65513
     Albuquerque, NM 87193
     Telephone: (505) 903-9411
     Email: rosariovegalynnlawfirm@outlook.com


     RIVERSIDE LAW GROUP, PLLC

     By: /s/ Matthew Z. Crotty
     MATTHEW Z. CROTTY, *Pro Hac Vice Pending*
     MATTHEW Z. MENSIK, *Pro Hac Vice Pending*
     905 West Riverside, Suite 404
     Spokane, WA 99201-0300
     Telephone: (509) 850 7011
     Email: mzc@riverside-law.com
         mam@riverside-law.com