IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| VALENTINE FERTITTA,<br><br>         Plaintiff,<br>v.<br><br>MERRICK GARLAND, in his official capacity as Attorney General of the United States of America,<br><br>         Defendant. | Civil Action No. 22-966-GJF/SCY |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

  **I.  INTRODUCTION & SUMMARY OF ARGUMENT**

  Plaintiff Valentine Fertitta, a career FBI Agent, alleges retaliation under the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791, *et. seq*. ("Rehabilitation Act"). His claim stems from events that began in 2021, when he filed an Equal Opportunity Employment (EEO) complaint against his supervisors at the FBI's Albuquerque Division—SAC Raul Bujanda, ASAC Amy Kaskel, and SSA Percy Giles—alleging disability discrimination and retaliation. Plaintiff contends that, in response, these supervisors deliberately submitted false allegations about him to the FBI's Security Division, leading to a referral for a "lack of candor" investigation in June 2022[1]. The allegations underlying the referral—claims that Plaintiff had mishandled protected information, improperly signed an official document, and engaged in a house-flipping business—were based on incidents that allegedly occurred more than two years earlier and had previously been dismissed

---

[1] It was not until September 2023 that Mr. Fertitta became aware of the 2022 referral - - - which case weeks after he initiated an administrative whistleblower claim predicated on the facts germane to this lawsuit. (Doc. 103, ¶17, 18)

1

or debunked by FBI records and other management personnel. Plaintiff asserts that the referral was a calculated act of retaliation designed to undermine his career by threatening his security clearance, which is essential for continued FBI employment. (Doc 69 at 5, 68, 70-71, 80-82, 103-104, 108).

Rather than addressing the merits of Plaintiff's claims, Defendant now seeks to prevent this case from moving forward "on any and all claims . . . relating to the investigation currently being conducted by the FBI's Security Division" by arguing that the Court lacks subject matter jurisdiction and that Plaintiff failed to exhaust administrative remedies. (Doc 101 at 1). However, these arguments are unavailing.

***First***, Plaintiff's claims fall squarely within the framework established in *Rattigan v. Holder*, 689 F.3d 764 (D.C. Cir. 2012), which makes clear that Title VII claims are not precluded when agency employees knowingly submit false security-related information with a retaliatory or discriminatory motive. (*See* Doc 69). The EEO office confirmed the legitimacy of this claim by formally accepting it for investigation on December 7, 2023. (ECF 101-2 at 1). Additionally, Plaintiff's Amended Complaint fully sets forth these allegations, and at this stage, the Court must construe all well-pled facts in his favor. *Sanchez v. Guzman*, 105 F.4th 1285, 1299 (10th Cir. 2024).

***Second***, Plaintiff properly exhausted his administrative remedies before filing suit. While Defendant selectively presents only limited portions of the EEO filings in matter FBI-2024-00003 (Valentine Fertitta IV), Plaintiff submits a more complete context of the Equal Employment Opportunity Affairs Office's Report of Investigation (ROI), which supports his claims.

***Third***, Defendant's motion appears to be part of a broader effort to shield key witnesses and obstruct discovery into the retaliatory conduct of Plaintiff's former supervisors. *See* Doc 85 at 2-3 (Plaintiff's motion to compel, seeking answers and information on the referrals made to the

Security Division); *see also* (Doc 102). Defendant's filings seek to foreclose essential depositions and restrict access to evidence that would establish the knowing submission of false information. (*See* Defendant's Emergency Motion to Vacate Remaining Pre-Trial Deadlines and Trial Setting, Doc 91 at 4 ("If the Court grants [Defendant's motion to dismiss] and dismissed claims relating to the Security Division's investigation, then those issues are not proper topics for discovery."); Defendant's Motion for Protective Order, Doc 95 at 2 ("The Government contends the scheduled depositions of Percy Giles, Raul Bujanda, and Amy Kaskel will likely include questioning about the security clearance investigation").

## II. RESPONSE TO STATEMENT OF FACTS

1. Plaintiff does not dispute paragraphs 1, 5, 6 and 8.

2. Defense facts 2, 3 & 4 are misleading and incomplete. Plaintiff's EEO complaint includes more allegations than Defendant included, and Plaintiff's full allegations were included in his signed, sworn statement, that was submitted to the EEO. *See* Plaintiff's Additional Facts A & F, below. Those facts will not be set forth in their entirety here to avoid unnecessary duplication.

3. Regarding Defense fact 7, Plaintiff mentions his wife, Emily Fertitta, and calls out that there was "no reason for [Liston Smith of FBI Security Division] to go through Emily to attempt to reach Plaintiff. Further, Plaintiff's sworn statement, provided as part of the EEO's Report of Investigation (ROI) in FBI-2024-00003 (Valentine J. Fertitta IV), provides:

> Even after making direct contact with the SecD investigators, advising them I had by FBI cellular phone, access to FBI greenside Email, providing my current military contact information, and requesting they not involve my wife, they again insisted on contacting my wife. This action appear to me and my wife to be a subterfuge to gain compliance and induce stress in the situation. My wife, Special Agent Emily Fertitta, did make a verbal report to her SSA regarding this activity.

*Declaration of Matthew Z. Crotty in Opposition to Defendant's Motion to Dismiss ("Crotty*

3

*Decl."),* ¶ 3, Ex. A, FBI 00064-65.

### III. PLAINTIFF'S ADDITIONAL FACTS.

A. On or about October 25, 2023, Plaintiff filed a form DOJ-201A and accompanying statement to the EEO, reporting "an instance of retaliation relating to the existing EEO case FBI-2021-00193." (Doc 101-1 at 6). Plaintiff had previously contacted an EEO counselor on October 2, 2023. *Crotty Decl.*, ¶ 5. Plaintiff's statement to the EEO outlines that he was being interviewed and investigated for:

> [A]lleged misconduct referred to FBI HQ by management of the Albuquerque Division (AQ) of the FBI, three of whom, the SAC [Bujanda], ASAC [Kaskel], and SSA [Giles], I previously accused of disability discrimination and retaliation. *Those same managers who made the referral are named in my federal lawsuit against the FBI. The allegations* are related to actions from over two and a half years ago *and were clearly refuted by FBI records* and by other FBI management personnel in May and June of 2021.

(Doc 101-1 at 4) (emphasis added). Plaintiff set forth that he was being investigated for "candor issues" that allegedly occurred two years prior. *Id*. at 5-6.

> Again, if the below allegations are of merit, and executive management of FBI AQ and FBI Security Division believe I am a National Security threat with 'Candor issues" why then did they wait over two years to refer the instance to FBI HQ? Note, in June of 2021, when these allegations were originally made by my SSA after I reported his violation of FBI Policy Guide 1074, I requested, in writing, to the AQ SAC that he move to acquire the Sentinel logs that showed these allegations to be false.

(Doc 101-1 at 6).

B. On December 7, 2023, the EEO advised that it has accepted for investigation "Whether [Plaintiff] was subjected to reprisal for prior EEO activity when, allegedly, in or about September 2023 he learned that in 2022 he had been referred to the Security Division for 'lack of candor.'" (Doc 101-2 at 1).

4

C. On or about May 31, 2024, the Office of Equal Employment Opportunity Affairs issued its Report of Investigation (ROI) in FBI-2024-00003 (Valentine J. Fertitta IV). (Doc 100-1 at 6).

D. The ROI includes signed sworn statements from the Plaintiff, Marvin Garcia (Chief Security Officer of FBI Albuquerque office), Raul Bujanda, and Arseni Giulio (Security Division). *Crotty Decl.*, ¶ 3, Ex. A, page FBI 00002.

E. Giulio J. Arseni, the Unit Chief of the Clearance Referral Evaluations Unit of the FBI's Security Integrity and Investigations Section, testified in a sworn statement that, "I am aware the referral for Fertitta was received on June 7, 2022, and it came from the FBI's Insider Threat Office (InTo). Upon further review of Javelin entries, it was noted that a security investigation was opened on Fertitta *due to security concerns relating to mishandling protected information, and personal conduct*." (Doc 100-1 at 11-12).

F. The ROI includes Plaintiff's claims, in the form of a sworn statement, regarding his referral to the Security Division for mishandling information, "lack of candor," including the "double signing" incident and the "house flipping" incident. *Crotty. Decl.*, ¶ 3, Ex. A, FBI 000066-70. Plaintiff summarized as follows:

> The totality of these facts makes me believe the double signing of my application is being purposely misrepresented to support the retaliatory SecD referral and attempt to cloak the original FBI policy violation…[o]r put differently, this SecD referral is in retaliation for my prior EEO activity….
>
> Another allegation referred to SecD was that I was involved in a house flipping business. This allegation illustrates the clear manipulation of facts in an attempt to justify a charge of misconduct and thus shows a clear retaliatory intent of the entirety of the referral to SecD.

*Crotty. Decl.*, ¶ 3, Ex. A, FBI00068-69.

G.  As required by regulation, Plaintiff waited over 180 days after filing the Agency-internal EEO complaint before bringing retaliation related claims in this Court, and after receiving the ROI. *See* Plaintiff's July 23, 2024, Motion to Amend Complaint (Doc 63).

H.  Plaintiff's intent to amend his complaint to include the Security Division referral retaliation claim was reiterated during a December 5, 2023, scheduling conference. (Doc. 43) When the exhaustion timeframe expired Plaintiff, without opposition from Defendant, amended his complaint to include the claim Defendant now seeks to dismiss. (*Compare* Doc. 63 Motion to Amend *with* Doc. 68 Order Granting Motion to Amend ("the Court considers Defendant's failure to respond in opposition by the extended deadline of 8/9/2024, as consent to grant the motion.")). At no time did Defendant raise any "jurisdictional" or "futility" defenses.

I.  Plaintiff's Amended Complaint (Doc 69) set forth the basis for his retaliation claims in Paragraphs 54-93, with the allegations that SAC Bujanda, SSA Giles, and ASAC Kaskel referred information clearance-review personnel they knew to be false with a retaliatory or discriminatory motive. (Doc 69 at 5, 68, 70-71, 80-82, 103-104, 108).

J.  The loss of security clearance is devastating to an FBI Agent's career and effectively eliminates an agent's ability to be employed anywhere inside or outside the FBI in a national security capacity. Any related employment outside the FBI will ask as part of the application process if the applicant has ever had their clearance or access removed for any reason. If the answer is "yes," that individual is virtually unemployable. *Declaration of Valentine Fertitta IV ("Fertitta Decl.")*, ¶ 4-7.

### IV.     ARGUMENT

**A.     The Court enjoys subject matter jurisdiction over Plaintiff's claims relating to the "lack of candor" referral to the Security Division.**

   ***1.     Plaintiff's Claims Under <u>Rattigan v. Holder</u>, 689 F.3d 764, 770 (D.C. Circuit 2012, and fall outside of <u>Egan</u>.***

Relying on *Department of Navy v. Egan*, 484 U.S. 518 (1988), Defendant contends that this Court is categorically barred from reviewing security clearance-related matters—including Defendant's investigation into Plaintiff: "The bar on judicial review [of security clearance decisions] goes beyond final decisions to deny or revoke a security clearance – the investigation itself and *the reasons for the initiation of the investigation* are also beyond the Court's review." (Doc 101 at 6) (emphasis added). This is not an accurate assessment of the law.

In *Rattigan v. Holder*, the D.C. Circuit squarely addressed held that *Egan* does not shield agency employees who fabricate security concerns with retaliatory or discriminatory intent. 689 F.3d 764 (D.C. Cir. 2012). The plaintiff in that case "alleged that FBI officials retaliated against him in violation of Title VII of the Civil Rights Act of 1964 when, by reporting unfounded security concerns to the Bureau's Security Division, they prompted an investigation into his continued eligibility for a security clearance."[2] *Rattigan*, 689 F.3d at 765. The *Rattigan* court held that, while security clearance determinations themselves may be unreviewable, claims based on false information given with discriminatory or retaliatory intent fall within Title VII's protections. *Id.* at 668, 771.

The DC Circuit explicitly rejected the idea that all security clearance-related claims are beyond judicial review: "[W]e adhere to our holding that *Egan's* absolute bar on judicial review

---

[2] As set forth in the declaration of the Plaintiff, the revocation of an FBI agent's security clearance is tantamount to an FBI career death sentence. *Fertitta Decl.*, ¶ 4-7.

*covers only* security clearance-related decision made by trained Security Division personnel *and does not* preclude all review of decisions by other FBI employees who merely report security concerns." *Id.* at 768 (emphasis added). The court explained that "the agency's expertise in security matters and its sensitivity to the Executive's broad reporting standard have little relevance to whether an employee has reported knowingly false information." *Id*. at 771. "For all of these reasons, we hold that Rattigan's Title VII claim may proceed only if he can show that agency employees acted with retaliatory or discriminatory motive in reporting or referring information that they knew to be false." *Id.*

In further narrowing the holding of *Egan*, the *Rattigan* court explained: "[T]he Security Division cannot possibly be assisted by employees who knowingly report false[3] information—that is, outright lies—about fellow employees." *Id.* Further solidifying this holding, the *Rattigan* Court continued "[w]ere we to declare all reporting-based claims nonjusticiable, federal employees could no longer seek redress for the harm caused when a coworker fabricates security concerns in retaliation for statutorily protected activity, and Congress's purpose in enacting Title VII would be frustrated." *Id.* at 771.

*Rattigan* cuts directly against Defendant's claim that Court lacks subject matter jurisdiction over "any and all claims" asserted by Plaintiff "relating to the investigation currently being conducted by the FBI's Security Division." *Rattigan* holds otherwise, and the Tenth Circuit has not directly addressed the question. The Court should adopt *Rattigan's* well-reasoned analysis.

### 2. *The Amended Complaint Sets Forth Plaintiff's Retaliation Claims Under Rattigan.*

Construing the complaint liberally, and accepting as true all well-pled facts and viewing

---

[3] SSA Giles has a documented history of making false statements in the course of his employment with the FBI. (Doc 105-1 at 4)

all reasonable inferences in favor of the Plaintiff, Plaintiff's Amended Complaint (ECF 69) sets forth the basis for his retaliation, which are reviewable under *Rattigan*. Specifically, Plaintiff alleges that SAC Bujanda, SSA Giles, and ASAC Kaskel knowingly provided false information to clearance-review personnel to retaliate against Plaintiff for his prior EEO activity. (Doc 69 ¶¶ 5, 68, 70-71, 80-82, 103-04, 108).

The Amended Complaint contains detailed allegations surrounding the false and retaliatory referral. Plaintiff alleges that FBI investigators told him the referral to headquarters originated from FBI Albuquerque management and would have required forwarding by SAC Bujanda. (Doc 69 ¶ 68). Investigators also stated that Bujanda, Giles, and Kaskel accused Plaintiff of intentionally "double signing" his application for the PRS position in violation of FBI policy—despite the fact that double signing was a known system glitch that had been resolved years earlier. (*Id.* ¶ 70). Additionally, investigators questioned Plaintiff about alleged involvement in a "house flipping" business, an accusation Plaintiff traces back to Giles. (*Id.* ¶ 71). Plaintiff points out the inconsistency of these security concerns, noting that if the FBI truly believed he was a national security risk, they would not have left him with access to classified nuclear weapons information for years. (*Id.* ¶ 72).

The Amended Complaint further alleges that revoking or suspending an agent's security clearance—effectively ending their career—is a known form of FBI retaliation, as confirmed by a DOJ advisory memorandum. (*Id.* ¶ 81). Plaintiff asserts that the misconduct allegations referred to the Security Division were driven by Bujanda, Giles, and Kaskel, the same individuals named in this lawsuit. (*Id.* ¶ 82). Finally, Plaintiff alleges that the FBI has continued to retaliate against him after he filed this lawsuit. (*Id.* ¶ 108).

...

Plaintiff admits that he believes the FBI's security investigation itself is retaliatory (and portions of the Amended Complaint spell that out). But that belief does not preclude Plaintiff from pursuing his properly pled, and properly exhausted *Rattigan* claims for a knowingly false referral to the Security Division. Further, Plaintiff's Amended Complaint was not filed in a vacuum, as it was timely filed on the heels of the EEO complaint and investigation in which Plaintiff set forth the specific conduct at issue. *See, e.g.*, Additional Fact F.

### 3. *Defendant's Attack on Rattigan is Misplaced.*

Defendant attempts to undermine the holding in *Rattigan* by characterizing it as an "outlier decision." However, the case law cited by Defendant—two district court decisions (one of which is unpublished)—provides a thin reed for this position. (*See* ECF 101 at 8-9). Defendant attempts to distinguish *Rattigan* by citing *Hall v. U.S. Dept. of Labor Admin Review Bd.*, 476 F.3d 847, 853 (10th Cir. 2007), a case that does not address whether agency employees acted with retaliatory or discriminatory motive in reporting or referring information they knew to be false, *see id.*, generally, and by citing *Becerra v. Dalton*, 94 F.3d 145, 149 (4th Cir. 1996), a case that predates *Rattigan* by sixteen years and also did not address fact pattern set forth in *Rattigan*. Again, the Tenth Circuit has not addressed this exact question.

In a brief nod to the validity of *Rattigan*, Defendant argues, "[h]ere, Plaintiff has not even alleged, let alone shown that any knowingly false security reports were made." (ECF 101 at 10) Defendant's argument is not accurate, considering everything that Plaintiff set forth above, and the lens through which the Court must view the allegations in the Amended Complaint.

Finally, Defendant argues that "Plaintiff has not received a favorable security clearance decision, and therefore, *Rattigan* does not apply." (ECF 101 at 10). This requirement is not found in *Rattigan*. *Rattigan* made clear that it is for the jury to decide whether Plaintiff's managers

knowingly made false reports to the Security Division. *Rattigan*, 689 F.3d at 772. There is no requirement that a favorable security clearance decision be made first. *Id*. In fact, *Rattigan* says the opposite:

> Under a knowingly false standard, whether the information reported was sufficient to 'raise[ ] doubts' about the plaintiff's eligibility for a security clearance is irrelevant; the only question is whether the reporting employee actually knew at the time of the reporting that the information he provided was actually false. The limited scope of this inquiry would also alleviate the government's (and Egan's) concerns about conflicting evidentiary standards, for juries would apply the preponderance standard only to determine whether the employee knowingly reported or referred false information and would make no judgments, under any standard, as to whether the plaintiff's continued access to classified information was clearly consistent with national security.

*Id*. at 770. Even the mere questioning of an applicant's clearance by a prior employer will render the individually virtually unemployable, *Fertitta Decl.*, ¶ 5-6, which is another reason why a favorable security clearance is not necessary.

The Court enjoys subject matter jurisdiction over Plaintiff's retaliation claim under Rattigan, and the Court should deny Defendant's motion.

**B.        This Court has jurisdiction because Plaintiff exhausted his administrative remedies and the FBI investigated his claims.**

        ***1.   Failure to exhaust is not a jurisdictional bar.***

As a starting point "failure to file an EEOC charge regarding a discrete employment incident merely permits the employer to raise an affirmative defense of failure to exhaust but does not bar a federal court from assuming jurisdiction over a claim." *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1185 (10th Cir. 2018).

        ***2.   The purpose of EEO counseling process is <u>not to compile a record for judicial review</u> but to allow the agency to attempt to informally resolve and investigate the claim — which happened here.***

11

The FBI's arguments ignore (a) that the "purpose of informal EEO counseling … is designed to enable the agency and its employee 'to try to informally resolve the matter before an administrative charge is filed'" (b) the "***purposes of counseling and mediation are not to compile a record for judicial review but instead simply to afford the employee and the employing office an opportunity to explore and possibly resolve the employee's claims informally***," (c) that "[w]here counseling produces sufficient information to enable the agency to investigate the claim, that purpose has been served" because (d) "[t]o hold otherwise would turn the informal counseling requirement into a trap for unwary counselees rather than a step toward remediation, and it would violate the principle that 'Title VII's exhaustion requirement should not be read to create useless procedural technicalities.'" *Miles v. Kerry*, 961 F. Supp. 2d 272, 287 (D.D.C. 2013) (emphasis added) (citing *Blackmon–Malloy v. U.S. Capitol Police Bd.,* 575 F.3d 699, 711–12 (D.C. Cir. 2009); *Artis v. Bernanke*, 630 F.3d 1031, 1034 (D.C. Cir. 2011); *President v. Vance*, 627 F.2d 353, 362 (D.C. Cir. 1980)). District courts of this circuit are in accord. *Rodriguez-Ortega v. Rich*, 2023 WL 1861422, at *10 (D.N.M. Feb. 9, 2023) (citing *Taylor v. W. and S. Life Ins. Co.*, 966 F.2d 1188, 1195 (7th Cir. 1992) (***explaining that Title VII plaintiff does not have to allege in an EEOC charge each and every fact that combines to form the basis of each claim***)).

With this context in mind, Plaintiff gave the EEO Counselor sufficient information to investigate his claims, and the FBI investigated those claims. "The ultimate question is whether 'the conduct alleged [in the lawsuit] would fall within the scope of an EEOC investigation which would reasonably grow out of the charges actually made [in the EEOC charge]." *Smith v. Cheyenne Ret. Inv'rs L.P.*, 904 F.3d 1159, 1164 (10th Cir. 2018) (internal quotations omitted). In this instance, Plaintiff's retaliation claims under *Rattigan* fell within the scope of the EEO complaint and investigation.

At the outset, the Court must liberally construe Plaintiff's allegations set forth in the EEO complaint. *Smith*, 904 F.3d 1164. And the Court should consider that the EEO fully understood what Plaintiff was conveying in his EEO complaint. On December 7, 2023, the EEO advised that it has accepted for investigation "Whether [Plaintiff] was subjected to reprisal for prior EEO activity when, allegedly, in or about September 2023 he learned that in 2022 he had been referred to the Security Division for 'lack of candor.'" (ECF 101-2 at 1). That was based upon Plaintiff's complaint that "alleged misconduct referred to FBI HQ by management of the Albuquerque Division (AQ) of the FBI, three of whom, the SAC [Bujanda], ASAC [Kaskel], and SSA [Giles], I previously accused of disability discrimination and retaliation. Those same managers who made the referral are named in my federal lawsuit against the FBI." (ECF 101-1 at 4). Plaintiff set forth that he was being investigated for "candor issues" that allegedly occurred two years prior, and that evidence "showed these allegations were false." *Id*. at 5–6.

Further, the EEO ROI includes Plaintiff's claims, in the form of a sworn statement, regarding his referral to the Security Division for "lack of candor," including the "double signing" incident and the "house flipping" incident. Plaintiff stated:

> The totality of these facts makes me believe the double signing of my application is being purposely misrepresented to support the retaliatory SecD referral and attempt to cloak the original FBI policy violation…[o]r put differently, this SecD referral is in retaliation for my prior EEO activity….
>
> Another allegation referred to SecD was that I was involved in a house flipping business. This allegation illustrates the clear manipulation of facts in an attempt to justify a charge of misconduct and thus shows a clear retaliatory intent of the entirety of the referral to SecD.

*Crotty Decl.*, ¶ 3, Ex. A, FBI00068-69.

Plaintiff's EEO claims carried over into the Amended Complaint. As set forth above, the

13

allegations Plaintiff's Amended Complaint (ECF 69) sets forth the basis for his retaliation claims under *Rattigan*, with the allegations that SAC Bujanda, SSA Giles, and ASAC Kaskel referred information clearance-review personnel they knew to be false with a retaliatory or discriminatory motive. (ECF 69 ¶¶ 5, 68, 70–71, 80–82, 103–04, 108).

### 3. *Plaintiff complied with the statutory and regulatory exhaustion requirements.*

The governing statute is the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791, *et seq.*, ("Rehabilitation Act"). Defendant does not claim that Plaintiff failed to comply with the relevant deadlines. Plaintiff waited 180 days after filing the Agency-internal EEO complaint (October 25, 2023) before bringing retaliation related claims in this Court. (*See* Doc 69, Amended Complaint) Plaintiff properly exhausted and amended his federal complaint accordingly.

### C. *The True Purpose of Defendant's Motion is to block discovery into Plaintiff's meritorious claim.*

With *Rattigan* in mind, the available evidence is clear that at least one or all of Plaintiff's managers identified above,[4] outright lied about security concerns regarding Plaintiff (*e.g.*, running a house flipping business, knowingly double signing an Electronic Communication (or "EC"), and then trying to conceal his double signing of the EC, being an "insider threat," and violating regulation by downloading unclassified information and forwarding that information to a personal email system even though such conduct is not forbidden by FBI policy).

The "double signing" incident is one of the key allegations in this case. During Plaintiff's September 2023 interview, an FBI investigator questioned him about events central to this lawsuit, including SSA Giles' failure to process Plaintiff's promotional application and the claim that

---

[4] Likely at least SSA Giles, but Plaintiff cannot confirm that because the SecD investigator refused to disclose at deposition who he interviewed and what those individuals said.

Plaintiff's alleged double signing of a document amounted to "lack of candor." (Doc 104-2 at 58:15-25; 59:1-12; 70:6-10; 80:8-25; 81:1-25; 82:1-18).

The investigator asserted that a witness reported Plaintiff had intentionally concealed the double signing and only admitted to it after being confronted by SAC Raul Bujanda. (*Id.* 71:5-9). However, this claim is false and falls squarely within the purview of *Rattigan*. Plaintiff's former supervisor, Luther Seals, who had firsthand knowledge of the situation, testified in his deposition that Plaintiff did not attempt to hide the double signing. Mr. Seals also confirmed that there is no documentary evidence showing that the PRS application ever reached SAC Bujanda. (Doc 104-5 at 27:12-22; 28:7-15; 29:16-22; 30:17-23).

Despite the investigation being open since June 2022, no one from the Security Division ever contacted Mr. Seals—the key witness—about the double signing before his December 5, 2024 deposition.[5] (*Id.* 30:24-25; 31:1-12). This failure to investigate a primary witness raises serious doubts about the legitimacy of the referral and supports Plaintiff's claim that the investigation itself was retaliatory and based on information Giles knew was false but conveyed to SecD to get revenge on Mr. Fertitta.

During the interview, the investigator also questioned Plaintiff about whether he ran a "house flipping" business. (Doc 104-2 at 96:10-25; 97:1-25; 98:1-25; 99:1-10). Plaintiff does not run (nor never has ran) a house flipping business. (Doc 103 at ¶ 3-7, 10) The only possible source of this inquiry appears to be a passing remark made by SSA Giles. While visiting Plaintiff's home and noticing recent renovations, SSA Giles remarked to Plaintiff words to the effect of "So you

---

[5] At deposition the investigator was shown an email from Mr. Seals wherein Mr. Seals made clear that Plaintiff made no attempt to hide his double signing of the EC and likely inadvertently double signed it because he (Plaintiff) was with his father in the emergency room as his father had experienced a near fatal car accident. (Doc 104-2 at 94:12-24; 95:1-25).

guys are like those couples on TV . . . House flippers and all." Plaintiff told SSA Giles that was not the case. *Id.* ¶ 4. The fact that the investigator knew to ask about this uniquely specific "house flipping" issue shows SSA Giles' involvement in the referral to the Security Division and his knowing submission of false information to the Security Division for the purpose of retaliating against Plaintiff. *Id*. ¶ 10.

Under *Rattigan*, (1) the name of the referring individual, (2) the information that was referred and when, (3) the circumstances surrounding the referral, and (4) how the information was received and processed, are all directly relevant to the question of whether an agency employees acted with retaliatory or discriminatory motive in reporting or referring information that they knew to be false.[6] Plaintiff is attempting to obtain this information, and Defendant is stonewalling that effort. See e.g., (Doc 85). Deposing SSA Giles, ASAC Kaskel, SAC Bujanda, and the relevant FBI investigators is necessary not only to flesh out who initiated the retaliatory Security Division report and the basis for doing so but also to help Plaintiff prove his other disability discrimination and retaliation claims.

D.      *The Court should grant leave to Amend.*

The FBI quibbles with some phrasing of Plaintiff's Amended Complaint, alleging it does not match, word for word, the issue investigated at the administrative stage. (Doc. 101, p. 13) In the event the Court finds merit to the FBI's argument, Plaintiff respectfully requests leave to amend to clarify that the *Rattigan* Security Division referral retaliation claim he brings before this Court is the same one he timely filed and had investigated at the administrative level. *Quintana v. Core Civic (C.C.A.)*, 504 F. Supp. 3d 1224, 1238 (D.N.M. 2020) ("The Court will grant Quintana an

---

[6] To be clear, Plaintiff believes that the Security Division investigation is a sham investigation, as demonstrated by the depositions to date. But that has no bearing on his *Rattigan* claims.

16

opportunity to amend to remedy the defects in his pleading.).  Allowing such will not prejudice the FBI as the case scheduling order has been stricken and Plaintiff, has not been deposed.

Respectfully submitted this 31st of January 2025.

        ROSARIO D. VEGA LYNN LAW OFFICES, LLC

        By:    */s/ Rosario D. Vega Lynn*
        Rosario D. Vega Lynn
        PO Box 65513
        Albuquerque, NM 87193
        (505) 903-9411
        Email: rosariovegalynnlawfirm@outlook.com

        RIVERSIDE NW LAW GROUP, PLLC

        By:   *Matthew Z. Crotty*
        Matthew Z. Crotty
        Matthew Z. Mensik
        905 W. Riverside Ave. Ste. 208
        Spokane, WA 99201
        (509) 850-7011
        Email: mzc@rnwlg.com

        Attorneys for Plaintiff VALENTINE FERTITTA

**CERTIFICATE OF SERVICE**

      I certify that on January 31, 2025, I caused the forgoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

                                            *//Matthew Z. Crotty*
                                            MATTHEW Z. CROTTY
                                            Riverside NW Law Group, PLLC
                                            905 W. Riverside Ave, Suite 208
                                            Spokane, WA 99201
                                            Telephone:   (509) 850-7011
                                            Email: mzc@riverside-law.com