UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

VALENTINE FERTITTA,

        Plaintiff,

v.                                    Civ. No. 1:22-966 GJF/SCY

PAMELA BONDI, in her
official capacity as Attorney General
of the United States,

        Defendant.

MEMORANDUM OPINION AND ORDER ON
DEFENDANT'S MOTION TO DISMISS
OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

THIS MATTER is before the Court on Defendant's Motion to Dismiss or in the Alternative for Summary Judgment ("the Motion"), which is fully briefed. ECFs 101, 109, 114. Having thoroughly considered the motion, briefs, pleadings, supplemental authority and responses thereto [ECFs 117–21], and applicable law, the Court will **GRANT** the Motion and **DISMISS** for lack of subject matter jurisdiction any claims that relate to referrals made to the FBI's Security Division or to the Division's security investigation.

## I.    FACTUAL ALLEGATIONS[1]

Plaintiff is a Major in the United States Marine Corps Reserves ("USMCR") and, since 2014, has also worked as a Special Agent for the Federal Bureau of Investigation ("FBI"). ECF 69 ¶¶ 8–10. During times relevant to this case, he worked in the FBI's Albuquerque Office. *See id*. ¶¶ 12, 32, 44. Plaintiff alleges that, throughout 2020 and 2021, his military service required his

---

[1] The facts that follow come from Plaintiff's Amended Complaint [ECF 69]. The Court must accept all well-pled allegations therein as true, viewing them in the light most favorable to Plaintiff. *See Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009). Because the Court resolves Defendant's Motion solely on jurisdictional grounds and does not reach the issue of exhaustion, *see infra* Part V, it has omitted facts material only to the issue of exhaustion.

absence from the FBI, including for "military mandated medical appointments" to monitor and treat hearing loss and a vision anomaly identified by the USMCR. *Id*. ¶¶ 13–17. Plaintiff's FBI supervisor, Supervisory Special Agent ("SSA") Percy Giles, advised Plaintiff that Assistant Special Agent in Charge ("ASAC") Amy Kaskel was "upset" about his absences and expected him to "conduct FBI work while on military reserve status regardless of whether these military caused absences related to treating [his] disability impairments." *Id*. ¶ 18. Plaintiff responded with an e-mail to SSA Giles, insisting that ASAC Kaskel's demand that he perform FBI work while on military reserve status violated federal law. *Id*. ¶ 19.

Approximately four months later, Plaintiff applied for a position within the FBI as a Primary Relief Supervisor ("PRS") at the Santa Fe Resident Agency, but SSA Giles and ASAC Kaskel "refused to forward" his application to the Local Career Board for consideration. *Id*. ¶ 22. As a result, the application period for the PRS position closed with no applicants. *Id*. ¶ 23.

In a subsequent meeting with Special Agent in Charge ("SAC") Raul Bujanda, Plaintiff provided background information related to his PRS application, suggested that SSA Giles and ASAC Kaskel's "blocking" of that application violated FBI policy, and requested that the application be presented to the Local Career Board for consideration. *Id*. ¶ 26. Approximately three weeks later, SSA Giles summoned Plaintiff to his office and asked him about his meeting with SAC Bujanda. *Id*. ¶ 28. Plaintiff alleges that SSA Giles "berated [him] for his 'poor judgment'" in submitting his PRS application without SSA Giles' permission and in asking SAC Bujanda to intervene. *Id*. Afterward, SSA Giles completed a Performance Appraisal Rating ("PAR") in which he ranked Plaintiff as an "inconsistent performer," a rating Plaintiff had never received in his previous eight years of FBI service. *Id*. ¶¶ 28–29. According to Plaintiff, "SSA Giles stated that the basis for the 'inconsistent' PAR was that [Plaintiff] applied for the [PRS] position[] over [his] objections . . . and [those of] ASAC Kaskel." *Id*. ¶ 29. On June 23, 2021, Plaintiff emailed the

2

Agency EEO Counselor to seek guidance in filing a complaint concerning SSA Giles' denial of his PRS application. *Id*. ¶ 30.

In August 2021, Plaintiff again applied for the still-unfilled PRS position. *Id*. ¶ 35. Once again, SSA Giles "refused to forward his application." *Id*. ¶ 35. This time, SSA Giles told Plaintiff that he had not submitted a Supervisor Development Program ("SDP") rating along with his application. *Id*. ¶ 36. SSA Giles completed a new SDP form and, in contrast to the positive ratings Plaintiff received on an earlier SDP, marked Plaintiff as "Needs Improvement" in nearly every category. *Id*. ¶ 37.

On September 2, 2021, Plaintiff informed SSA Giles and ASAC Kaskel that he had invoked the EEO process in an effort to have his PRS application considered by the Local Career Board. *Id*. ¶ 39. Later that month, Plaintiff's application was presented to the Local Career Board, which convened for the sole purpose of reviewing his application. *Id*. ¶ 40. On September 22, 2021, the Agency informed Plaintiff that he had been "selected to serve as a PRS -- but . . . for an entity located in Santa Fe that [Plaintiff] did not work with on a regular basis." *Id*. ¶ 41. According to Plaintiff, the proposed PRS arrangement would have required him to supervise an entity in a location 49 miles away, rather than one geographically co-located with the Santa Fe Resident Agency squad. *Id*. ¶ 41. SAC Bujanda recommended that Plaintiff use his once-in-a-career Office of Preference selection to move near the Santa Fe squad. *Id*. ¶ 43. According to Plaintiff, numerous other agents who had not filed EEO complaints received interdivision transfers in 2021 and 2022 without being required to use their Office of Preference selection. *Id*. ¶¶ 43, 46.

On October 22, 2021, Plaintiff filed an EEO Complaint. *Id*. ¶ 47. A week and a half later, an Agency nurse notified Plaintiff that he was required to undergo a mental evaluation that would evaluate his fitness for access to national security information, his ability to use a weapon, and whether he was a danger to himself or others. *Id*. ¶ 48. When Plaintiff requested context for the

evaluation, the Agency nurse advised that an "unidentified 'ASAC' made a request . . . because the Agency management doubted the necessity of [Plaintiff's] medical absences." *Id*. ¶ 50. Plaintiff explains that "[t]his request [for] additional medication information is material to a[n] FBI Agent's career because the issuing of a security clearance is at the discretion of each issuing sponsor" and "can result [i]n the removal of a clearance for which there is no judicial recourse" and which would "effectively eliminate[] an agent's ability to be employed anywhere inside or outside the FBI in a national security capacity." *Id*. ¶ 104 (internal quotations omitted).

On December 20, 2022, Plaintiff filed the instant suit. ECF 1.

While Plaintiff was away performing military service for the USMCR, and despite the FBI having access to his up-to-date contact information, Liston Smith of the FBI Security Division contacted Plaintiff's wife, also a Special Agent with the FBI, requesting Plaintiff's contact information. *Id*. ¶¶ 54–55. When Plaintiff returned Smith's call, Smith advised that he needed to conduct a "procedural security interview" over the phone, which Plaintiff and Smith scheduled for September 12, 2023. *Id*. ¶ 56. The day before the telephonic interview was to occur, however, Smith advised that the interview would instead take place in person due to the "Top-Secret" nature of the material to be discussed. *Id*. ¶ 58. In advance of the security interview, Plaintiff sought clarification as to its purpose and nature, but none was provided. *Id*. ¶ 59. The in-person security interview took place at the Norfolk, Virginia FBI Field Office on September 27, 2023. *Id*. ¶ 60.

During the interview, Security Division investigators advised Plaintiff that the allegations against him were referred to FBI Headquarters by FBI management in Albuquerque and would have necessarily been forwarded by SAC Bujanda approximately one year prior. *Id*. ¶ 68. Plaintiff insists that "[i]t is clear the allegations of misconduct against [him] were referred to [the Security Division] by SAC Bujanda (or others acting at his direction) based on facts provided by former SSA Giles . . . and ASAC Kaskel." *Id*. ¶ 82.

During their questioning, the investigators asked Plaintiff about his forwarding of unclassified emails from an unclassified FBI e-mail account to an account outside of FBI systems. *Id*. ¶ 69. According to Plaintiff, this e-mail forwarding issue had previously been "addressed and resolved" by FBI Albuquerque's Chief Security Officer. *Id*. In addition, the investigators advised Plaintiff that SSA Giles, ASAC Kaskel, and SAC Bujanda alleged that he "verbally admitted to intentionally double signing his application for the PRS position in violation of FBI policy." *Id*. ¶ 70. According to Plaintiff, the reported double-signing was "unintentional" and occurred due to a known "glitch" in the computer system. *Id*. As with the e-mail forwarding, Plaintiff alleges that the double-signing issue had previously been "resolved." *Id*.

The investigators asked Plaintiff whether he had been engaged in a "house flipping" business. *Id*. ¶ 71. According to Plaintiff, "[t]he only person who could have conceivably provided [the Security Division] with this (bogus) 'house flipping' allegation is . . . SSA Giles[,] who (in 2021 while at [Plaintiff's] house) jokingly asked if [Plaintiff] was in the 'house flipping' business." *Id*. Plaintiff alleges that in response he assured SSA Giles that he was *not* in the "house flipping" business. *Id*. In addition to questioning him about e-mail-forwarding, double-signing, and house-flipping, the investigators showed Plaintiff various unclassified documents, including a 2018 document entitled "Observations and Recommendations," which Plaintiff describes as a document he authored that was "critical of the way the FBI conducts initial training and the treatment of women in the FBI academy." *Id*. ¶ 74.

Plaintiff contends that, following his September 27, 2023 security interview, the FBI then required his wife to report to FBI Headquarters—with less than one week's notice, under threat of disciplinary action, without the assistance of an attorney, and without the ability to invoke spousal privilege—where she was subjected to 16 hours of interviews "related to a 'National Security investigation' into [Plaintiff]." *Id*. ¶¶ 75–76.

Plaintiff asserts that if the FBI suspends, revokes, or affects his security clearance, he will be suspended without pay indefinitely without judicial recourse. *Id*. ¶ 81. He further alleges that "[t]he true intent of the investigation[] is to harass and intimidate the Fertitta family from continuing their EEO lawsuit against the FBI/DOJ." *Id*. ¶ 86.

## II.    APPLICABLE LAW

Motions to dismiss under Rule 12(b)(1) "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based." *Campos v. Las Cruces Nursing Ctr.*, 828 F. Supp. 2d 1256, 1265 (D.N.M. 2011) (quoting *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002) (internal citations omitted)). "On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a rule 12(b)(6) motion: the court must consider the complaint's allegations to be true." *Id*. (quoting *Alto Eldorado Partners v. City of Santa Fe*, No. Civ. 08-0175 JB/ACT, 2009 WL 1312856, at *8 (D.N.M. Mar. 11, 2009), *aff'd*, 634 F.3d 1170 (10th Cir. 2011) (internal citations omitted)). "But when the attack is factual, a district court may not presume the truthfulness of the complaint's factual allegations" and may "allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." *Id*. (citation omitted). "In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 [summary-judgment] motion." *Id*. (citation omitted).

Here, Defendant describes the jurisdictional challenge as a "facial" one [ECF 101 at 4] but also submits materials for the Court's consideration beyond the Amended Complaint. *See* ECF 101, Ex. A (Plaintiff's October 2023 EEO Complaint), Ex. B (Department of Justice letter identifying issue accepted for EEO investigation). Plaintiff, too, submits his own additional materials for the Court's consideration. *See* ECF 109, Ex. A (FBI's Report of Investigation), Ex.

B (sworn statement of Guilio J. Arseni, Unit Chief with the FBI), Ex. C (Plaintiff's Declaration). These extrinsic materials relate to the non-jurisdictional issue of exhaustion, however, which the Court does not reach here. *See infra*, Part V. Because the Court need not consider these extrinsic materials to resolve the *jurisdictional* question before it—whether the Court has subject matter jurisdiction over claims that relate to FBI referrals to its Security Division or to the security investigation—the Court declines the parties' invitations to convert Defendant's Motion into one for summary judgment. Instead, the Court resolves Defendant's facial jurisdictional challenge on the Amended Complaint under Rule 12(b)(1) without reference to extrinsic materials. While it is Plaintiff's burden to prove the Court has jurisdiction, *see Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 104 (1998), the Court accepts as true the well-pled facts in Amended Complaint and views all reasonable inferences in Plaintiff's favor.

## III.    PARTIES' PRIMARY ARGUMENTS

### A.  Subject Matter Jurisdiction

Defendant contends that the Court lacks subject matter jurisdiction over Plaintiff's claims that relate to his FBI security investigation pursuant to *Department of Navy v. Egan*, 484 U.S. 518 (1988) and its progeny. ECF 101 at 5. Defendant observes that, in *Hall v. U.S. Department of Labor, Administrative Review Board*, 476 F.3d 847 (10th Cir. 2007), the Tenth Circuit recognized that *Egan* precludes judicial review of employment law claims that challenge an Executive Branch agency's security clearance decision, its security investigation, or the reasons therefor. *Id*. at 6 (citing *Hall*, 476 F.3d at 852–53).

In response, Plaintiff urges the Court to adopt the reasoning of the D.C. Circuit in *Rattigan v. Holder*, which held that *Egan's* bar on judicial review of security clearance decisions does *not* extend to the knowing submission of false security referrals with retaliatory or discriminatory

intent. ECF 109 at 7–8. Plaintiff insists that his "claims fall squarely within the framework established in *Rattigan*" and are therefore justiciable. *Id*. at 2.

Defendant replies that Plaintiff does not offer compelling reasons why the Court should adopt the rationale in *Rattigan*, which it describes as an "outlier." ECF 114 at 5–6. Defendant further insists that even if the Court were to adopt *Rattigan*, doing so would not salvage Plaintiff's claims. *Id*. at 7–8. From Defendant's perspective, Plaintiff's claims focus on the *process* and *substance* of his security investigation, not the *referral* to the Security Division by FBI supervisors as in *Rattigan*. *Id*. at 8. Finally, Defendant argues that *Rattigan* is of no help to Plaintiff because, unlike Rattigan, Plaintiff has not alleged that he received a favorable security determination. *Id*. at 9.

### B.  Exhaustion

In the alternative, Defendant argues that Plaintiff's claims related to his FBI security investigation were not properly exhausted. ECF 101 at 14. Referring to Plaintiff's October 24, 2023 EEO complaint and to a response from the Department of Justice that identifies the issue accepted for EEO investigation, Defendant insists that Plaintiff did not exhaust a discrimination or retaliation claim based on the manner in which the investigators conducted the investigation, including with respect to their alleged treatment of Plaintiff's wife. *Id*. at 13–14. Instead, Defendant maintains that Plaintiff's EEO complaint and the resulting EEO investigation were limited to the issue of whether the *referral* to the Security Division for lack of candor was made in retaliation for prior EEO activity. *Id*.

In response, Plaintiff accuses Defendant of presenting only selective portions of the relevant EEO filings. ECF 109 at 2. Purporting to offer a "more complete context," he submits the EEO Affairs Office Report of Investigation, which he suggests supports his position that he

properly exhausted the claims in his Amended Complaint. *Id*. Specifically, because the Report of Investigation includes claims related to the allegedly retaliatory referral to the Security Division for lack of candor, Plaintiff insists that he exhausted his *Rattigan* claim. *Id*. at 13 (citing ECF 109-1 ¶ 3; ECF 109-2 at 35–36).

In reply, Defendant *agrees* that Plaintiff exhausted a claim that his FBI supervisors made a retaliatory referral to the Security Division but insists that Plaintiff omitted such a claim from his Amended Complaint. ECF 114 at 10. As for the security-investigation-related claims Plaintiff *did* include in his Amended Complaint, Defendant reiterates its position that "Plaintiff did not exhaust a discrimination or a retaliation claim based on the manner in which the investigators are conducting the investigation, or even the decision of the Security Division to initiate it." *Id*. at 14.

## IV.    ANALYSIS

In his Amended Complaint, Plaintiff asserts claims against Defendant for discrimination and retaliation in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 791, *et seq*. ECF 69 ¶¶ 1, 95–109. Although the Amended Complaint is not a model of clarity, the Court surmises that it includes a singular discrimination claim and at least three retaliation claims with various facets. First, in Count I, Plaintiff claims that Defendant violated the Rehabilitation Act when SAC Giles *discriminated* against him by denying his May 2021 PRS application and subsequent applications because of Plaintiff's disability or record of impairment. *Id*. at 96–101.

Count II is less straightforward. There, Plaintiff alleges that Defendant *retaliated* against him in violation of the Rehabilitation Act on various occasions, in various manners, and for various protected activity, including: (1) after Plaintiff told FBI management in September 2021 that he had initiated the EEO process, Defendant retaliated against him by giving him the PRS job but requiring that he supervise his new charges from a place nearly 50 miles away or, alternatively,

requiring that he use his Office of Preference selection to move closer to those he was supervising [*id*. ¶ 103]; (2) after Plaintiff made a formal EEO complaint on October 22, 2021, Defendant retaliated against him by seeking additional medical information, including a mental evaluation, and thereby threatening the revocation of his security clearance and his "ability to be employed anywhere inside or outside the FBI in a national security capacity" [*id*. ¶¶ 48, 104]; and (3) after Plaintiff filed the instant lawsuit, Defendant retaliated against him by engaging in the activity "described in paragraphs 52–93" of his Amended Complaint [*id*. ¶ 108]. Drawing all reasonable inferences from paragraphs 52–93 in Plaintiff's favor, the Court understands Plaintiff to allege that Defendant retaliated against him by (a) FBI management referring security-related allegations to FBI headquarters concerning issues that had been previously resolved or, in the case of an alleged house-flipping business, were "bogus" [*see id*. ¶¶ 68–71]; (b) conducting the security investigation itself in an improper manner and for improper retaliatory purposes[2] [*id*. ¶¶ 56–74]; and (c) declining to make any "definitive decision" on Plaintiff's September 2023 request for a "No Cost" transfer from New Mexico to Norfolk, Virginia, where his wife was transferred the previous year [*id*. ¶¶ 87–93]. In sum, paragraphs 52–93 relate to a security referral, the security investigation that followed, and an unrelated transfer request. *See id*. ¶¶ 52–93.

Defendant points to two problems with the "focus" of Plaintiff's claims: (1) the Court lacks jurisdiction to hear claims related to Plaintiff's security investigation; and (2) Plaintiff did not

---

[2] Among Plaintiff's complaints as to the manner in which the investigators have conducted the security investigation are their insistence on an in-person, unrecorded interview despite no classified documents being presented or discussed; their questioning Plaintiff on issues directly related to his lawsuit against the FBI; and their unnecessary contact with Plaintiff's spouse, ostensibly to obtain Plaintiff's contact information, and later requiring that she undergo on short notice an interview related to Plaintiff's security clearance, under threat of disciplinary action, without the assistance of counsel, and without the benefit of spousal privilege; *See, e.g*., ECF 69 ¶¶ 54–61, 74-76. In Plaintiff's assessment, the purpose of the security investigation is to "harass and intimidate" his family with the aim of getting him to drop the present lawsuit. *Id*. ¶ 86.

exhaust any claims related to the process or substance of his security investigation in the FBI's administrative complaint process. ECF 101 at 3. Because the Court resolves the former issue in Defendant's favor, it need not reach the latter.

### A. The *Egan* Doctrine

*Department of Navy v. Egan*, 484 U.S. 518 (1988) is the seminal case addressing the justiciability of employment claims in the security clearance context. There, the Supreme Court held that the Merit Systems Protection Board did not have the authority to review the substance of a decision to deny or revoke an Executive Branch security clearance when assessing an allegedly adverse employment action taken against the holder of the clearance. *Id.* at 530. In so holding, the Court reasoned that the "strong presumption" in administrative law in favor of judicial review "runs aground when it encounters concerns of national security, as . . . where the grant of security clearance to a particular employee, a sensitive and inherently discretionary judgment call, is committed by law to the appropriate agency of the Executive Branch." *Id.* at 526–27. The Court explained that courts should not intrude on the Executive Branch's exclusive discretion "to classify and control access to information bearing on national security" and to make "[p]redictive judgment[s]" about access to that information. *Id.* at 527–29. According to the Court, "it is not reasonably possible for an outside nonexpert body[,]" like a court, "to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction with confidence." *Id.* at 528–29.

### B. The Tenth Circuit's Decision in *Hall*

Nearly two decades after the *Egan* non-justiciability doctrine was first articulated, the Tenth Circuit had occasion to apply it in *Hall v. U.S. Department of Labor, Administrative Review Board*, 476 F.3d 847 (10th Cir. 2007). As relevant here, Dr. Hall, a civilian chemist with the Army,

challenged a decision of the Administrative Review Board that it lacked authority to review the merits of the Army's reinvestigation, suspension, and recommended revocation of his security clearance, which he claimed were in retaliation for his reporting of environmental concerns. *Id*. at 850–51. Citing *Egan*, the Tenth Circuit agreed that the Board lacked authority to consider Dr. Hall's security-clearance-related retaliation claims. *Id*. at 851–52. The court explained that "[d]etermining whether there was a retaliatory motive behind the challenged actions would have required the Board to examine the legitimacy of the Army's proffered reasons and the merits of the revocation decision." *Id*. at 852. The court emphasized that a reviewing body may consider a security clearance decision *only* where Congress expressly grants it authority to do so, which the whistleblower provision of the environmental statute at issue there did not. *Id*. at 853 (citing *Becerra v. Dalton*, 94 F.3d 145, 149 (4th Cir. 1996)).

Notably, the court rejected Dr. Hall's suggestion that, in contrast to *Egan*, the court need not wade into the merits of the ultimate security clearance decision to resolve his retaliation claim but needed only to determine whether those decisions constituted evidence of retaliatory motive. *Id*. In concluding to the contrary, the Tenth Circuit relied heavily on the Fourth Circuit's analysis in *Becerra*, a case in which that court described "the distinction between the *initiation* of a security investigation and the *denial* of a security clearance [as] a distinction without a difference." *Becerra*, 94 F.3d at 149 (emphasis added). Analogizing Dr. Hall's claims to those of Becerra, the court explained:

> Dr. Hall argues for a distinction without a difference. To review the circumstances under which the Army recommended revocation of Dr. Hall's security clearance for evidence of retaliation is to review the basis of the determination itself, regardless of how the issue is characterized. The inquiry "goes to the very heart of the 'protection of classified information [that] must be committed to the broad discretion of the agency responsible.'" *Becerra*, 94 F.3d at 149 (citing *Egan* 484 U.S. at 529) (alteration in original) (declining to review the reasons why the Navy instigated an investigation into the plaintiff's security clearance). This is precisely

what *Egan* prohibits.

*Hall*, 476 F.3d at 853 (citation omitted).

In addition to *Becerra*, the Tenth Circuit pointed to other circuit courts that had applied *Egan* to determine that, absent express statutory authority permitting review of security clearance decisions, they lacked authority to review them even to determine whether they were discriminatory or retaliatory. *Id.* (citing *Hill v. White,* 321 F.3d 1334, 1335-36 (11th Cir. 2003); *Hesse v. Dep't of State*, 217 F.3d 1372, 1377 (Fed. Cir. 2000); *Weber v. United States*, 209 F.3d 756, 759–60 (D.C. Cir. 2000); *Perez v. FBI*, 71 F.3d 513, 514 (5th Cir. 1995); *Brazil v. U.S. Dept' of Navy*, 66 F.3d 193, 196 (9th Cir. 1995); *Guillot v. Garrett*, 970 F.2d 1320, 1324–26 (4th Cir. 1992)).

Defendant insists that *Egan* and *Hall* together bar the Court's review of Plaintiff's claims insofar as they relate to the FBI's security investigation against him. ECF 101 at 5–6. As Defendant sees it, "[t]he bar on judicial review goes beyond final decisions to *deny* or *revoke* a security clearance—the investigation itself and the reasons for the initiation of the investigation are also beyond the Court's review." *Id.* at 6 (citing *Hall*, 476 F.3d at 852). In support, Defendant emphasizes that the Tenth Circuit did not limit its decision in *Hall* to the *revocation* of a security clearance but also held that claims related to the *reinvestigation* of Dr. Hall's security clearance were outside the Administrative Review Board's purview. *Id.* at 8 (citing *Hall*, 476 F.3d at 851–52).

Although much of Plaintiff's Amended Complaint centers around the process and substance of the FBI's security investigation, he appears to concede, as he must, that the Court may not review these claims. *See* ECF 109 at 10. Even so, Plaintiff urges the Court to adopt the out-of-circuit holding in *Rattigan v. Holder*, 689 F.3d 764 (D.C. Cir. 2012), to reach the merits of

what he refers to as his "properly pled[] and properly exhausted *Rattigan* claim[] for a knowingly false referral to the Security Division." ECF 109 at 10.

Plaintiff attempts to frame this "*Rattigan* claim" in his response brief: "that SAC Bujanda, SSA Giles, and ASAC Kaskel knowingly provided false information to clearance-review personnel to retaliate against Plaintiff for his prior EEO activity." *Id*. at 9 (citing ECF 69 ¶¶ 5, 68, 70–71, 80–82, 103–04, 108). But Defendant does not read the Amended Complaint to include such an allegation. *See* ECF 114 at 7. The Court, too, questions whether Plaintiff has pled a "*Rattigan* claim." At most, the Amended Complaint alleges that a security referral to the Security Division originated from FBI Albuquerque management, that FBI managers told investigators that Plaintiff admitted to intentionally double-signing his PRS application, though he insists that issue had been previously resolved, and that SSA Giles was the "only person who could have conceivably provided [the Security Division] with th[e] (bogus) 'house flipping' allegation." ECF 69 ¶¶ 68, 70–71. Perhaps acknowledging the disconnect between his description of his *Rattigan* claim in his briefing and the allegations of his Amended Complaint, Plaintiff requests leave to amend his complaint to "clarify" his *Rattigan* retaliatory referral claim. ECF 109 at 16. But for the reasons discussed below, even if properly pled, a *Rattigan* claim is not available under Tenth Circuit law nor under the circumstances here. As such, permitting Plaintiff to file a second amended complaint to add or clarify this claim would be futile.

## C.  The D.C. Circuit's Decision in *Rattigan*

The context of *Rattigan* is familiar. Like the *Rattigan* claim Plaintiff outlines in his briefing, it arose from an allegedly retaliatory referral by an FBI employee to the agency's Security Division in retaliation for prior complaints of discrimination. *Rattigan v. Holder*, 636 F. Supp. 2d 89, 91 (D.D.C. 2009). But in *Rattigan*, the accusations in the referral were ultimately rejected by

the Security Division as "unfounded," and Rattigan retained his security clearance. *Id*. Only then did he sue the FBI for retaliation, in that case under Title VII. *Id*. One business day before trial was to commence, the government filed a motion to dismiss for lack of subject matter jurisdiction. *Id*. at 90. Distinguishing *Becerra* and similar cases from the Eleventh and Ninth Circuit on the basis that the agencies in those case had *denied* or *revoked* the plaintiffs' security clearances, whereas Rattigan received a favorable security determination, the district court held that *Egan* did not operate to prevent review of the plaintiff's retaliatory security referral claim. *Id*. at 91–92. After a jury found in Rattigan's favor on his retaliation claim, the FBI appealed. *See Rattigan*, 689 F.3d at 765.

On appeal, and after rehearing, the D.C. Circuit held that Rattigan's Title VII retaliatory security referral claim did not run afoul of *Egan* so long as he could show that the agency employees who made the referral "acted with a retaliatory or discriminatory motive in reporting or referring information that they knew to be false." *Id.* at 771. The D.C. Circuit recognized the tension between adhering to the separation of powers principles discussed in *Egan* and preserving Title VII's protections against workplace discrimination and retaliation. *See id*. at 770. By employing a "knowingly false standard," the D.C. Circuit suggested that it was minimizing the risk of chilling Title VII claims *and* obviating the need to "'weigh the strength' of the information reported . . . or to second-guess the employee's determination that seemingly doubtful or insignificant information warranted reporting." *Id*.

Despite the passage of 13 years, the Tenth Circuit has not yet addressed the viability of a so-called "*Rattigan* claim." Nevertheless, Plaintiff describes the D.C. Circuit's analysis as "well-reasoned" and urges this Court to adopt it here. For her part, Defendant characterizes *Rattigan* as a "criticized outlier" and insists that the Fourth and Eleventh Circuits' decisions in *Becerra* and

*Hill*, respectively, are more persuasive than *Rattigan*. ECF 101 at 9 (citing *Becerra*, 94 F.3d at 149; *Hill*, 321 F.3d at 853). In both cases, the respective circuit courts described the distinction between the *initiation* of a security investigation and the adverse security clearance decision as "a distinction without a difference." *Becerra*, 94 F.3d at 149; *Hill*, 321 F.3d at 1335-36 (citation omitted). As the Eleventh Circuit put it, "[t]o review the initial stages of a security clearance determination is to review the basis of the determination itself." *Hill*, 321 F.3d at 1336. The Court notes that the Tenth Circuit favorably cited both *Becerra* and *Hill* in its own decision in *Hall*. *See Hall*, 476 F.3d at 853.

Plaintiff counters that *Becerra* predates *Rattigan* by 16 years. ECF 109 at 10.  *Hill*, too, was decided well before *Rattigan*. As a result, when the Tenth Circuit relied upon *Becerra* and *Hill* to conclude that claims regarding security clearance investigations are nonjusticiable, it did so without grappling with *Rattigan*. Other circuits have since been presented with the opportunity to adopt *Rattigan*, however, and have declined to do so. *See United States ex rel. Johnson v. Raytheon Co.*, 93 F.4th 776, 778 (5th Cir. 2024); *Wilson v. Dep't of Navy*, 843 F.3d 931, 935 (Fed. Cir. 2016); *Mowery v. Nat'l Geospatial-Intel. Agency*, 42 F.4th 428, 437 (4th Cir. 2022)).

### D. Post-*Rattigan* Decisions

As recently as 2022, the Fourth Circuit reaffirmed its *Becerra* decision, and distinguished *Rattigan*, acknowledging that it is "in some tension with" *Becerra*, and favorably citing criticisms of *Rattigan*, including now-Justice Kavanaugh's oft-cited dissent in *Rattigan*.[3] *Mowery*, 42 F.4th

---

[3] Now-Justice Kavanaugh's dissent argued that the majority's conclusion—that courts may, in some circumstances, review allegedly retaliatory reports of security risks by agency employees—could not be squared with *Egan*. *Rattigan*, 689 F.3d at 774. He described the majority's holding in *Rattigan* as a "new-fangled scheme" that "slic[ed] and dic[ed] . . . the security clearance process into reviewable and unreviewable portions [that were] nowhere to be found in *Egan*." *Id*. Justice Kavanaugh cautioned that narrowing the *Egan* doctrine should be left only to the Supreme Court or to Congress, not to lower federal courts. *Id*. at 776. And he insisted that courts "must apply *Egan* according to its terms," which he read to "protect[] the front end of the security clearance process—including reports of possible security risks—as much as [they] protect[] the back end." *Id*. at 775.

at 437 (citation omitted) (citing *Kruise v. Fanning*, 214 F. Supp. 3d 520, 526 (E.D. Va. 2016); *Rattigan*, 689 F.3d at 774 (Kavanaugh, J., dissenting)). Consistent with *Becerra*, the Fourth Circuit in *Mowery* reasoned that "it is not possible to disentangle the early stages of a security assessment from the end result" because "the 'reasons why a security investigation is initiated may very well be the same reasons why the final security clearance decision is made.'" *Id*. at 439 (citing *Becerra*, 94 F. 3d at 149; *Hill v. Dep't of Air Force*, 844 F.2d 1407, 1411 (10th Cir. 1988)).

For its part, the Fifth Circuit in *Johnson* determined that *Egan* barred review of the plaintiff's claims that his former defense contractor employer made retaliatory and fraudulent misrepresentations to the Navy related to his security clearance. 93 F.4th at 787–88. The court explained that "any analysis of the 'possibly pretextual nature of [the government contractor's] proffered reasons' for monitoring, *reporting*, and ultimately firing" Johnson would have required judicial scrutiny of the merits of the decision to revoke his security clearance. *Id*. (emphasis added). The Fifth Circuit emphasized that, in determining that Johnson's security clearance should be revoked, the agency *credited* the agency's underlying reports and, as a result, assessing the reasons for those reports would necessitate second-guessing the ultimate security clearance revocation. *Id*. at 788. Although Johnson urged the court to follow *Rattigan* in recognizing an exception to *Egan*, the court concluded that it need not determine whether to do so because the case fell "outside" of *Rattigan*. *Id*. That is, "[i]n *Rattigan*, judicial review was unlikely to interfere with national security because the security investigation concluded that the allegations were unfounded." *Id*. at 788–89. In contrast, security investigators concluded that Johnson *had* committed the reported security violations, such that resolving his false reporting claims would implicate the merits of the revocation of his security clearance. *Id*. at 789. Accordingly, *Egan* precluded review of Johnson's false reporting claims. *Id*.

The District Court of the District of Columbia has also declined to apply *Rattigan* under similar circumstances. In *Bland v. Johnson*, 66 F. Supp. 3d 69 (D.D.C. 2014), *aff'd in relevant part*, 637 F. App'x 2 (D.C. Cir. 2016), the court distinguished *Rattigan* on the basis that Bland, an employee of FEMA, had not received a favorable security decision. *Id*. at 70. Bland asserted Title VII discrimination and retaliation claims *after his security clearance was suspended*. *Id*. He challenged, among other things, his managers' request that his security clearance be "reconsider[ed]" as well as the ultimate suspension of his clearance. *Id*. at 73. His employer moved to dismiss on the ground that his claims were nonjusticiable under *Egan*, and the district court agreed. *Id*. at 70–73. The court explained that review of the security clearance suspension itself was forbidden under "the clearest application of *Egan*." *Id*. at 73. With respect to the agency managers' requests that Bland's security clearance be reconsidered, the court described that claim as "more complicated" because it arose from actions of agency management rather than trained security personnel charged with making predictive judgments about sensitive information. *Id*. at 74. Acknowledging that the D.C. Circuit in *Rattigan* had permitted review of a discrimination claim "involving employees who report[ed] security concerns," the court nevertheless concluded that Bland's circumstances were different because his clearance, unlike Rattigan's, had been suspended. *Id*. at 75 (emphasis added). The court ultimately dismissed Bland's claims insofar as they alleged that his managers discriminated or retaliated by requesting the "reconsideration" of his security clearance. *Id*.

At least two other district courts have reached a similar conclusion. *See e.g.*, *Al-Kaysey v. Engility Corp*., No. 11-cv-6318, 2016 WL 5349751, at *9 (E.D.N.Y. Sept. 23, 2016) (holding that *Rattigan* was "distinguishable as [it] provide[s] for judicial review only where the final security clearance determination was *favorable* to the plaintiff"); *Tharp v. Lynch*, No. 15-cv-719, 2015 WL

8482747, at *9 (E.D. Va. Dec. 8, 2015) (same). *But see Burns-Ramirez v. Napolitano*, 962 F. Supp. 2d 253, 257 (D.D.C. 2013) (concluding that a favorable security determination was not a dispositive factor in *Rattigan*).

In three separate Notices of Supplemental Authority filed since the completion of briefing on Defendant's Motion, Plaintiff has supplied additional authority that, in his view, supports the notion that the Court may exercise jurisdiction over his *Rattigan* claim: *Perkins Coie LLP v. U.S. Department of Justice*, 2025 WL 1276857, No. 25-716 (BAH) (D.D.C. May 2, 2025); *Wilmer Cutler Pickering Hale and Dorr, LLP v. Trump*, No. 25-917 (RLJ) (D.D.C. May 27, 2025); and *Susman Godfrey, LLP v. Trump*, No. 25-1107 (LLA), 2025 WL 1779830 (D.D.C. June 27, 2025). *See* ECFs 117, 119, 120. Apart from observing that these District of D.C. decisions cite either *Rattigan* or *Egan*, or both, Plaintiff offers little insight into their application here. *See* ECFs 117, 119, 120.

These recent decisions each address Executive Orders issued by President Trump suspending security clearances for three separate law firms. Defendant notes that the cases originate from a court within the D.C. Circuit where, unlike the Tenth Circuit, *Rattigan* is controlling. *See* ECF 118 at 1. In addition, Defendant observes that in each instance the district court permitted judicial review of the Executive Order because the plaintiff law firm brought a constitutional challenge to a *blanket* policy that revoked all of the firm's employees' security clearances. ECF 118 at 1 (citing *Perkins Coie*, 2025 WL 1276857, at *20); ECF 121 at 1 (citing *Susman Godfrey*, 2025 WL 1779830 at *9). To be sure, none of the decisions Plaintiff supplies for the Court's consideration address a challenge to an *individual* security clearance determination involving the sort of "predictive judgments" described in *Egan*. *See e.g.*, *Perkins Coie*, 2025 WL 1276857, at *20 (finding it critical that the plaintiff there "challenge[d] a *general policy* rather than

an individual determination" that might have required "second-guessing . . . 'predictive judgment[s]' . . . of the security clearance experts") (emphasis added) (citation omitted). Although the district court in *Perkins Coie* cited *Rattigan* for the proposition that judicial review of claims "is not absolutely barred" as to decisions made by non-experts who do not make "predictive judgments" about issues of national security, that observation is not particularly helpful to the Court's analysis here, given its very different context and the non-binding nature of *Rattigan* in the Tenth Circuit. In short, Plaintiff's supplemental authority fails to persuade the Court that it has jurisdiction over a claim that Plaintiff's FBI managers made a retaliatory referral to the Security Division.

On the other hand, the Court finds pertinent and persuasive the Fourth and Fifth Circuits' post-*Rattigan* decisions in *Mowery* and *Johnson* as well as now-Justice Kavanaugh's dissent in *Rattigan*, discussed *supra* note 3. And significantly, through its discussion of the *Becerra* decision in *Hall*, the Tenth Circuit has given every indication that it too would decline to adopt the majority's view in *Rattigan*.

Even if the Tenth Circuit were to permit a *Rattigan* claim in some circumstances, however, Plaintiff here joins with the plaintiffs in *Johnson*, *Bland*, *Al-Kaysey*, and *Tharp*, whose security referrals were not determined to be unfounded. Absent a determination of this sort, Plaintiff's case is not on all fours with *Rattigan*. Although it is true, as Plaintiff points out, that *Rattigan* itself does not explicitly condition its holding on a favorable security decision, the Court is satisfied that a favorable decision was an important factor in the court's conclusion, even if it didn't say as much. *See Johnson*, 93 F.4th at 788-89; *see also Rattigan*, 636 F. Supp. 2d at 91-92. Logically speaking, it was only because the Security Division had rejected the allegations referred to it as "unfounded" that the court could consider Rattigan's retaliatory referral claim without entangling itself in the

20

merits of the security clearance investigation. For all of these reasons, *Rattigan* offers very little help to Plaintiff here.

## V.    CONCLUSION

Applying the binding precedents of *Egan* and *Hall* as it must, and considering the Tenth Circuit's favorable treatment of *Becerra* and *Hill*, the Court joins the majority of courts in concluding that it lacks jurisdiction to review Plaintiff's retaliation claims insofar as they relate to agency security referrals to the Security Division and to the process and substance of the security investigation that followed from such referrals (including requests for additional medical information, including a mental evaluation, and investigators' contacts with and interviews of Plaintiff's wife). In the Court's view, permitting these claims to move forward would do violence to precedent requiring courts to leave national security decisions to the discretion of the responsible Executive agency, in this case the FBI.

This being so, only three justiciable claims remain in Plaintiff's Amended Complaint:

(1) his claim in Count I that Defendant violated the Rehabilitation Act when SAC Giles discriminated against him by denying his May 2021 PRS application and subsequent applications because of Plaintiff's disability or record of impairment [ECF 69 ¶¶ 96–101];

(2) his claim in Count II that after Plaintiff told FBI management in September 2021 that he had initiated the EEO process, Defendant retaliated against him by giving him the PRS job but requiring that he supervise his personnel from a place nearly 50 miles away or, alternatively, requiring that he use his Office of Preference selection to move closer to those he was supervising [*id*. ¶ 103]; and

(3) his claim, also in Count II, that after Plaintiff filed the instant lawsuit, Defendant retaliated against him by declining to make any "definitive decision" on his September 2023 request

for a "No Cost" transfer from New Mexico to Norfolk, Virginia [*id.* ¶¶ 87–93].

Defendant's Motion, which targets Plaintiff's security-investigation-related claims, is well taken, and these claims must be dismissed for lack of subject matter jurisdiction. It follows that the Court need not reach Defendant's alternative argument that Plaintiff failed to exhaust his claims based on the initiation of the security investigation or the manner in which that investigation was conducted.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss is [ECF 101] is **GRANTED**.

**IT IS FURTHER ORDERED** that, insofar as Plaintiff's claims relate to FBI referrals to the Security Division or to the process and substance of the security investigation that followed, those claims are **DISMISSED** for lack of subject matter jurisdiction.

**SO ORDERED.**

_____
THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
***Presiding by Consent***