**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

VALENTINE FERTITTA,

Plaintiff,

v. Civ. No. 22-966 GJF/SCY

TODD BLANCHE, in his
Official Capacity as Attorney General
of the United States of America,

Defendant.

**MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION TO STRIKE AND FOR LEAVE TO SUPPLEMENT PLEADINGS**

**THIS MATTER** is before the Court on *Defendant's Motion for Summary Judgment* (Dkt. No. 131) ("Motion for Summary Judgment") and *Plaintiff's Motion to Strike and for Leave to Supplement Pleadings* (Dkt. No. 135) ("Motion to Strike"). Both motions are fully briefed. *See* Dkt. Nos. 132–33, 137–38. The Court heard extensive oral argument on these motions July 1, 2026 ("Hr'g").[1] *See* Dkt. No. 142.

As explained below, the Court **DENIES AS MOOT** Plaintiff's Motion to Strike and **GRANTS IN PART AND DENIES IN PART** Defendant's Motion for Summary Judgment. More specifically, the Court concludes that Plaintiff has presented sufficient evidence to create a genuine issue of material fact for trial as to three sub-claims under the Rehabilitation Act: (1) his claim, in Count I, alleging Defendant discriminated against him on the basis of disability by rejecting his first Primary Relief Supervisor ("PRS") application; (2) his claim, also in Count I,

[1] The Hr'g citation refers to an audio recording of the July 1, 2026 Motions Hearing stored on the Court's Liberty system. Neither the audio recording nor a transcript is currently available on CM/ECF; however, either party may obtain the recording through the Court's records department and have it transcribed.

alleging Defendant discriminated against him on the basis of disability by giving him an unfavorable performance check-in on June 15, 2021; and (3) his claim, in Count II, alleging Defendant retaliated against him by revoking an informal agreement under which he was permitted to work half-time from Santa Fe. Accordingly, Defendant's Motion for Summary Judgment is **DENIED** as to these claims. In contrast, Plaintiff has *failed* to present sufficient evidence to create a genuine issue of material fact for trial as to four sub-claims under the Rehabilitation Act: (1) his exhaustion of any claim in Count I for retaliation or reprisal; (2) his claim in Count II alleging Defendant retaliated against him by awarding him the Santa Fe PRS role but denying a transfer to Santa Fe; (3) his claim in Count II alleging Defendant retaliated against him by requiring additional medical documentation; and (4) his claim in Count II alleging Defendant retaliated against him by failing to approve his request for a transfer to Norfolk, Virginia. Thus, Defendant's Motion for Summary Judgment is **GRANTED** as to these claims.

## I. INTRODUCTION

In his Amended Complaint, Plaintiff asserts claims against Defendant for discrimination and retaliation in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 791, *et seq*. Dkt. No. 69 ¶¶ 1, 95–109. The Court previously observed that "[a]lthough . . . not a model of clarity," the Amended Complaint appears to include "a singular discrimination claim and at least three retaliation claims with various facets." Dkt. No. 122 at 9. The Court granted Defendant's Motion to Dismiss, dismissing for lack of subject matter jurisdiction any claims related to referrals to the FBI's Security Division or to the security investigation and noting that, as a result, only three justiciable claims appeared to remain in Plaintiff's Amended Complaint:

> (1) [Plaintiff's] claim in Count I that Defendant violated the Rehabilitation Act when [SSA] Giles discriminated against him by denying his May 2021 PRS application . . . because of Plaintiff's disability or record of impairment;

(2) his claim in Count II that after [he] told FBI management in September 2021 that he had initiated the EEO process, Defendant retaliated against him by giving him the PRS job but requiring that he supervise his personnel from a place nearly 50 miles away or, alternatively, requiring that he use his Office of Preference selection to move closer to those he was supervising; and

(3) his claim, also in Count II, that after [he] filed the instant lawsuit, Defendant retaliated against him by declining to make any "definitive decision" on his September 2023 request for a "No Cost" transfer from New Mexico to Norfolk, Virginia.

Dkt. No. 122 at 21–22 (internal citations omitted). In addition, the Court recognized that Plaintiff asserts in Count I that Defendant took adverse actions against him between his PRS application in the Spring of 2021 and his final PRS application in August 2021. *Id*. at 21–22 (Memorandum Opinion and Order). Defendant now seeks summary judgment on all remaining claims.

## II. FACTUAL BACKGROUND[2]

Plaintiff, a Major and later a Lieutenant Colonel in the United States Marine Corps Reserves ("USMCR"), was hired by the Federal Bureau of Investigation ("FBI") in 2014. Pl.'s Resp. to Def.'s Mot. for Summ. J., Additional Undisputed Material Fact (hereinafter "Pl.'s AUMF"), Dkt. No. 132 ¶ A; Dkt. No. 132-26 ¶ 1 (Fertitta Decl.). At all relevant times, Plaintiff was a Special Agent ("SA") of the FBI. Dkt. No. 69 ¶¶ 8–10; Dkt. No. 132-26 ¶ 1 (Fertitta Decl.). Although he was assigned to the Human Intelligence ("HUMINT") program in the FBI's Albuquerque Division, Plaintiff estimates that from approximately mid-2019 through October 2021 he worked roughly half of his time from the Santa Fe Resident Agency ("RA") due to inadequate HUMINT staffing in Santa Fe, a focus on operations in Santa Fe, and Plaintiff's own

[2] The facts that follow are construed in Plaintiff's favor and are either affirmatively admitted or not "specifically controverted" with competent evidence by Plaintiff. *See* D.N.M. LR-Civ. 56.1. For disputed or allegedly unsupported facts, the Court cites to the underlying exhibits and other materials in the record as necessary. *See* Fed. R. Civ. P. 56(c)(3) ("The court need only consider the cited materials, but it may consider other material in the record.").

childcare considerations. Dkt. No. 132-26 at 2 ¶ 4 (Fertitta Decl.); Def.'s Mot. for Summ. J., Undisputed Material Fact (hereinafter "Def.'s UMF") ¶ 1, Dkt. No. 131. According to Plaintiff, approximately 66% of the agents assigned to the HUMINT program worked out of various New Mexico RAs rather than out of Albuquerque. Dkt. No. 132-26 ¶ 5 (Fertitta Decl.).

In July 2020, Percy Giles was appointed Supervisory Special Agent ("SSA") of the FBI's Guardian squad of the Albuquerque field office, and after a reorganization in the fall of 2020, the HUMINT program was assigned to that squad. Def.'s UMF ¶ 3. While overseeing both the HUMINT program and the Guardian squad, SSA Giles served as Plaintiff's rating official and first-level supervisor from the fall of 2020 through October 2021. Def.'s UMF ¶ 4. Amy Kaskel was the Assistant Special Agent in Charge ("ASAC") of the Intelligence/Administrative Branch in Albuquerque, and she served as Plaintiff's second-level supervisor from March 1, 2020 to October 14, 2021. Def.'s UMF ¶¶ 5–6. Raul Bujanda served as Special Agent in Charge ("SAC"), ASAC Kaskel's supervisor, and division head of the Albuquerque field office from April 2021 until his retirement. Def.'s UMF ¶¶ 7-8. As division head, SAC Bujanda had discretion to make decisions for the FBI Albuquerque Division, which covers all of New Mexico. Def.'s UMF ¶ 9.

Plaintiff suffered various impairments related to his military service, including PTSD, a vision impairment, and a hearing impairment that was at one time considered by the USMCR severe enough to render him "Not Medically Ready" under governing military medical standards. Dkt. No. 132-26 ¶¶ 2, 6, 7, 8 (Fertitta Decl.). Plaintiff avers that his "Not Medically Ready" designation required him to travel to Walter Reed Army Medical Center for advanced hearing tests and other medical appointments. Dkt. No. 132-26 ¶ 11 (Fertitta Decl.). As a result, he was absent from the FBI workplace for a total of approximately 30 days from November 16, 2020 to April 22, 2021. Def.'s UMF ¶ 10. SSA Giles was aware that Plaintiff was on military leave during that

period and that he was attending medical appointments with the Veteran's Administration ("VA"). Def.'s UMF ¶ 11; Dkt. No. 132-26 at 3–6 ¶¶ 9–11, 15–18 (Fertitta Decl.). Like Plaintiff, SSA Giles is a military veteran who has received medical treatment through the VA. Def.'s UMF ¶ 15.

On or about December 21, 2020, after receiving a diagnosis related to hearing and vision loss, Plaintiff informed SSA Giles of his medical conditions. Dkt. No. 132-26 ¶ 8 (Fertitta Decl.). The following week, he advised SSA Giles of "pending absences related to VA examinations and treatment." Dkt. No. 132-26 ¶ 8 (Fertitta Decl.). Then, at a December meeting, Plaintiff informed SSA Giles that his "USMCR status required that [he] miss approximately seven weeks each year, including military mandated medical appointments." Dkt. No. 132-26 ¶ 9 (Fertitta Decl.). In response, SSA Giles asked Plaintiff how he could mitigate the impact of his military reserve duty on his FBI duties. Dkt. No. 132-26 ¶ 9 (Fertitta Decl.). Plaintiff kept SSA Giles informed of his medical appointments. For instance, on January 4, 2021, he alerted SSA Giles that he had a "VA appointment" the following day that he had previously "overlooked." Dkt. No. 132-26 ¶ 10 (Fertitta Decl.). Ten days later, on January 14, 2021, SSA Giles informed Plaintiff that ASAC Kaskel was upset that Plaintiff was out of the office and that she expected him to perform FBI duties while on military reserve status regardless of whether Plaintiff's absences were related to treatment for medical impairments. Dkt. No. 132-26 ¶ 17 (Fertitta Decl.). The next day, Plaintiff sent an e-mail to SSA Giles explaining that ASAC Kaskel's suggestion that he conduct FBI work while on military reserve status would violate Office of Personnel Management policy and United States law. Dkt. No. 132-26 ¶ 18 (Fertitta Decl.).

On March 10, 2021, Plaintiff informed SSA Giles via e-mail that he would be out of the office for approximately two weeks for various reasons, including a "medical issue [that] came up during an annual military medical screening" that did not affect his "duty status" at that time.

Def.'s UMF ¶ 12. Plaintiff advised that he intended to take annual leave as well as leave without pay to address the medical issue, which related to his military service. Def.'s UMF ¶ 12. Two days later, Plaintiff provided an update to SSA Giles via text message: "Heard back from the Doc at the VA. I am clear. No tumor, no bleeding, all good. What a relief." Def.'s UMF ¶ 13.

***A. FBI's Relief Supervisor Program***

The FBI's Unified Relief Supervisor Policy sets forth the policies and procedures for designating relief and principal relief supervisors within the FBI through the Supervisor Development Program ("SDP"). Def.'s UMF ¶ 16. This Policy governs the designation of supervisors to perform "routine tasks of front-line leaders when front-line leaders are absent, unavailable, or unable to perform assigned duties for 30 consecutive days or less." Def.'s UMF ¶ 16. A Relief Supervisor ("RS") is an employee who has completed the SDP and is authorized to fill in for a front-line leader to complete routine tasks for a period of less than 30 days. Def.'s UMF ¶ 17. A Principal Relief Supervisor ("PRS") is an employee who has completed the SDP, has competed for and been selected for the "principal" or "primary" designation, and is therefore authorized to serve as the acting supervisor when the front-line leader is absent and unable to designate an RS. Def.'s UMF ¶ 18. While a PRS need not be from the same squad or unit, he or she must be selected from the same division or field office advertising the PRS position. Def.'s UMF ¶ 19. After selecting an employee, the FBI division or field office has the discretion to assign that employee to the squad with the opening or to have them serve as the PRS of that squad while remaining in their original squad or unit. Def.'s UMF ¶ 20.

To be promoted to a Supervisory Special Agent, Plaintiff would need to demonstrate experience as an RS or Acting SSA. Dkt. No. 132-26 ¶ 22 (Fertitta Decl.). Although assignment

to a PRS position[3] was not a specified requirement for advancement (*see* Dkt. No. 133 at 21; Dkt. No. 132-14 § 4.1 (URS Policy)), Plaintiff attests that designation as a PRS would typically provide additional opportunities to serve as an Acting SSA (Dkt. No. 132-26 ¶ 24 (Fertitta Decl.)).

***B. FBI Transfer Policies***

The Santa Fe RA is approximately 54 miles from the Albuquerque FBI headquarters. Dkt. No. 131-18 at 2 (Bujanda Decl.). Notably, an assignment more than 50 miles away from an agent's duty station must comply with the FBI's Employee Transfer Policy Guide, which outlines the applicable requirements and procedures for transfers. Def.'s UMF ¶¶ 20–21. A Management Directed Reassignment ("MDR") is the movement of an employee from one FBI division or field office to another to meet the needs of the FBI. Def.'s UMF ¶ 22. As part of his employment with the FBI, Plaintiff agreed to be subject to a temporary or permanent MDR anywhere in the world pursuant to 5 C.F.R. Part 335 and 28 C.F.R. § 0.138. Def.'s UMF ¶ 23. Indeed, all FBI employees, including special agents, are subject to transfer at any time to meet the FBI's organizational and program needs. Def.'s UMF ¶ 24. FBI employees may also transfer if they are granted an employee-initiated reassignment in accordance with the Transfer Policy. Def.'s UMF ¶ 24. A full-time transfer to a new location requires approval of the FBI's Human Resources Division ("HRD"), however, and each transfer falls under one of two categories: a "cost" transfer or "no cost" transfer. Def.'s UMF ¶¶ 25–26. Cost transfers are primarily for the benefit of the government, and relocation expenses for such transfers are therefore paid by the FBI. Def.'s UMF ¶ 25. No-cost transfers, in contrast, are ordinarily made at the request of the employee, must comply with 5 U.S.C. § 5724(h), and are paid by the relocating employee. Def.'s UMF ¶ 25.

[3] The URS Policy required that an applicant have RS status (as Plaintiff had) to be eligible to be a front-line leader, though it did not specify that the applicant was required to have RS *experience*. Dkt. No. 132-14 § 4.1 (URS Policy); *see* Dkt. No. 133 at 21.

With limited exceptions, an FBI special agent receives *one* Office of Preference transfer benefit per career, which is valued at more than $20,000. Def.'s UMF ¶ 28; Dkt. No. 132-26 ¶ 69 (Fertitta Depo.); Dkt. No. 132-3 at 35:1–36:23 (Monroney Depo.). When using that benefit, the special agent may designate up to three offices for the FBI's consideration. Def.'s UMF ¶ 27. An Office of Preference transfer may be granted based upon the needs of the office and seniority of the individual. Def.'s UMF ¶ 28.

A Common Household Transfer ("CHTR"), on the other hand, is an employee-initiated, *no-cost* transfer. Def.'s UMF ¶ 30. When one spouse in a special agent couple receives a transfer, the FBI's Transfer Policy provides that "the other spouse is afforded a no-cost [CHTR] to accompany the spouse receiving the transfer," without exhausting his or her Office of Preference benefit.[4] Def.'s UMF ¶ 31; Dkt. No. 131-8 at 9, § 4.5.3.1.

***C. Spring 2021 PRS Vacancy Announcement***

On April 22, 2021, the FBI issued a vacancy announcement to all agents in its Albuquerque Division advertising multiple RS and PRS positions. Def.'s UMF ¶ 34; Pl.'s AUMF ¶ N. The announcement described the eligibility requirements and process for submission of applications via an Electronic Communication ("EC") in the FBI's Sentinel computer system. Def.'s UMF ¶ 35. The announcement specified that an employee was eligible to apply if he or she had "completed the Supervisor Development Program (SDP) curriculum" and had an "[a]pproved EC requesting the relief supervisor designation." Dkt. No. 131-9 at 1. The announcement further provided that each EC must include, among other things, "a copy of the candidate's SDP evaluation, as an

---

[4] Defendant contends that "[a]ll CHTR are subject to the discretion of HRD." *See* Def.'s UMF ¶ 33 (citing Dkt. No. 131-8 § 4.5.3.3). The section of the Transfer Policy that Defendant cites, however, applies to non-FBI spouses, whereas Plaintiff's spouse was herself an FBI special agent at all times relevant to Plaintiff's claims.

enclosure to the EC" and that the "EC must contain comments from [the candidate's] rating official, and be approved by their rating official." Dkt. No. 131-9 at 2.

On Sunday, May 2, 2021, at 6:22 p.m., while SSA Giles was out of the office on prescheduled medical leave and Aaron Carp was serving as Acting Supervisory Special Agent ("A/SSA"), Plaintiff sent A/SSA Carp an e-mail advising that Plaintiff's father had been involved in a serious car accident, had been airlifted from the scene, and was still in surgery. Dkt. No. 131-10; Def.'s UMF ¶ 41; Pl.'s AUMF ¶ T. Plaintiff explained that, as a result, he would likely need to take leave from his position with the FBI for one to two weeks. Dkt. No. 131-10. In the same e-mail, Plaintiff advised A/SSA Carp that he intended to submit an application for the advertised PRS position located at the Santa Fe RA. Dkt. No. 131-10 at 2. The following morning, Plaintiff forwarded that same e-mail to Bruce Sweeny, SSA for the Joint Terrorism Task Force, explaining that he had not received a response from A/SSA Carp. Dkt. No. 131-10 at 2. SSA Sweeny, in turn, forwarded Plaintiff's e-mail to ASAC Kaskel, Plaintiff's second-level supervisor. Def.'s UMF ¶ 40. Upon receipt, ASAC Kaskel forwarded the e-mail chain to SSA Giles (Dkt. No. 131-10 at 1) and responded directly to Plaintiff, assuring him that he could take all the time he needed to deal with the family issue he mentioned in his e-mail to SSA Sweeny (Def.'s UMF ¶ 40).

Although SSA Giles was Plaintiff's "rating official" and therefore responsible for approving (or not approving) his application for a PRS designation (Dkt. No. 132-6 at 114:10–22), SSA Giles testified that ASAC Kaskel directed him not to approve Plaintiff's May 2021 application for the Santa Fe PRS position because executive management did not support the application. Dkt. No. 132-6 at 119:16–25, 120:20–25 (Giles Depo.); Dkt. No. 131-3 at 4 (Giles Affidavit). According to SSA Giles, ASAC Kaskel advised him that she did not intend to approve Plaintiff's PRS application. Dkt. No. 131-3 at 4 (Giles Affidavit). For her part, ASAC Kaskel

denied that there was any directive preventing Plaintiff's May 2021 PRS application. Dkt. No. 132-2 at 59:10–13 (Kaskel Depo.). She testified, however, that Plaintiff had a "unique assignment"[5] in the Albuquerque field office, as he was responsible for providing guidance to agents in the HUMINT program. Dkt. No. 131-2 at 75:1–4 (Kaskel Depo.). She further explained that a majority of the HUMINT agents Plaintiff advised were co-located in Albuquerque, and she indicated that Plaintiff was therefore not permitted to be assigned to the Santa Fe RA. Dkt. No. 131-2 at 75:4–10, 75:11–15 (Kaskel Depo.). SAC Bujanda acknowledged that a different agent who served as the HUMINT Coordinator Agent, Krankle Enviah, split his time between Albuquerque and Santa Fe RA. Dkt. No. 132 at 9–10 (citing Dkt. No. 132-1 at 114:17–116:11 (Bujanda Depo.)).

SSA Giles testified that he ultimately directed A/SSA Carp not to approve Plaintiff's May 2021 PRS application because Plaintiff's SDP form was not current and because SSA Giles needed to discuss with his own supervisor Plaintiff's eligibility for the PRS position at the Santa Fe RA. Dkt. No. 131-1 at 87:9–88:3 (Giles Depo.). At the time he applied for the Santa Fe PRS position, Plaintiff had already earned the RS designation. Dkt. No. 131-1 at 176:2–10 (Giles Depo.). Nevertheless, SSA Giles testified that Plaintiff was required to submit an updated SDF form from his then-current supervisor along with his May 2021 PRS application. Dkt. No. 131 -1 at 174:16–175:22 (Giles Depo.). Plaintiff insists that SSA Giles's understanding is at odds with the Unified Relief Supervisor Policy Guide, which states that once an RS designation is granted, it remains

[5] Plaintiff disputes this characterization, representing that there was a vacant HUMINT position on the HUMINT squad at the Santa Fe RA at the time of his PRS application. Dkt. No. 132 at 9 (citing Dkt. No. 132-3 at 30:13–31:5 (SSA Monroney Depo.)). However, the testimony to which Plaintiff refers was not included in the exhibits to his response brief.

with the agent indefinitely. Dkt. No. 132 at 9 (citing Dkt. No. 132-14 (Unified Relief Supervisor Policy Guide) at 6–7, 9–10).

According to SAC Bujanda and ASAC Kaskel, there was also a "practice" in place in the Albuquerque field office whereby management avoided assigning the same supervisor to a special agent couple. Dkt. No. 131-4 at 96:9–17 (Bujanda Depo.); Dkt. No. 131-2 at 42:23–43:17 (Kaskel Depo.). SAC Bujanda and ASAC Kaskel indicated that they had concerns about Plaintiff and his wife, who was then an FBI special agent assigned to the Santa Fe RA, reporting to the same supervisor in Santa Fe. Dkt. No. 131-2 at 42:23–43:17 (Kaskel Depo.) SAC Bujanda admitted that another married special agent couple worked out of the Santa Fe RA together, albeit under different supervisors. Dkt. No. 132-1 at 97:4–9 (Bujanda Depo.). Neither SAC Bujanda nor ASAC Kaskel mentioned these concerns to Plaintiff, however. Dkt. No. 132-26 ¶ 56 (Fertitta Decl.). Indeed, Plaintiff first became aware of these purported concerns when he received the first EEO Report of Investigation in late 2022. Dkt. No. 132-26 ¶ 56 (Fertitta Decl.).

SSRA Luther Seals, the supervisor in the Santa Fe RA, invited Plaintiff to apply for the Santa Fe PRS position, indicating that he had no concerns about him performing that role, even if it meant both Plaintiff and his wife were assigned to SSRA Seals's squad. Dkt. No.132-26 ¶¶ 54–55 (Fertitta's Decl.); Dkt. No. 132-26, Ex. H.

Plaintiff's May 2021 application was never approved for submission. Pl.'s AUMF ¶ W. Instead, on May 3, 2021, SSA Giles notified Plaintiff via e-mail that he did not have SSA approval for the application. Dkt. No. 131-10 at 1 (May 3, 2021 e-mail). SSA Giles explained that the FBI intended to work toward transferring Plaintiff to Santa Fe but only after the Albuquerque field office's HUMINT resources were fully staffed. Dkt. No. 131-10 at 1 (May 3, 2021 e-mail). To memorialize the denial of Plaintiff's PRS application, SSA Giles entered a notation in the Sentinel

system indicating that the "application [was] denied" because Plaintiff was "the only HUMINT collection agent within the Albuquerque Field Office and [his] talents [were] most needed" in Albuquerque. Dkt. No. 131-12 at 1 (Sentinel Working Copy). Plaintiff attests that because he did not initially have access to the Sentinel system, he did not see SSA Giles's notation that his application was denied until May 17, 2021. Dkt. No. 132-26 ¶ 30.

In his April 4, 2022 Declaration, SSA Giles averred that he was not aware of Plaintiff's alleged disability or his EEO activity in May 2021, and therefore did not consider his protected status or EEO participation in making the relevant decisions. Dkt. No. 131-3 at 1–2 (Giles Decl.). SSA Giles also insisted that he did not communicate with ASAC Kaskel about Plaintiff's medical conditions or medical leave (Dkt. No. 131-1 at 58:14–19; 209:5–10 (Giles Depo.)), and ASAC Kaskel, for her part, denied knowing that Plaintiff took medical leave or used military leave to attend medical appointments. Dkt. No. 131-2 at 15:25–16:17, 17:21–18:8, 23:18–24:4 (Kaskel Depo.). In contrast, Plaintiff testified that SSA Giles told him "it was ASAC Kaskel's expectation that [he] conduct FBI work while on military reserve status regardless whether these military caused absences related to treating [his] disability impairments." Dkt. No. 132-26 ¶ 17 (Fertitta Decl.). Although SAC Bujanda indicated that Plaintiff did not advise him that he had been out of the office prior to May 2021 for military medical reasons (Dkt. No. 131-4 at 30:8–19 (Bujanda Depo.)), Plaintiff avers that he requested a meeting with SAC Bujanda on May 26, 2021, at which time he advised Bujanda that he "had been away from work for multiple days to deal with [his] medical appointments." Dkt. No. 132-26 ¶ 32 (Fertitta Decl.); Pl.'s AUMF ¶ X.

According to Plaintiff, SSA Giles summoned him to his office on June 15, 2021, and criticized him for applying for the PRS position without SSA Giles's authorization and for attempting to seek assistance from SAC Bujanda. Dkt. No. 132-26 ¶ 34 (Fertitta Decl.). Plaintiff

attests that SSA Giles described his conduct as "poor judgment." Dkt. No. 132-26 ¶ 34 (Fertitta Decl.).

***D. June 15, 2021 Performance Check-In***

From the date of his hiring in 2014 until mid-2021, Plaintiff's performance reviews were satisfactory or higher, and he received performance awards in the four years leading up to the 2021 events at issue here. Pl.'s AUMF ¶ A. In his role as supervisor in 2021, SSA Giles was required to provide at least one performance check-in with each of his subordinates. Def.'s UMF ¶ 52. At Plaintiff's June 15, 2021 performance check-in, SSA Giles for the first time ranked Plaintiff as an "Inconsistent Performer" in competencies and admonished him for "not effectively communicat[ing]" his intention to apply for the Santa Fe PRS position, acting outside his chain of command, using a prior supervisor's "support form," violating policy, and harming his own "credibility and good standing within the office." Pl.'s AUMF ¶ AA; Dkt. No. 132-19 at 1. SSA Giles also reported that Plaintiff's "judgement [sic], communication, and professionalism [were] inconsistent, with respect to the circumstances related to [his] Primary Relief Supervisor application." Dkt. No. 131-13 at 1.

SSA Giles explained that "[d]espite being advised" that his transfer to Santa Fe RA "could not be supported" due to a lack of resources supporting the HUMINT program in Albuquerque, Plaintiff nevertheless "submitted his application to Branch 2B leadership, without including his current chain of command" from Branch 2C. Dkt. No. 131-13 at 1; Dkt. No. 131-1 at 136:14–137:14, 140:2–24 (Giles Depo.). ASAC Kaskel concurred with the ratings SSA Giles gave Plaintiff. Def.'s UMF ¶ 56. Although SSA Giles testified that a negative performance check-in does not necessarily foreclose a future promotion (Dkt. No. 131-1 at 132:15–133:5 (Giles Depo.)), Plaintiff attested that his June 15, 2021 performance check-in "remains in FBI systems as part of

[his] permanent performance record visible to future FBI supervisors and potentially considered by career boards." Dkt. No. 132-26 ¶ 35 (Fertitta Decl.).

### *E. EEO Complaint 2021-00193*

In Plaintiff's declaration,[6] he attests that he made several calls to HRD's Office of Equal Employment Opportunities Affairs ("OEEOA" or "EEO office"), on June 23, 2021, and June 24, 2021, and that he spoke to more than one EEO counselor. Dkt. No. 132-26 ¶ 40 (Fertitta Decl.). According to Plaintiff, he informed EEO counselors during his June 23, 2021 calls that: (1) he was considered a disabled veteran by the U.S. Department of Veterans Affairs due to injuries he sustained during combat operations; (2) he had recently missed a significant amount of work for treatment and testing related to those injuries; (3) he had been "blocked" from applying for a promotion in violation of FBI policy due to those work absences; and (4) he was seeking resolution and protection from continued retaliation. Dkt. No. 132-26 ¶ 40 (Fertitta Decl.). Plaintiff further states that, during these phone calls with EEO counselors, he referenced the Uniform Services Employment and Reemployment Rights Act ("USERRA")[7] *and* "EEO laws" because it was his understanding at that time that "USERRA and EEO protections were essentially the same" with respect to protecting servicemembers with disabilities.[8] Dkt. No. 132-26 ¶ 41 (Fertitta Decl.).

[6] Defendant urges the Court to disregard Plaintiff's Declaration on the grounds that it is "self-serving" and not supported by any other documentation in the record. Dkt. No. 133 at 14. Because Defendant does not point to any contrary sworn testimony by Plaintiff, however, the Court considers the statements contained in his declaration in deciding the summary judgment motion.

[7] Under USERRA, the federal government must make certain efforts to reemploy or to accommodate an employee who has incurred or aggravated a disability during military service. *See* 38 U.S.C. § 4313(a)(3). Plaintiff does not assert any claims under USERRA here. Indeed, Plaintiff's counsel conceded at oral argument that Congress has divested federal courts of jurisdiction over USERRA claims brought by FBI agents. Hr'g at 11:28:33–11:29:03.

[8] Defendant attempts to dispute Plaintiff's testimony that he expressed a desire to pursue the EEO process prior to July 18, 2021, arguing that this claim is not supported by Plaintiff's written correspondence, the EEOC acceptance letter, or any other documentation. Dkt. No. 133 at 25 (citing Dkt. No. 131-19 (e-mails between Plaintiff and EEO Counselor Green); Dkt. No. 133-3 (Edmonds Decl. (explaining that generally when an employee contacts OEEOA with a concern outside the purview of EEO laws, the EEO counselors provide information for contacting alternative entities while also processing any EEO-related matters raised)). Defendant relies on the declarations of Kimberly Edmonds and

Plaintiff reports that an EEO counselor advised him that he "had no protections under EEO law, that the EEO office had never before handled a complaint from a disabled service member, and that USERRA was likely [his] only protection." Dkt. No. 132-26 ¶ 41 (Fertitta Decl.). According to Plaintiff, the EEO counselor agreed to research the issue and get back to him. Dkt. No. 132-26 ¶ 41 (Fertitta Decl.). In support, Plaintiff attaches to his Declaration a record showing outgoing phone calls to a Washington D.C. number at 11:27 a.m. and 11:28 a.m. on June 23, 2021. Dkt. No. 132-26, Ex. D.

Plaintiff also e-mailed the EEO office on the afternoon of June 23, 2021, advising that he was "in [the] process of submitting a complaint under [USERRA]" and asking whether the "EEO office receive[s] such complaints" and if not asking EEO to identify "the correct venue to find assistance with such complaints." Dkt. No. 131-19 at 2. Plaintiff explains that he sent that e-mail "to make record of [his earlier] request for USERRA information." Dkt. No. 132-26 ¶ 42.

The EEO office responded to Plaintiff's June 23, 2021 e-mail the following day, directing him to the Department of Labor's Veterans Employment and Training Service and explaining that the Department could help him file a USERRA complaint and provide information about USERRA. Dkt. No. 131-19 at 1. According to Plaintiff, he filed a complaint with the Department of Labor as suggested but, on July 18, 2021, received notification that the FBI is exempt from Department of Labor oversight. Dkt. No. 132-26 ¶ 44 (Fertitta Decl.). That same day, Plaintiff sent another email to the EEO office, explaining that he had an issue that he believed fell "under EEOA purview," given that it involved his "status as a disabled veteran." Dkt. No. 131-19 at 1.

---

Shannon Rose in this regard. These declarations are the subject of Plaintiff's Motion to Strike in which he urges the Court to strike Edmonds and Rose's declarations on the basis that Defendant failed to identify either witness in initial disclosures under Federal Rule of Civil Procedure 26(a) or his supplements thereto. Dkt. No. 135. As discussed hereinafter, the Court need not decide the admissibility of these declarations at this stage because, at most, they reveal a factual dispute for the jury to resolve.

On August 11, 2021, the EEO office advised Plaintiff that July 18, 2021, would constitute his initial contact date with an EEO counselor for purposes of his EEO claims. Def.'s UMF ¶ 72. Two months later, on October 22, 2021, Plaintiff filed a formal complaint alleging discrimination based on physical and mental disability and reprisal. Def.'s UMF ¶ 73; Pl.'s AUMF ¶ HHHH. By letter dated February 24, 2022, the EEO office advised Plaintiff that the issues accepted for investigation were:

> 1) Between May 25 and June 24, 2021, his management delayed a response and/or resolution of his denied request to apply for the Primary Relief Supervisor position;
> 2) On June 15, 2021, he received a performance check-in rating of "Inconsistent";
> 3) In July 2021, his supervisor refused to sign his application for the position of Primary Relief Supervisor for the Santa Fe Resident Agency;
> 4) On August 9, 2021, his supervisor did not approve his electronic communication (EC) to be considered for the Primary Relief Supervisor position;
> 5) On May 26 and October 14, 2021, his Special Agent in Charge advised that he should use his Office of Preference benefit to transfer to the Santa Fe Resident Agency, despite being assigned as the Primary Relief Supervisor; and
> 6) On January 12, 2022, he was directed by the nurse in the Albuquerque Field Office to complete form FD-948: Certificate of Essential Duty Status.

Def.'s UMF ¶ 74. OEEOA further determined that Plaintiff's allegations of unlawful reprisal would apply only to accepted issues (5) and (6), as those issues related to conduct that occurred after Plaintiff elected EEO alternative dispute resolution on September 2, 2021. Def.'s UMF ¶ 75.

***F. August 2021 PRS Vacancy Announcement***

On August 4, 2021, while Plaintiff was on military leave, the FBI issued another vacancy announcement for RS and PRS positions at various FBI RAs. Def.'s UMF ¶ 59; Pl.'s AUMF ¶ PP. Like the May 2021 announcement, the August 2021 announcement detailed the eligibility requirements and the process for applying via EC in the FBI's Sentinel system. Def.'s UMF ¶ 59.

Plaintiff notified his then-supervisors, SSA Giles and ASAC Kaskel, of his intent to apply for the August 2021 PRS opening in Santa Fe. Def.'s UMF ¶ 60. On August 4, 2021, SSA Giles

told Plaintiff he would need to attach an updated SDP evaluation to his PRS application, as opposed to using the SDP form completed by his former supervisor, SSA Craig Monroney, a year prior. Dkt. No. 131-16 at 2 (August 9, 2021 e-mail); Dkt. No. 131-12 at 1 (Sentinel Working Copy in which SSA Giles directed Plaintiff to remove the September 10, 2020 evaluation form because it was "not valid"); Dkt. No. 132-26 ¶ 48 (Ferittal Decl.). SSA Giles's updated SDP evaluation rated Plaintiff less favorably than did SSA Monroney's SDP. *Compare* Dkt. No. 132-26, Ex. E (SSA Giles's SDP form), *with* Dkt. No. 132-26, Ex. F (SSA Monroney's SDP form).

The FBI's Unified Relief Supervisor Policy Guide ("Policy Guide") and HRD Fact Sheet ("Fact Sheet") provided that the SDP is a rating form for a specific curriculum (*i.e.*, Basic Relief Training and Advanced Relief Training) that consists of online classes and the completion of certain administrative tasks under the supervision of a mentor/SSA. Dkt. No. 132-14 at 6–10 (Policy Guide); Dkt. No. 132-17 at 1–2 (Fact Sheet); Dkt. No.132-26 ¶ 49 (Fertitta's Decl.). Thus, at most, the Policy Guide indicates that a special agent's current "rating official" has a role in the process of applying for a PRS position, not that the SDP form must be completed by the current rating official. Dkt. No. 132-14 ¶ 4.3.3 (Policy Guide). In Plaintiff's case, he completed the SDP curriculum on September 10, 2020, receiving a favorable rating from his then-supervisor SSA Monroney. Dkt. No. 132-26 ¶ 49 (Fertitta Decl.). Notably, SSA Giles testified that once a special agent is designated as an RS, as Plaintiff had been, he need not re-apply to become a RS, as that status follows the employee. Dkt. No. 132-6 at 172:4–173:5, 176:4–15 (Giles Depo.).

On August 10, 2021, the PRS vacancy announcement was removed. Pl.'s AUMF ¶ WW. Two days later, it was reposted with a note explaining that "[c]andidates need to be assigned within the [Area of Responsibility] of the location in order to apply" and advising that "[c]ost transfers are not available at this time." Dkt. No. 131-17 at 5 (Amended Vacancy Announcement); Dkt. No.

131-4 at 89:10–90:21 (Bujanda Depo.). Although there were often PRS openings (Dkt. No. 132-1 at 21:2–24 (Bujanda Depo.)), the August 12, 2021 PRS vacancy announcement was the only announcement to make such a clarification. Dkt. No. 132-26 ¶ 51 (Fertitta Decl.); Dkt. No. 132-26, Ex. G (vacancy announcements). The Unified Relief Supervisor Policy Guide provides that "Principal Relief Supervisor opportunities are not restricted to FBI employees assigned to the squad/unit advertising the posting." Dkt. No. 131-7 at § 4.3.2 (Policy Guide).

SAC Bujanda testified that, by amending the vacancy announcement, the FBI was attempting to make clear that there was "no funding that was allocated to have somebody move to a different location outside of a 50-mile area of Albuquerque." Dkt. No. 131-4 at 89:10–90:21 (Bujanda Depo.). He further testified that although there were "multiple employees" who wanted to apply to be a PRS outside of their own squad or RA, the PRS position "was not to be exploited as a mechanism to change squads or to transfer to an RA." Dkt. No. 131-18 at 3 (Bujanda EEO Affidavit); Dkt. No. 131-4 at 89:10–22 (Bujanda Depo.). SAC Bujanda explained that he did not know whether Plaintiff was attempting to exploit the PRS vacancy in this manner. Dkt. No. 132-1 at 90:11–21 (Bujanda Depo.).

On September 2, 2021, Plaintiff informed SSA Giles and ASAC Kaskel, via e-mail, that he had invoked the EEO process to have his PRS application considered by the Local Career Board. Pl.'s AUMF ¶ EEE. Only after invoking that process was Plaintiff's PRS application considered by the Local Career Board. Pl.'s AUMF ¶ EEE. The following month, on October 7, 2021, Plaintiff and SAC Bujanda participated in an EEO alternative dispute resolution proceeding involving Plaintiff's EEO claims. AUMF ¶ GGG. Within a week of that proceeding, Plaintiff was awarded the PRS position for the Santa Fe RA, but his duty station remained Albuquerque. Dkt. No. 132-26 ¶ 61 (Fertitta Decl.); Dkt. No. 133-1 at 29:13–18, 84:5–11, 82:17–18 (Bujanda Depo.).

SAC Bujanda explained that a "separate arrangement[]" was made whereby Plaintiff's wife would be supervised by another supervisor from Albuquerque when Plaintiff was to act as the PRS for the Santa Fe RA. Dkt. No. 131-18 at 3 (Bujanda Affidavit). Around the same time, another special agent was selected for a PRS position in the Las Cruces RA, and he too was expected to execute his responsibilities from the RA to which he was assigned, in Roswell, New Mexico. Def.'s UMF ¶ 68.

On October 12, 2021, following the EEO alternative dispute resolution proceedings and Plaintiff being awarded the Santa Fe PRS position, Plaintiff was assigned a new supervisor, SSA Sweeny, who told Plaintiff he was prohibited from working from the Santa Fe RA even when performing supervisory duties. Dkt. No. 132-26 ¶ 61 (Fertitta Decl.); Dkt. No. 131-4 at 84:5–11 (Bujanda Depo.); Dkt. No. 69 ¶ 41 (Am. Compl.). Plaintiff attests that this instruction was a departure from 17 years of precedent under which supervisors were geographically co-located with the agents they were supervising.[9] Dkt. No. 132-26 ¶ 61 (Fertitta Decl.). When Plaintiff told SAC Bujanda, on October 14, 2021, that he considered his PRS arrangement untenable, SAC Bujanda

[9] Plaintiff refers the Court to the testimony of Former SSRA Mark Buie, SSA Seals, and SSA Monroney (one former and two current FBI employees) to demonstrate that requiring a PRS to perform his supervisory functions from a different RA is not workable. For instance, he presents evidence that when former SSRA Mark Buie learned of the circumstances of Plaintiff's PRS assignment, he asked Plaintiff, "[W]ho did you piss off?" and "[W]hy are they f–king with you?" Dkt. No. 132-26 ¶ 64 (Fertitta Depo.). Along the same lines, he presents evidence that Former SSRA Mark Buie opined that an arrangement in which a PRS works out of a different RA is "not a tenable situation" because "anyone seeking [to] supervise the operations of the RA from such a distance and without the daily interactions with agents and a working knowledge of the intricacies of the RA would be severely hindered in providing effective supervision." Dkt. No. 132-26 ¶ 64 (Fertitta Depo.); Dkt. No. 132-26, Ex. I (Buie Affidavit). SSRA Buie's predecessor at the Santa Fe RA, SSA Seals, testified that he agreed with Buie's assessment. Dkt. No. 132-5 at 51:20–25, 54:11–25, 55:1–12 (Seals Depo.). SSA Monroney, too, agreed as to the unworkability of the assignment and testified that he had not heard of any such arrangement since he began serving in the Albuquerque field office in 2011. Dkt. No. 132-3 at 36:24–38:3, 39:22–41:19 (Monroney Depo.). There is no evidence that these former and current agents were involved in the decision to award Plaintiff the Santa Fe PRS position and to require him to perform that role from Albuquerque. The Court therefore considers their testimony immaterial.

suggested that Plaintiff could use his Office of Preference benefit to transfer to the Santa Fe RA.[10] Dkt. No. 131-18 at 2 (Bujanda Affidavit); Dkt. No. 132-1 at 92:15–23 (Bujanda Depo.).

In addition to hindering his ability to effectively perform his PRS role, Plaintiff avers that the prohibition on working from Santa Fe revoked a longstanding agreement under which he was permitted to work half-time from the Santa Fe RA.[11] Dkt. No. 132-26 ¶¶ 4, 65 (Fertitta Decl.); *see also* Dkt. No. 132-1 at 80:25–82:6, 84:12–21 (Bujanda Depo.) (testifying that he learned through the EEO process in September 2021 that Plaintiff had an informal arrangement with his FBI supervisors whereby he was permitted to work half-time in Santa Fe).

Although the FBI made an official announcement about Plaintiff's designation as Santa Fe PRS (Dkt. No. 132-26 ¶ 71 (Fertitta Decl.)), Plaintiff attests that, at least as of early April 2026, he had not yet performed any PRS duties (Dkt. No. 132-26 ¶ 72 (Fertitta Decl.)). Plaintiff further avers that he experienced humiliation and stigmatization due to his colleagues' recognition of the "inconsistency" between his designation as PRS for the Santa Fe RA and his continued assignment

[10] Plaintiff also presents evidence that (1) in July 2021, SAC Bujanda permitted SA Anna Sepulveda to transfer from Albuquerque to Santa Fe and to do so without using her Office of Preference benefit (Dkt. No. 54 ¶ 6 (Sepulveda Decl.)); (2) around August or September 2021, SAC Bujanda also transferred SA Craig Monroney to Santa Fe (though Monroney did not move to Santa Fe) without requiring him to use his Office of Preference benefit (Dkt. No. 132-5 at 34:8–36:4 (Seals Depo.); Dkt. No. 132-3 at 36:16–19 (Monroney Depo.); Dkt. No. 132-1 at 108:16–109:19 (Bujanda Depo.)); (3) neither Sepulveda nor Monroney made EEO complaints before they transferred to Santa Fe (Dkt. No. 132-1 at 111:2–6 (Bujanda Depo.); 132-26 ¶ 63 (Fertitta Decl.)); (4) SAC Bujanda permitted SA Krankle Enviah, who like the others did not file any EEO complaints, to work part-time in Santa Fe and part-time in Albuquerque (Dkt. No. 132-1 at 115:12–116:1 (Bujanda Depo.)); and (5) SAC Bujanda transferred away from the RA another agent who physically threatened to stab an Assistant U.S. Attorney in the head with a knife (Pl.'s AUMF ¶ BBBB). Apart from evidence that these transfers took place, Plaintiff does not present any admissible evidence to show the circumstances of the transfers or to demonstrate that the transferred agents were similarly situated to him. Indeed, Plaintiff's counsel conceded that the record is devoid of evidence as to *why* the enumerated individuals were transferred. Hr'g at 12:10:56–12:13:30. Without evidence concerning the circumstances of these transfers, the Court considers the fact of their transfer immaterial to Plaintiff's discrimination and retaliation claims.

[11] SSA Giles testified to the contrary, insisting that he did *not* have an agreement with Plaintiff during the time he served as his supervisor (*i.e.*, from October 2020 through May of 2021) under which Plaintiff was permitted to work half-time from the Santa Fe RA. Dkt. No. 133-2 at 148:10–19 (Giles Depo.). Instead, SSA Giles testified that it was "situationally dependent" when Plaintiff would work from the Santa Fe RA and that Plaintiff kept him apprised when he had work or meetings that required him to be in Santa Fe. Dkt. No. 133-2 at 148:20–150:4 (Giles Depo.).

to Albuquerque, which he reports resulted in "inquiries and assumptions" about his competence or conduct. Dkt. No. 132-26 ¶ 71 (Fertitta Decl.).

SSRA Seals attested that SAC Bujanda told him that Plaintiff was not allowed to work out of Santa Fe because SAC Bujanda did not "want to award people for making complaints," or words or a sentiment to that effect.[12] Dkt. No. 132-26 ¶ 73 (Fertitta Decl.); Dkt. No. 132-23 at 3–4 (Seals EEO Affidavit). SSA Seals apprised Plaintiff of this comment on November 9, 2021. Dkt. No. 132-26 ¶ 73 (Fertitta Decl.). Although SSA Seals could not elaborate on SAC Bujanda's comment when asked about it at his deposition, he did not dispute that SAC Bujanda made such comment or that Bujanda's statements were relayed to Plaintiff. Dkt. No. 132-5 at 43:5–47:3 (Seals Depo.). For his part, SAC Bujanda denied expressing the sentiment that complainers should not be rewarded. Dkt. No. 132-1 at 122:17–19 (Bujanda Depo.).

### *G. FBI's Failure to Decide Transfer Request*

SSA Sweeny began serving as Plaintiff's first-level supervisor in October 2021 when Plaintiff was assigned to his squad. Def.'s UMF ¶¶ 78–80. He first learned of Plaintiff's alleged disability around the same time. Def.'s UMF ¶ 80. According to SSA Sweeny, Plaintiff was either on leave without pay or military leave for three to four months between October 7, 2021 and May 2022. Dkt. No. 131-23 at 4 (Sweeny Affidavit). Plaintiff was then stationed in Norfolk, Virginia for his active military service. Def.'s UMF ¶ 83; Pl.'s AUMF ¶ WWWW; Dkt. No. 131-25 at 3. On September 14, 2022, Plaintiff's wife, Emily Fertitta, was granted a Non-Bureau Common

[12] Defendant contends that this statement by SSRA Seals constitutes inadmissible hearsay that the Court should disregard on summary judgment. Dkt. No. 133 at 29 (citing *Johnson v. Weld Cnty., Colo*., 594 F.3d 1202, 1209 (10th Cir. 2010)); *see also* Hr'g at 10:48:13–10:50:26. The Court disagrees, as SSA Seals would be permitted to testify at trial as to an admission by SAC Bujanda (*i.e*., one of the FBI employees "involved in the decisionmaking process affecting the employment action" against Plaintiff). *See Johnson*, 594 F.3d at 1209; Fed. R. Civ. P. 56(c)(2) (a party may object only that "the material cited . . . cannot be presented in a form that would be admissible in evidence."); Hr'g at 10:49:51–10:50:26 (conceding that SSA Seals would be permitted to testify as to SAC Bujanda's statements on this topic).

Household Transfer ("CHTNB") from the Santa Fe RA, where she was assigned as a special agent, to the FBI's Norfolk, Virginia field office to join Plaintiff while he performed his military service. Def.'s UMF ¶ 83; Pl.'s AUMF ¶ WWWW; Dkt. No. 131-24; Dkt. No. 131-25. Almost a year later, on August 22, 2023, Plaintiff informed his FBI chain of command in Albuquerque that he would be released from military duty and would return to work for the FBI in January 2024. Def.'s UMF ¶ 84.

On September 21, 2023, Plaintiff requested a CHTR from Albuquerque to Norfolk. Def.'s UMF ¶ 85; Pl.'s AUMF ¶ UUUU. The FBI's Transfer Policy provides that "if one spouse in a [special agent] couple . . . receives a transfer, the other spouse is afforded a no-cost common household transfer to accompany the spouse receiving the transfer." Dkt. No. 131-8 at 9, § 4.5.3.1 (Transfer Policy). With respect to Plaintiff's CHTR request, SAC Bujanda told HRD Assistant Director Michael Schneider that he would approve the request, but he noted that Plaintiff and his wife appeared to be attempting to use the CHTR to accomplish a joint move to Norfolk. Dkt. No. 131-25; Dkt. No. 131-4 at 127:2–19 (Bujanda Depo.). Despite SAC Bujanda indicating in September 2023 that he would "approve the [transfer] request" (Pl.'s AUMF ¶ DDDDD), Dominique Carla Evans, then-Acting Section Chief ("A/SC") for HRD, reported that HRD never formally received the request "because it was not approved by [Albuquerque]" (Dkt. No. 131-27 at 2).

SAC Bujanda indicated that Plaintiff's CHTR request raised concerns "with setting precedence [sic]." Pl.'s AUMF ¶ ZZZZ. He elaborated that he was trying to prevent "[o]thers trying to do the same thing, trying to defraud the government by having . . . moves made at the same time." Pl.'s AUMF ¶ AAAAA. When asked whether he believed Plaintiff and his spouse were trying to defraud the government, SAC Bujanda responded that he believed the Fertittas were

attempting to do so "[b]y asking to have their household moved twice in common household." Pl.'s AUMF ¶ AAAAA. Although SAC Bujanda, as the lead federal law enforcement officer for the State of New Mexico, had a duty to report suspected fraud by a holder of top-secret security clearance, he did not report the Fertittas. Pl.'s AUMF ¶ CCCCC.

Without any knowledge of Plaintiff's alleged physical or mental disability or prior EEO activity, A/SC Evans completed an assessment for Plaintiff's CHTR request in September 2023. Def.'s UMF ¶¶ 87–88. Based on the information provided by the Albuquerque field office, the mission of the FBI, and her consideration of whether the transfer request satisfied the intent of a CHTR, A/SC Evans concluded that Plaintiff was *ineligible* for the requested transfer to Norfolk. Dkt. No. 131-26 at 4 (Evans Affidavit); Pl.'s AUMF ¶ XXXX. HRD advised SAC Bujanda to that effect and explained that Plaintiff's wife would need to request a return to the Albuquerque field office for the couple to remain in the same office. Dkt. No. 131-27 at 3 (Evans Affidavit); Dkt. No. 131-4 at 125:5–20 (Bujanda Depo.). A/SC Evans did not consider Plaintiff's EEO activities or his physical or mental disabilities when evaluating Plaintiff's CHTR request (Def.'s UMF ¶ 91), and she understood that the Albuquerque field office would communicate the status of the CHTR request to Plaintiff. Def.'s (UMF ¶ 92).

SAC Bujanda testified that he believed he *had* timely approved Plaintiff's CHTR request at his level and assumed HRD would notify Plaintiff that he was ineligible for transfer. Dkt. No. 131-4 at 125:9–20, 126:2–12, 134:1–135:6 (Bujanda Depo); Dkt. No. 131-29 at 2 (Bujanda EEO Supplemental Affidavit); Pl.'s AUMF ¶ EEEEE. But on October 25, 2023, Plaintiff was informed that his "request [was] pending at the SAC level [and a]ction [could] be taken by . . . Raul Bujanda, Ruben Morales, Philip Russell or [redacted]." Pl.'s AUMF ¶ EEEEE; Dkt. No. 132-26, Ex. N. As

of June 4, 2024, Plaintiff's CHTR request remained pending in the FBI HRD Transfer Request portal. Dkt. No. 132-26 ¶ 84 (Fertitta Decl.).

SAC Bujanda testified that he did not have the authority to approve a full-time transfer to a new location without HRD's approval. Dkt. No. 131-4 at 93:5–94:7 (Bujanda Depo.); Dkt. No. 131-28 at 3 (Bujanda EEO Affidavit) ("I was not the final decision maker for [Plaintiff's] transfer request, as HRD makes those decisions."). And according to A/SC Evans, even if SAC Bujanda had approved Plaintiff's request for a CHTR to Norfolk, HRD would *not* have approved it, as HRD had determined that Plaintiff was ineligible for the transfer. Dkt. No. 131-27 at 2 (Evans Supplemental Affidavit).

Even so, SAC Bujanda attested that he approved a temporary duty assignment hardship transfer for Plaintiff to Norfolk in January 2024. Dkt. No. 131-28 at 4 (Bujanda Affidavit).

### *H. EEO Complaint 2024-0003*

Plaintiff filed an EEO Complaint for reprisal on October 24, 2023. Def.'s UMF ¶ 97. The OEEOA initially communicated one accepted issue for investigation. Def.'s UMF ¶ 98. Plaintiff later amended his EEO complaint to add an additional claim for discrimination and retaliation based on physical and mental disability, asserting that "since September 21, 2023, he ha[d] not received a response to his request to transfer to another field office." Def.'s UMF ¶ 99.

### *I. Requests for Medical Documentation (November 2021 and January 2022)*

After attending an FBI Agent "Fit for Duty" medical examination, which is a condition of employment with the FBI, Plaintiff was found fit for duty on September 9, 2021. Dkt. No. 132-26, Ex. J; Dkt. No. 132-4 at 21:3–22:1 (Price Depo.); Dkt. No. 133-5 at 7, 23 (FBI FFD Policy Guide). Two months later, on November 3, 2021, the FBI directed Plaintiff to complete a mental health evaluation to assess his psychological fitness for duty. Dkt. No. 132-26 ¶ 75 (Fertitta Decl.); Dkt.

No. 132-4 at 9–17 (Price Depo.). Amanda Price, the nurse who requested the mental health evaluation, testified that she unilaterally initiated a request for Plaintiff's mental health records when she noticed a new medication prescribed for PTSD in his medical records. Dkt. No. 132-4 at 22:18–23:6, 26:6–11 (Price Depo.). Ms. Price acknowledged that requiring agents to undergo mental health evaluations "may seem like a deterrent [because] . . . agents feel like this is a risk to their job." Dkt. No. 132-4 at 30:1–12 (Price Depo.).

Ms. Price testified that in early 2022, she was summoned to the office of a member of FBI executive management to discuss how the FBI could be assured that it was safe for Plaintiff to return to FBI work following extended leave. Dkt. No. 132-4 at 35:8–36:25 (Price Depo.). Ms. Price stated that this was the only time in her eight-year career that she recalled being summoned by executive management to discuss a Fitness for Duty examination for an FBI agent. Dkt. No. 132-4 at 37:10–24 (Price Depo.). According to Ms. Price, the Administrative Officer and ASAC who summoned her reported to SAC Bujanda. Dkt. No. 132-4 at 35:1–36:25 (Price Depo.).

On January 12, 2022, at the behest of FBI executive management, Ms. Price asked Plaintiff to have his physician complete a Certificate of Essential Duty Status (FD-948) at his next appointment. Dkt. No. 132-4 at 34:18–36:25 (Price Depo.). Ms. Price testified that FBI executive management reported having received guidance from HRD that it was appropriate to request completion of that form to ensure that it was safe for Plaintiff to return to work following his extended absence. Dkt. No. 132-4 at 36:17–21 (Price Depo.). According to Plaintiff, Ms. Price told him over the phone that she was "afraid to put anything in writing" that would disclose which unidentified ASAC made the request for the additional evaluation. Dkt. No. 132-26 ¶ 77 (Fertitta Decl.). Ms. Price later testified that she did not recall the details of her January 2022 phone conversation with Plaintiff. Dkt. No. 132-4 at 41:6–42:7 (Price Depo.).

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1290 (10th Cir. 1999). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986). Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. at 248.

Initially, the moving party bears the burden of showing that no genuine issue of material fact exists. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial. *Id.* The nonmoving party must go beyond the pleadings and must designate specific facts derived from admissible evidence (affidavits, depositions, answers to interrogatories, or admissions) demonstrating a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In deciding a motion for summary judgment, the court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995). If there is no genuine issue of material fact in dispute, then the court must determine whether the movant is entitled to judgment in its favor as a matter of law. *See Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex Corp*., 477 U.S. at 322.

## IV. PARTIES' PRIMARY ARGUMENTS

Defendant contends that Plaintiff failed to exhaust the Rehabilitation Act discrimination claim asserted in Count I of his Complaint and, to the extent Count I purports to include a claim for retaliation or reprisal, any such claim arising prior to September 21, 2021. Dkt. No. 131 at 21–26. Defendant further argues that even if Plaintiff exhausted his discrimination claim, he fails to demonstrate that he had a disability under the Rehabilitation Act or to satisfy his burden at the first and third steps of the *McDonnell Douglas* framework on that claim. *Id*. at 24–28. That is, Defendant insists that Plaintiff can neither establish a prima facie claim of discrimination nor demonstrate that the legitimate business reasons the FBI offers for its employment decisions were a pretext for disability discrimination. *Id*. at 26–31.

With respect to Plaintiff's retaliation claims in Count II of his Complaint, Defendant contends that Plaintiff fails to establish a prima facie case of retaliation because he has not demonstrated any adverse employment action resulting in significant harm that was causally connected to his protected activity. Dkt. No. 131 at 31. As with Plaintiff's discrimination claims, Defendant maintains that Plaintiff cannot show that the legitimate business reasons offered by the FBI for its employment decisions were pretext for retaliation. *Id*. at 34–45. Insofar as Plaintiff's retaliation claims arise from the FBI's requests that he provide medical or mental health evaluations or records, Defendant insists that the Court lacks jurisdiction over those claims. Dkt. No. 133 at 42.

For his part, Plaintiff insists that, in light of his telephonic communications with an EEO counselor in June 2021, issues of fact exist as to whether he exhausted his disability discrimination claims. Dkt. No. 132 at 36–38. Plaintiff contends that he makes out a prima facie case of disability discrimination by establishing a disability under the Rehabilitation Act (*i.e.*, hearing impairment)

and by creating genuine issues of material fact both as to whether he experienced an adverse employment action and as to whether the FBI had knowledge of his disability. Similarly, Plaintiff insists that there are genuine issues of material fact as to whether the non-discriminatory grounds the FBI asserts for its employment actions were pretext for disability discrimination. *Id*. at 42–45.

As to his three Count II retaliation claims, Plaintiff contends that there are genuine issues of material fact as to whether a reasonable employee would have been dissuaded from making or supporting a discrimination charge by actions such as those Defendant took against him. *Id*. at 46. Finally, Plaintiff contends that he presents both direct and circumstantial evidence that the reasons offered by Defendant for the FBI's employment actions against him were pretext for retaliation. *Id*. at 47–56.

Turning to the Motion to Strike and for Leave to Supplement Pleadings, Plaintiff first urges the Court to strike the declarations of Kimberly Edmonds and Shannon Rose because Defendant failed to disclose either witness in its initial disclosures and thereafter relied on those declarations without affording Plaintiff an opportunity to depose either witness. Dkt. No. 135 at 1–2. Plaintiff further contends that, even if Edmonds and Rose are proper rebuttal witnesses, Federal Rule of Civil Procedure 26(a)(1) does not exempt their disclosure. *Id*.

Defendant, on the other hand, argues that motions to strike are disfavored and that Federal Rule of Civil Procedure 12(f) applies only to pleadings, not to declarations. Dkt. No. 137 at 2–3. Defendant also contends that Edmonds and Rose's declarations respond to matters placed at issue by Plaintiff's response brief and therefore should be considered in evaluating Plaintiff's contentions and "new evidence." *Id*. at 4.

Plaintiff's Motion also addresses an independent issue: whether Plaintiff should be permitted to supplement the record with e-mail correspondence he received seven days after he

responded to Defendant's summary judgment motion that suggests his 2023 request for a transfer from New Mexico to Virginia remains pending within in his division. Dkt. No. 135 at 3. According to Plaintiff, the e-mail correspondence undermines Defendant's position that HRD reviewed Plaintiff's transfer request and determined that he was not entitled to the transfer. *Id*.

In response, Defendant contends that the proposed evidence is untimely, inadmissible, and immaterial to the issues in the case and fails to create an issue of material fact. Dkt. No. 137 at 4.

## V. ANALYSIS

Defendant seeks summary judgment on the grounds that Plaintiff failed to exhaust his discrimination claims and failed to raise a genuine issue of material fact as to whether Defendant discriminated against him based on a disability or retaliated against him due to protected activity when (1) Plaintiff's May 2021 application for the Santa Fe PRS role was rejected by his FBI supervisors (Count I); (2) SSA Giles gave Plaintiff an unfavorable performance check-in on June 15, 2021[13] (Count I); (3) Plaintiff was assigned as PRS for the Santa Fe RA but was required to perform that role from Albuquerque (Count II); (4) Plaintiff was required to provide additional

[13] At the July 1, 2026 Motions Hearing, counsel for Plaintiff acknowledged that Count I of the Amended Complaint focuses on the alleged denial of (or refusal to forward) Plaintiff's May 2021 PRS application and does not specifically allege that Defendant also discriminated against Plaintiff by providing an unfavorable performance check-in on June 15, 2021. Hr'g at 12:36–12:37:20. Plaintiff's counsel argued, however, that Federal Rule of Civil Procedure 8 does not require all evidence of discrimination to be specified within Count I. *Id*. Plaintiff's counsel observed that the performance check-in was listed as an issue that the FBI investigated, and he argued that there is no prejudice to the FBI in considering the performance check-in as a form of alleged discrimination against Plaintiff. Reading the Complaint as a whole and construing the facts alleged, including those related to the unfavorable performance check-in (*see, e.g.*, Dkt. No. 69 ¶¶ 29, 32), in the light most favorable to Plaintiff as the non-movant, the Court is satisfied that the Complaint provides fair notice to Defendant that the unfavorable performance check-in is one ground upon which Plaintiff's discrimination claim rests. The Court therefore considers the parties' arguments on that claim.

medical documentation to Defendant (Count II); and (5) Defendant failed to approve Plaintiff's request for a Common Household Transfer ("CHTR") to Norfolk, Virginia (Count II).

### *A. Count I*

In Count I, Plaintiff asserts that Defendant violated the Rehabilitation Act when SSA Giles, Plaintiff's first-level supervisor, discriminated against him by rejecting his May 2021 PRS application because of his disability or record of impairment. Dkt. No. 69 at 21 ¶ 100 (Am. Compl.). In addition, the parties treat Plaintiff's allegation that SSA Giles discriminated against him by giving him an unfavorable performance check-in on June 15, 2021 (*see id*. at ¶¶ 28–29) as another subclaim of Count I. As to both claims, Defendant maintains that Plaintiff has neither exhausted nor satisfied his *McDonnell Douglas* burden.

#### i. <u>Exhaustion</u>

##### a. Discrimination Claims (Count I)

"Federal employees alleging discrimination or retaliation prohibited by . . . the Rehabilitation Act must comply with specific administrative complaint procedures in order to exhaust their administrative remedies." *Hickey v. Brennan*, 969 F.3d 1113, 1118 (10th Cir. 2020) (quoting *Showalter v. Weinstein*, 233 F. App'x 803, 804 (10th Cir. 2007)). Exhaustion is not a jurisdictional prerequisite for suit; however, it is a claims-processing rule that the employer may raise as an affirmative defense. *See Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1185 (10th Cir. 2018) ("[A] plaintiff's failure to file an EEOC charge regarding a discrete employment incident merely permits the employer to raise an affirmative defense of failure to exhaust but does not bar a federal court from assuming jurisdiction over a claim."). Exhaustion is thus subject to the same waiver and estoppel principles that govern other affirmative defenses. *Id.* at 1186 n.11. "[E]quitable doctrines such as tolling or estoppel . . . are to be applied sparingly," however, *Nat'l R.R. Passenger*

*Corp. v. Morgan,* 536 U.S. 101, 113, (2002), because the "[p]rocedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants," *Baldwin Cty. Welcome Ctr. v. Brown*, 466 U.S. 147, 152 (1984) (per curiam).

When exhausting his administrative remedies, a federal employee must "initiate contact" with an EEO counselor at his agency "within 45 days of the date of the matter alleged to be discriminatory," 29 C.F.R. § 1614.105(a)(1), and file an EEO complaint with that agency, 29 C.F.R. § 1614.106(a). "[A] plaintiff's claim in court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC." *Smith v. Cheyenne Ret. Invs. L.P.*, 904 F.3d 1159, 1164 (10th Cir. 2018). For the FBI, it is the OEEOA or EEO office that receives and investigates EEO complaints. *Berry v. Bondi*, No. 25-2014, 2026 WL 574889, at *1 (10th Cir. Mar. 2, 2026).

Here, Defendant insists that Plaintiff failed to initiate the requisite contact with an EEO counselor until July 18, 2021, and that, as a result, any alleged discriminatory actions prior to June 3, 2021 (*i.e.*, Defendant's alleged interference with Plaintiff's May 2021 PRS and his non-selection for that position),[14] were not timely exhausted. Dkt. No. 131 at 22. Plaintiff, on the other hand, points to evidence of communications he initiated with EEO counselors on June 23, 2021 and June 24, 2021, and he insists that issues of fact exist as to whether he timely initiated contact with the EEO concerning disability discrimination claims arising from the May 2021 rejection of his PRS application. Dkt. No. 132 at 36–38. A summary of that evidence follows.

[14] SSA Giles notified Plaintiff that his application would not be approved on May 3, 2021, and Plaintiff identifies May 17, 2021, as the date he first learned that his May 2021 application for the Santa Fe PRS position had been denied.

Plaintiff attests that he made several calls to the OEEOA on June 23, 2021 and June 24, 2021, speaking to more than one EEO counselor. He avers that, during these calls, he advised EEO counselors that (1) he was considered a disabled veteran by the U.S. Department of Veterans Affairs due to injuries he sustained during combat operations; (2) he had recently missed a significant amount of work for treatment and testing related to those injuries; (3) he had been "blocked" from applying for a promotion in violation of FBI policy due to those work absences; and (4) he was seeking resolution and protection from continued retaliation. Plaintiff insists that he referenced both USERRA *and* "EEO laws" during those calls because it was his understanding at that time that "USERRA and EEO protections were essentially the same" with respect to protecting servicemembers with disabilities. He reports that an EEO counselor advised him that he "had no protections under EEO law, that the EEO office had never before handled a complaint from a disabled service member, and that USERRA was likely [his] only protection." According to Plaintiff, the EEO counselor agreed to research the issue and get back to him. To corroborate this account, Plaintiff supplies phone records showing outgoing calls to a Washington D.C. number at 11:27 a.m. and 11:28 a.m. on June 23, 2021.

In addition to his phone conversations with EEO counselors in June 2021, Plaintiff e-mailed the OEEOA on the afternoon of June 23, 2021, advising that he was "in process of submitting a complaint under [USERRA]" and asking whether the "EEO office receive[s] such complaints [and asking] if not, what is the correct venue to find assistance with such complaints." According to Plaintiff, he sent this e-mail following his phone conversation with EEO counselors "to make record of [his] request for USERRA information." The EEO office responded by e-mail the following day, directing Plaintiff to the Department of Labor's Veterans Employment and Training Service and explaining that the Department of Labor could assist him in filing a USERRA

complaint. Although Plaintiff filed a complaint with the Department of Labor as advised, on July 18, 2021, he received notification that the FBI is exempt from Department of Labor oversight. That same day, Plaintiff sent another email to OEEOA, explaining that he had an issue that he believed fell "under EEOA purview," given that it involved his "status as a disabled veteran." The OEEOA advised Plaintiff that July 18, 2021, would be regarded as his initial contact date with the OEEOA for purposes of his EEO claims.

Based on the summary judgment record, Plaintiff contends that he timely "initiate[d] contact" with the EEO as to his disability discrimination claims within the meaning of the applicable regulation, because he satisfies three elements: "(1) [he] contact[ed] an agency official logically connected with the EEO process . . . ; (2) demonstrate[d] an intent to begin the EEO process; and (3) allege[d] that an incident in question is based on discrimination." Dkt. No. 132 at 36–37 (quoting *Brucks v. O'Neill*, 184 F. Supp. 2d 1103, 1110 (D. Kan. 2001) (quoting *Johnson v. Glickman*, 155 F. Supp. 2d 1240 1247 (D. Kan. 2001)). But as the Tenth Circuit recently explained in *Berry v. Bondi*, it has *not* adopted the three-element test for exhaustion articulated by the District of Kansas in *Brucks*. 2026 WL 574889, at *8.

To the extent Plaintiff avers that he advised EEO counselors on June 23, 2021 and June 24, 2021, that his PRS application was blocked because of absences related to treatment for his medical impairments, Defendant insists that his "self-serving declaration" is not supported by his concurrent e-mail communications with EEO counselors, by the EEOC's acceptance letter, or by any other documentation in the record, and is therefore insufficient to create a genuine issue of material fact. That is, although undisputed evidence shows that Plaintiff emailed and called the OEEOA in June 2021, Defendant maintains that his communications concerned *only* his USERRA claims and did not include any mention of a potential disability discrimination claim. Dkt. No. 131

at 23. In support, Defendant notes that the OEEOA itself concluded that Plaintiff's June 24, 2021 email to an EEO counselor failed to exhibit the requisite intent to commence the EEO process, and it therefore regarded Plaintiff's July 18, 2021 e-mail to the EEO as his first initiation of contact concerning discrimination. *Id*. In addition, Defendant offers the sworn statement of Kimberly Edmonds of the OEEOA in which she suggests that "generally . . . when an employee contacts OEEOA with a concern outside the purview of EEO laws, [the OEEOA] provide[s] information for contacting those alternative entities, while continuing to process any EEO-related matters that may be raised." Dkt. No. 133-3 at 1 ¶ 4 (Edmonds Decl.). Ms. Edmonds goes on to observe that Plaintiff's June 2021 e-mail to the EEO "shows that [he] contacted the EEO Counseling Program . . . regarding his pursuit of a complaint under" USERRA. Dkt. No. 133-3 at 2 ¶ 5 (Edmonds Decl.). In sum, Defendant insists that the admissible evidence before the Court establishes that Plaintiff did *not* inform the OEEOA of his discrimination claim until July 18, 2021, over 45 days after the May 2021 vacancy had closed. Dkt. No. 133 at 34 (citing Def.'s UMF ¶¶ 71–77).

Defendant's reliance on Ms. Edmond's declaration implicates Plaintiff's Motion to Strike, in which he asks the Court to strike the declarations of both Kimberly Edmonds and Shannon Rose pursuant to Federal Rule of Civil Procedure 37(c)(1). Dkt. No. 135 at 1. Federal Rule of Civil Procedure 37(c)(1) provides that if any party fails to provide information or identify a witness as required by Federal Rule of Civil Procedure 26(a), "the party is not allowed to use that information or witness to supplement evidence on a motion . . . unless the failure was substantially justified or is harmless." In assessing substantial justification and harmlessness, courts consider (1) prejudice or surprise; (2) ability to cure prejudice, if any; (3) extent to which the testimony would disrupt a trial; and (4) bad faith or willfulness." *Gale v. Uintah County*, 720 F. App'x 427, 431 (10th Cir. 2017)).

Plaintiff argues that Defendant is unable to demonstrate that his failure to disclose Kimberly Edmonds or Shannon Rose was substantially justified or harmless. Dkt. No. 135 at 2. He notes that Defendant provided his initial disclosures nearly three years before discovery closed and then never sought to amend those disclosures to identify Edmonds or Rose. *Id*. (citing Dkt. No. 38; Dkt. No. 129; Crotty Decl., Ex. A). Plaintiff insists that Defendant relies on Edmonds and Rose's declarations without affording him any opportunity to depose the declarants. *Id*. (citing *Vesom v. Atchison Hospital Ass'n*, 279 F. App'x 624, 631 (10th Cir. 2008)). Plaintiff also emphasizes that the Tenth Circuit has consistently held that allowing undisclosed witness declarations at the summary judgment stage prejudices the opposing party. *Id*. (citing *Clean Harbors, Inc. v. CBS Corp*., 875 F. Supp. 2d 1311, 1317 (D. Kan. 2012); *Univ of Kan. v. Sinks*, 565 F. Supp. 2d 1216, 1229 (D. Kan. 2008)). Although Defendant contends that motions to strike are disfavored by courts and that Federal Rule of Civil Procedure 12(f) only applies to pleadings (Dkt. No. 137 at 2–3), Plaintiff insists that his Motion to Strike is governed by Rule 37(c)(1), not Rule 12(f) (Dkt. No. 138 at 1).

Defendant notes that his initial disclosures listed "other witnesses required for foundational or rebuttal purposes," and he insists that Edmonds and Rose qualify as rebuttal witnesses. Dkt. No. 137 at 3 (citing Dkt. No. 135-1); *see also* Hr'g at 12:45:39–12:45:57. In Defendant's view, Edmonds and Rose's declarations rebut Plaintiff's representation that he discussed initiating EEO claims with the OEEOA prior to July 18, 2021. Dkt. No. 137 at 3 (citing Dkt. No. 132-25 ¶ 38–45 (Fertitta's Decl.)). Defendant emphasizes that Edmonds and Rose's declarations respond to matters placed at issue by Plaintiff for the first time in his response to Defendant's Motion for Summary Judgment: that in addition to discussing potential USERRA violations with EEO counselors on

June 23, 2021 and June 24, 2021, he also mentioned potential violations of "EEO laws" on those same dates. *Id*. at 3–4.

Plaintiff contends that Edmonds and Rose are *improper* rebuttal witnesses, suggesting that the phone records on which he relies to establish his June 23, 2021 and June 24, 2021 phone conversations with EEO counselors were not "unanticipated" by Defendant.[15] Dkt. No. 138 at 2–3. Plaintiff also insists that the subject phone records directly contradict Defendant's argument that his declaration is "unsupported by any other documentary evidence." *Id*. at 3 (citing Dkt. No. 133 at 34-35). Moreover, Plaintiff argues that even if Edmonds and Rose were proper rebuttal witnesses, they were still subject to Rule 26(a)(1), which requires a party to disclose the name and contact information for any individual likely to have discoverable information that the party may use to support its claims or defenses, unless solely for impeachment. *Id*. Plaintiff observes that Rule 26(a)(1) contains no exemption from disclosure on the basis that a witness's testimony rebuts that of another witness. *Id*. (citing Federal Rule of Civil Procedure 26(a)(1); *Faure v. Las Cruces Med. Ctr., LLC*, No. 14cv559 KG/KBM, 2017 WL 4119162, at *2 (D.N.M. Sept. 15, 2017) ("Witnesses, including rebuttal witnesses, are subject to the Rule 26(a)(1) disclosure requirements, unless they are offered solely for impeachment purposes."). According to Plaintiff, a vague reference within Defendant's initial disclosures to "other witnesses required for foundational or rebuttal purposes" fails to satisfy Rule 26(a)(1)'s disclosure requirements, particularly when the declarations are not used solely for impeachment. *Id*. at 4 (citing *Poitra v. Sch. Dist. No. 1 in the*

[15] Plaintiff explains that, as early as March 2022, he included the subject phone records in an e-mail to FBI EEO Investigator Lowanda Hill as part of the EEO Investigation. Dkt. No. 138 at 2–4 (citing Dkt. No. 132-26 ¶ 3–6 (Fertitta Decl.)). In addition, Plaintiff insists that the FBI cellphone records contained evidence of the calls. *Id*. at 3 (citing Dkt. No. 132-26 ¶ 9 (Fertitta Decl.)). He also explains that, after realizing the subject phone records were not included in the Report of Investigation, he mailed a hard copy to the U.S. Attorney's Office in January 2025, which was received and confirmed by former AUSA Jesse Hale in August 2025. *Id*. (citing Dkt. No. 132-26 ¶12-13 (Fertitta Decl.)). Finally, Plaintiff explains that the phone records were produced yet again to defense counsel during discovery on February 4, 2025. *Id*. (citing Dkt. No. 132-26 ¶ 94 (Fertitta Decl.)).

*Cnty. of Denver*, 311 F.R.D. 659, 662 n.3 (D. Colo. 2015)). Plaintiff emphasizes that Defendant relies on the declarations as substantive support for the position that Plaintiff first initiated contact with an EEO counselor in July 2021. *Id*. (citing Dkt. No. 133 at 34; *Paul v. Aramark Healthcare Support Servs*., LLC, No. 1:15-CV-189-MHC, 2016 WL 7888045, at *4 (N.D. Ga. June 2, 2016); *Powers v. Emcon Assocs., Inc*., No. 14-cv-03006-KMT, 2017 WL 2718476, at *4 (D. Colo. June 23, 2017)).

Although the Court is inclined toward Defendant's position that Rose and Edmonds were proper rebuttal witnesses, it need not resolve whether Defendant was required to disclose them as part of his initial or supplemental disclosures. Regardless of the substance of Rose and Edmonds's declarations, the Court is satisfied that Plaintiff raises a genuine issue of fact as to whether he timely exhausted his disability discrimination claims arising from the rejection of his May 2021 PRS application and an unfavorable performance check-in. Construing the facts and reasonable inferences in the light most favorable to Plaintiff, the Court notes that there is evidence in the summary judgment record – specifically, Plaintiff's own sworn statement – that he initiated contact with EEO counselors on June 23, 2021 and June 24, 2021, to seek protection under the "EEO laws" from what he considered to be discrimination by the FBI on account of injuries sustained during military combat. Moreover, Plaintiff presents evidence that he initiated that contact with the EEO less than 45 days after he learned, on May 17, 2021, that his application for the PRS position had been denied. In addition, the record suggests that Plaintiff also initiated contact with an EEO counselor on July 18, 2021, to address conduct he believed fell "under EEOA purview." That contact occurred within 45 days of his unfavorable performance check-in on June 15, 2021. And notably, the OEEOA advised Plaintiff by letter on February 24, 2022, that both the denial of his request to apply for the May 2021 PRS position and his unfavorable performance check-in

were among the issues accepted for investigation. As a result, Defendant's Motion for Summary Judgment is **DENIED IN PART** insofar as he contends that Plaintiff failed to timely exhaust his discrimination claims.

With respect to Plaintiff's Motion to Strike, the Court concludes that Edmonds and Rose's declarations, which were offered to rebut those of Plaintiff, at most present disputes of fact as to what was discussed with the EEO counselors on June 23, 2021 and June 24, 2021, and whether Plaintiff explicitly invoked "EEO laws" during those communications or instead merely complained of USERRA violations. Because the Court cannot resolve disputes of fact on summary judgment, considering Edmonds and Rose's declarations would not affect the outcome of Defendant's Motion for Summary Judgment. As such, Plaintiff's Motion to Strike is **DENIED AS MOOT**.

**b. Retaliation or Reprisal Claim (Count I)**

As to any claim of retaliation or reprisal,[16] Defendant insists that Plaintiff failed to timely exhaust any such claim arising prior to September 21, 2021. Dkt. No. 131 at 23. Relatedly, Defendant maintains that Plaintiff offers no competent evidence to support a finding that Defendant was aware of any protected activity prior to September 21, 2021. Dkt. No. 133 at 35 (citing Def.'s UMF ¶ 76). Plaintiff neither argues in opposition nor presents any evidence to suggest that he timely exhausted a retaliation or reprisal claim asserted under Count I that arose prior to September 21, 2021. As a result, Defendant's Motion for Summary Judgment is **GRANTED** to the extent it seeks judgment in Defendant's favor based on Plaintiff's failure to

[16] Defendant observes that "Count I asserts adverse actions occurring between his first PRS application in April 2021, and the last PRS application in August 2021" and perceives a possible retaliation or reprisal claim in Count I. Dkt. No. 131 at 23–24.

exhaust any claim within Count I for retaliation or reprisal and as to any such action arising prior to September 21, 2021.

**ii. <u>Prima Facie Case of Discrimination</u>**

Under the *McDonnell Douglas* burden-shifting framework, which applies to Rehabilitation Act discrimination cases, Plaintiff must establish a prima facie case of discrimination by satisfying four elements: (1) he is disabled under the Act; (2) he is "otherwise qualified"; (3) he works for a federal agency; and (4) the agency discriminated against him on the basis of his disability. *McGeshick v. Principi*, 357 F.3d 1146, 1150 (10th Cir. 2004). With regard to the third element of Plaintiff's disability discrimination claim, the evidence must support a reasonable inference that Plaintiff's disability was the "sole cause" of the adverse action. *See* 29 U.S.C. § 794(a) ("solely by reason of . . . his disability); *Crane v. Utah Dep't of Corr*., 15 F.4th 1296, 1313 (10th Cir. 2021) (explaining that although claims are typically evaluated identically under the ADA and Rehabilitation Act, "a point of possible divergence is the different causation standard" under the Rehabilitation Act, which "prohibits discriminating against qualified individuals 'solely by reason of [their] disability'" (quoting 29 U.S.C. § 794(a))).

**a. Disability under the Rehabilitation Act**

Defendant begins by challenging Plaintiff's prima facie showing as to the first element: disability under the Rehabilitation Act. The Act defines an "individual with a disability" as any person who (1) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) has a record of such impairment, or (3) has been regarded as having such an impairment." 42 U.S.C. § 12102(1); 29 U.S.C. § 705(20)(B); 29 C.F.R. § 1630.2(g). The Tenth Circuit has construed the Rehabilitation Act to require two elements (1) "that the [plaintiff] has, has a record of having, or is regarding as having a physical or mental

impairment; and (2) that [his] impairment 'substantially limits one or more major life activities.'" *Welsh v. City of Tulsa, Okla*., 977 F.2d 1415, 1417 (10th Cir. 1992). The regulations issued by the Department of Health and Human Services under the Rehabilitation Act define major life activities as functions such as "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking standing, sitting, . . . ." among other things. 29 C.F.R. § 1630.2(i). To qualify, an impairment must be one that "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii).[17] "An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Id*. Moreover, "'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by [its] terms." *Id*. at § 1630.2(j)(1)(i). In short, "'substantially limits' is not meant to be a demanding standard." *Id*.

The EEOC regulations list three factors to be considered in determining whether an individual is substantially limited in a major life activity: "(i) [t]he nature and severity of the impairment; (ii) [t]he duration or expected duration of the impairment; and (iii) [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Id*. § 1630.2(j)(2).

Because Plaintiff continued to work, serve in the military, and perform other life activities during times relevant to his discrimination claim, Defendant argues that he fails to establish that he suffered from a disability under the Rehabilitation Act. Dkt. No. 131 at 25. Plaintiff, in contrast, insists that his impairments were "well-recorded" and date back to 2017, when he received a VA

---

[17] In the Tenth Circuit, "ADA standards apply to § 504 claims." *Reinhardt v. Albuquerque Pub. Schs. Bd. of Educ*., 595 F.3d 1126, 1133 (10th Cir. 2010).

decision letter that highlighted his service-connected disabilities. Dkt. No. 132 at 38. Plaintiff notes that he was diagnosed with PTSD stemming from three combat deployments. He also points to an audiogram performed by the USMCR that revealed hearing impairments, including "Permanent [Significant Threshold Shift]," "Asymmetric Loss," and "Tinnitus." *Id*. at 39 (citing Pl.'s AUMF ¶ D).

Plaintiff emphasizes that the applicable statute only requires a substantial limitation of *one* or more life activities. *Id*. (citing 42 U.S.C. § 12101(1); 29 C.F.R. § 1630.2(g)). Because he plainly identifies a major life activity that is enumerated by the applicable regulation (*i.e.*, hearing), the Court focuses its analysis on that impairment. Although it is undisputed that Plaintiff has a hearing impairment, the existence of an impairment alone does not render Plaintiff disabled under the Rehabilitation Act. Rather, Plaintiff's impairment must "substantially limit" the identified major life activity, in this case his hearing.

To show a substantial limitation, Plaintiff emphasizes that his hearing impairment was found to be so significant that he was deemed "Not Medically Ready" under governing military medical standards, which he insists negatively impacted his military career in terms of assignments, transfers, training, and education. Dkt. No. 132 at 38–40. Plaintiff further explains that, during the period relevant to his disability claims, his "Not Medically Ready" designation required him to travel to Walter Reed Army Medical Center for advanced hearing tests and that, even now, he struggles to hear higher pitched tones, such as the voices of women or children. *Id*. at 40.

Defendant maintains that Plaintiff's military disability, like his VA award of benefits, is insufficient to create a genuine issue of material fact as to whether he was disabled under the Rehabilitation Act. Indeed, Defendant notes that the VA's disability ratings and determinations

are not binding on courts applying the Rehabilitation Act's definition of disability. Dkt. No. 133 at 36 (citing 29 C.F.R. Pt. 1630, App. § 1630.2(k); *Howell v. Sam's Club # 8160*, 959 F. Supp. 260, 267 (E.D. Pa. 1997); *Wilborn v. Ashcroft*, 222 F. Supp. 2d 1192 (S.D. Cal. 2002)).

The Court agrees that determinations by the military and VA as to Plaintiff's alleged disability are not binding on this Court in the context of a disability claim under the Rehabilitation Act. Nevertheless, construing the facts and reasonable inferences in Plaintiff's favor and applying the undemanding "substantially limiting" standard, the Court is satisfied that Plaintiff has demonstrated a triable issue of fact as to whether he had a disability, a record of disability, or Defendant regarded him as having a disability during times relevant to his discrimination claims. Even if the military's concerns about Plaintiff's hearing were ultimately dispelled through testing conducted in the Spring of 2021, the evidence before the Court, construed in Plaintiff's favor, suggests that he was regarded by the military as having a significant hearing issue in the months surrounding Defendant's relevant employment actions against him (*i.e.*, the alleged blocking of his May 2021 PRS application and the June 2021 unfavorable performance check-in). And as discussed more thoroughly below, Plaintiff presents evidence, albeit disputed, that SSA Giles was aware of his medical conditions, including his hearing impairment. Defendant's Motion for Summary Judgment is therefore denied on this ground.[18]

**b. Defendant's knowledge of the alleged disability**

Even with sufficient evidence of a disability to withstand summary judgment, Plaintiff must also raise a genuine issue of material fact that his supervisors and the individuals involved in

[18] Although Plaintiff's response brief makes passing references to PTSD and vision problems (*see* Dkt. No. 132 at 19, 38; Dkt. No. 132-26 ¶ 8 (Fertitta Decl.)), and Plaintiff's counsel suggested at oral argument that these conditions also support his discrimination claim (*see* Hr'g at 11:11:39–11:16:07), the Court declines to determine on the current record and in the absence of more developed briefing that there is a genuine issue for trial as to whether these conditions constitute disabilities under the Rehabilitation Act.

the employment actions against him *knew* of that disability. After all, "when an employer 'indisputably had no knowledge of the disability,' it 'cannot be liable under the [applicable Act].'" *Ewing v. Doubletree DTWC, LLC*, 673 F. App'x 808, 810 (10th Cir. 2016) (quoting *Hedberg v. Ind. Bell Tel. Co*., 47 F.3d 928, 934 (7th Cir. 1995)); *see also Miller v. Nat'l Cas. Co.,* 61 F.3d 627, 630 (8th Cir. 1995) (explaining that the employer was "not obligated to divine the presence of a disability from [the employee's] extended absence from work").

Defendant argues that Plaintiff presents no evidence that his FBI chain of command was aware of his hearing impairments. Dkt. No. 133 at 36 (citing Def.'s UMFs ¶¶ 14, 48–51, 77). There *is* evidence in the record, however, that after Plaintiff received a diagnosis related to hearing and vision loss, he informed SSA Giles of his "medical conditions." Dkt. No. 132-26 ¶ 8 (Fertitta Decl.)). There is also evidence that Plaintiff regularly advised SSA Giles of his medical appointments and their outcomes. Plaintiff avers that he warned SSA Giles that he would "miss approximately seven weeks [of FBI work] each year, *including military mandated medical appointments*" and also kept SSA Giles apprised of "pending absences related to VA examinations and treatment" Dkt. No. 132-26 ¶ 8–9 (Fertitta Decl.) (emphasis added). On March 10, 2021, for instance, Plaintiff e-mailed SSA Giles and advised that he would be out of the office for approximately two weeks for various reasons, including a "medical issue [that] came up during an annual military medical screening" that did not affect his "duty status" at that time. Def.'s UMF ¶ 12. Plaintiff told SSA Giles that he intended to take annual leave as well as leave without pay to address the medical issue, which related to his military service. Def.'s UMF ¶ 12. Two days later, Plaintiff sent an update to SSA Giles via text message: "Heard back from the Doc at the VA. I am clear. No tumor, no bleeding, all good. What a relief." Def.'s UMF ¶ 13. In addition, Plaintiff attests that SSA Giles conveyed to him that ASAC Kaskel was upset that he was out of the office

and that she expected Plaintiff to perform FBI duties while on military reserve status regardless of whether Plaintiff's absences related to treatment for medical impairments. Construing these facts in Plaintiff's favor, the Court concludes that he presents a genuine dispute of material fact that the individuals involved in the adverse employment actions against him, namely SSA Giles and ASAC Kaskel, knew of his disability or regarded him as having a disability. The Court therefore denies in part Defendant's Motion for Summary Judgment on this ground.

**c. Adverse Employment Actions**

In *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), the Supreme Court lowered the bar for establishing an adverse employment action in discrimination cases. There, the Court held that "[t]o make out a . . . discrimination claim, [an employee] must show *some harm* respecting an identifiable term or condition of employment" but need not show "that the harm incurred was 'significant.' Or serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Id*. at 354–55 (emphasis added). Plaintiff alleges that the blocking of his May 2021 PRS application, the failure to award him that position, and his unfavorable performance check-in on June 15, 2021, constitute adverse employment actions.

Defendant, on the other hand, emphasizes that at the time Plaintiff first attempted to apply for the PRS position in Santa Fe, he was *already* a RS. Dkt. No. 131 at 27 (citing Def.'s UMF ¶ 44). As Defendant sees it, the only difference between a PRS designation and an RS designation is that an agent in the former role serves as the default RS if the front-line supervisor is unable to designate their coverage. *Id*. (citing Def.'s UMF ¶¶ 17, 18). Defendant suggests that "the 'Primary' designation would not have *significantly* altered any of Plaintiff's duties, benefits or responsibilities." *Id*. (emphasis added). But under *Muldrow*, Plaintiff need not demonstrate that the alteration to the terms and conditions of his employment was "significant." *See* 601 U.S. at

355. Rather, he need only show "some harm respecting an identifiable term or condition of [his] employment." *Id*.

Plaintiff insists that the PRS designation, which makes an agent the first default acting RS for a front-line supervisor, provides crucial experience that positively affects that agent's advancement opportunities within the FBI. Dkt. No. 132 at 41 (citing Pl.'s AUMF ¶¶ O–Q). Indeed, he attests that, to be promoted to a Supervisory Special Agent, an agent must demonstrate *experience* as an RS or Acting SSA, with a PRS designation offering significantly more opportunities to gain such experience. Dkt. No. 132-26 ¶ 22 (Fertitta Decl.).

A reasonable inference arises from the summary judgment evidence that Defendant's failure to advance Plaintiff's PRS application adversely affected his future employment prospects and his promotion eligibility within the FBI, even if only temporarily. Dkt. No. 132 at 41 (citing *Reinhardt v. Albuquerque Pub. Schs. Bd. of Educ.*, 595 F.3d 1126, 1133 (10th Cir. 2010)). As such, the Court is satisfied that preventing the submission of a PRS application constitutes "some harm respecting an identifiable term or condition of [his] employment." *See Muldrow,* 601 U.S. at 355; *see also* Hr'g at 10:53:45–10:54:53 (Defense counsel conceding that Plaintiff's allegation that Defendant denied him the opportunity to compete for the PRS designation in Santa Fe satisfied the *Muldrow* standard).

Next, Plaintiff insists that SSA Giles's June 15, 2021 performance check-in also constitutes an adverse employment action. To be sure, the performance check-in was unfavorable, as it characterized Plaintiff's performance as "inconsistent" and indicated that he "did not effectively communicate his intentions," acted outside the chain of command, used a prior supervisor's support form, violated policy, and harmed his own "credibility and good standing within the office." Dkt. No. 132 at 42 (citing Pl.'s AUMF ¶¶ Z, AA). Even so, Defendant maintains that the

performance check-in itself did not result in any change to Plaintiff's pay, hours, opportunities, or benefits. Dkt. No. 131 at 27 (citing Def.'s UMFs ¶¶ 52, 57). Plaintiff, in contrast, characterizes the performance check-in as a thinly veiled accusation of deceptiveness. Dkt. No. 132 at 42 (citing Pl.'s AUMF ¶ AA; *Dye v. Moniz*, 672 F. App'x 836, 841 (10th Cir. 2016); *Brown v. Austin*, 13 F.4th 1079, 1092 (10th Cir. 2021)). Significantly, Plaintiff attests that the June 15, 2021 performance check-in "remains in FBI systems as part of [his] permanent performance record visible to future FBI supervisors and potentially considered by career boards." Dkt. No. 132-26 ¶¶ 35–36 (Fertitta Decl.).

Because the comments included in the June 15, 2021 performance check-in bear on Plaintiff's credibility as an FBI agent, essentially branding him as dishonest, there is a reasonable inference that the check-in has negative implications for his career as an FBI agent and as a testifying witness. *See* H'rg at 11:17:35. As with the blocking of the PRS application, the Court is satisfied that the June 15, 2021 performance check-in likewise constitutes "some harm respecting an identifiable term or condition of [his] employment." *See Muldrow,* 601 U.S. at 355.

In sum, Plaintiff raises genuine issues of fact as to whether both challenged employment actions caused the requisite harm.[19] The Court therefore denies Defendant's Motion for Summary Judgment as to this element.

---

[19] Defendant contends that, even if Plaintiff demonstrates adverse employment actions under the *Muldrow* standard, he lacks evidence that his chain of command was *aware* of his medical impairments such that those impairments could have *motivated* the adverse employment actions. Dkt. No. 131 at 27 (citing *Ewing v. Doubletree DTWC, LLC*, 673 F. App'x 808, 810 (10th Cir. 2016)). In other words, Defendant suggests that because SSA Giles, ASAC Kaskel, and SAC Bujanda lacked knowledge of any disability on Plaintiff's part, their actions could not be "because of" or causally related to that disability. Dkt. No. 131 at 28 (citing *Ewing*, 673 F. App'x at 812). But, as discussed above, Plaintiff presents a genuine dispute of material fact as to whether these individuals knew of his disability or regarded him as having a disability.

**iii. Legitimate Business Reason**

At the second step of the *McDonnell Douglas* framework, Defendant need only explain the FBI's actions against Plaintiff in terms that are not facially prohibited by discrimination laws. *See EEOC v. Flasher*, 986 F.2d 1312, 1317 (10th Cir. 1992) (citation omitted). As the Tenth Circuit has explained, this burden is "exceedingly light." *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1173 (10th Cir. 2007). Notably, Defendant must only proffer non-discriminatory reasons, not prove them. *See Carter v. Pathfinder Energy Servs., Inc.,* 662 F.3d 1134, 1149 (10th Cir. 2011) (describing the second-step burden as "one of production, not persuasion" and noting that "it can involve no credibility assessment").

Here, Defendant articulates various business reasons for each of the employment actions discussed by Plaintiff. Although Plaintiff challenges those reasons as pretextual, he does not dispute that Defendant has articulated legitimate business reasons for the FBI's decisions.

**a. Defendant's Reasons for Rejecting May 2021 PRS Application**

First, Defendant explains that Plaintiff submitted his May 2021 PRS application "through an incorrect chain of command." Dkt. No. 131 at 29 (citing Def.'s UMF ¶¶ 37–41). Second, he asserts that SSA Giles understood Plaintiff would need an updated SDP from SSA Giles as his current supervisor. *Id*. (citing Def.'s UMF ¶ 44). Third, Defendant suggests that, from an operational standpoint, HUMINT resources were not fully staffed, and Plaintiff had a "unique assignment in the [Albuquerque] field office where he was responsible for providing guidance to agents in the HUMINT program," the majority of whom worked in Albuquerque. *Id*. (citing Def.'s UMF ¶ 45). Fourth, Defendant contends that there were "logistical concerns" with awarding Plaintiff the Santa Fe PRS position, since he was not assigned to that RA, and the PRS position was subject to the FBI Transfer Policy. *Id*. (citing Def.'s UMF ¶¶ 19, 20, 21). Fifth and finally,

Defendant indicates that Plaintiff's wife was a special agent in Santa Fe, and SAC Bujanda understood it to be against office practice to permit spouses to supervise one another. *Id*. (citing Def.'s UMF ¶ 46).

**b. Defendant's Reasons for the Unfavorable June 2021 Performance Check-in**

As to the allegedly discriminatory performance check-in, Defendant insists that although Plaintiff may disagree with SSA Giles's remarks and ratings, his dissatisfaction does not translate to animus or improper motive on SSA Giles's part. *Id*. Defendant explains that Plaintiff's handling of the May 2021 PRS application, and his frustration with his chain of command, led to a decline in his professionalism and communication as reflected in Plaintiff's mid-year performance check-in. *Id*. (citing Def.'s UMF ¶ 54).

The Court is satisfied that Defendant has adequately articulated reasons for the FBI's employment actions in terms that are not facially prohibited by federal discrimination law. As such, Defendant has met his "exceedingly light" second-step burden as to both the rejection of Plaintiff's May 2021 PRS application and his June 2021 performance check-in. Accordingly, the burden shifts back to Plaintiff to show that the reasons offered for these actions were pretext for disability discrimination.

**iv. <u>Evidence of Pretext</u>**

At the final step of the *McDonnell Douglas* inquiry, the plaintiff must produce evidence that the explanations offered by the defendant for its adverse actions were merely pretextual. *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1268 (10th Cir. 2015). The presumption of discrimination resulting from the plaintiff's prima facie showing "drops out of the picture, and [t]he plaintiff then carries the full burden of persuasion to show that the defendant discriminated." *Swackhammer v. Sprint/United Management Co.*, 493 F.3d 1160 (10th Cir. 2007) (citations

omitted). A "plaintiff may establish pretext by showing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Bennett*, 792 F.3d at 1267 (quoting *Jones v. Okla. City Pub. Sch*., 617 F.3d 1273, 1280 (10th Cir. 2010)). The Supreme Court has identified three factors relevant to a court's inquiry: "the strength of the plaintiff's prima facie case; the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered." *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 148–49 (2000). There is more than one method for demonstrating pretext. A plaintiff may, for example, present direct evidence that the defendant's articulated reasons for its actions were false or unworthy of credence. *See Swackhammer*, 493 F.3d at 1167, 1170. Another method is for the plaintiff to show that the defendant treated him differently from other similarly situated employees. *Id*. at 1167–68. Although the Court must construe all facts in the light most favorable to Plaintiff as the non-movant, it must not second-guess Defendant's business judgment or replace Defendant's opinions of best practices with its own or those of Plaintiff. *Bennett*, 792 F.3d at 1268 (citing *Garrison v. Gambro, Inc*., 428 F.3d 933, 938 (10th Cir. 2005)).

**a. Evidence that Reasons for Rejecting May 2021 PRS Application Were Pretextual**

Plaintiff argues that issues of fact exist as to whether Defendant's articulated non-discriminatory reasons for rejecting his May 2021 PRS application are pretext for disability discrimination. Dkt. No. 132 at 42–45. First, he insists that Defendant's contention that Plaintiff proceeded through the incorrect chain of command is inconsistent with FBI policy. *Id*. at 43 (citing Pl.'s AUMF ¶¶ V, W). Because SSA Giles was out of the office on medical leave at the time

Plaintiff attempted to submit his PRS application in May 2021, he insists that FBI policy designated A/SSA Carp as the next in command to serve in SSA Giles's absence. *Id*. (citing Pl.'s AUMF ¶¶ T, CC, DD). Defendant does not dispute that A/SSA Carp was charged with filling this role. A reasonable factfinder could therefore infer that Plaintiff proceeded through the *correct* chain of command when he requested that SSA Carp sign his Santa Fe PRS application in SSA Giles's absence. *Id*. (citing Pl.'s AUMF ¶¶ T, CC, DD).

Second, Plaintiff maintains that SSA Giles's "understanding" that Plaintiff would need an *updated* SDP to apply for the PRS position was, once again, contrary to FBI policy. *Id*. at 44. In support, he points to FBI policies suggesting that SDP is a rating form for a specific curriculum that consists of online classes and the completion of certain administrative tasks under the supervision of a specific mentor/SSA. *Id*. (citing Pl.'s AUMF ¶¶ QQ, RR). Because Plaintiff completed the SDP curriculum in 2020, receiving a favorable rating from his then-supervisor, SSA Monroney, Plaintiff maintains that SSA Giles did not need to rate tasks he had not observed Plaintiff complete. Dkt. No. 132 at 44 (citing Pl.'s AUMF ¶¶ TT, UU). Plaintiff also observes that there was a three-month delay before SSA Giles purportedly realized that Plaintiff's application needed to be resubmitted with an updated evaluation. *Id*. (citing Pl.'s AUMF ¶ QQ; *Hendricks v. Mid-America Pipeline Co.*, 985 F. Supp. 1024, 1030 (D. Kan. 1997)). Plaintiff urges the Court to infer from Giles's actions that his insistence on the submission of an updated SDP, despite FBI policy to the contrary, was motivated by an intention to undermine Plaintiff's PRS application. *Id*. (citing Pl.'s AUMF ¶ VV).

Third, Plaintiff challenges Defendant's claim that he had a "unique assignment" in the Albuquerque field office that weighed against awarding him the PRS position in Santa Fe. Dkt. No. 132 at 44. Plaintiff attests that his assigned location was irrelevant to his HUMINT duties

because he provided HUMINT training to over 250 new agents *across the country*, and traveling was a regular part of his HUMINT duties. *Id*. at 44–45 (citing Pl.'s AUMF ¶ FF).

Fourth, Plaintiff argues that Defendant's reliance on "logistical concerns" is inconsistent and weak. *Id*. at 45. Plaintiff points to evidence that he was already working half-time in Santa Fe as well as SSRA Seals's statement indicating that he had no concerns with Plaintiff's transfer to Santa Fe to perform the PRS role. *Id*. (citing Pl.'s AUMF ¶ GG).

Fifth and finally, Plaintiff describes SAC Bujanda's "understanding" that it was against office practice to permit spouses to supervise one another as inconsistent and pretextual. *Id*. (citing Pl.'s AUMF ¶ DDD). Plaintiff emphasizes that the spouses-under-the-same-supervisor rationale was never mentioned by SSA Giles or ASAC Kaskel as a reason for refusing to put forward Plaintiff's May 2021 PRS application. *Id*. (citing Dkt. No. 131-10 (May 2-4, 2021 email exchanges)). Plaintiff notes that neither ASAC Kaskel, SSA Giles, nor SAC Bujanda placed any concerns of this nature in Sentinel. *Id*. (citing Dkt. No. 132-15 (Sentinel Working Copy of draft electronic communication regarding Plaintiff's application)). Moreover, Plaintiff observes that SSRA Seals, the supervisor in Santa Fe, attested that he had no problem with Plaintiff and his spouse working together in Santa Fe. *Id*. (citing Pl.'s AUMF ¶ II).

Taken together, Plaintiff's evidence sufficiently undermines Defendant's proffered reasons for refusing to advance his May 2021 PRS application to permit a reasonable factfinder to infer pretext for disability discrimination. In so concluding, the Court is cognizant that "an inference of pretext does not follow from every departure from standard procedure." *See Kincaid v. Unified Sch. Dist. No. 500, Kansas City, Kan.*, 94 F.4th 936, 949 (10th Cir. 2024). Even so, the evidence, construed in Plaintiff's favor, demonstrates "weaknesses, implausibilities, inconsistencies,

incoherencies, [and] contradictions" in Defendant's articulated reasons for the adverse employment actions. *Bennett*, 792 F.3d at 1267 (citation omitted).

**b. Evidence that Reasons for the Unfavorable Performance Check-in Were Pretextual**

With respect to Plaintiff's June 15, 2021 performance check-in, Defendant submits that even if his poor ratings constitute an adverse action, "changes in an employer's estimation of its employee's job performance, without more, cannot establish pretext as a matter of law." Dkt. No. 133 at 39 (quoting *Roberts*, 733 F.3d 1306, 1309 (10th Cir. 2013)). According to Defendant, Plaintiff must show that Defendant's reasons for rating Plaintiff poorly at the performance check-in were pretext for discrimination.

Plaintiff presents evidence that, from his hiring in 2014 until mid-2021, his performance reviews were satisfactory or higher and that he received performance awards in the four years leading up to the 2021 events at issue here. In contrast, the only performance review in which Plaintiff was rated as an "inconsistent" performer came shortly after he missed work for medical appointments and apprised SSA Giles of medical conditions that required further testing and appointments.

In addition, Plaintiff contends that the performance check-in is internally contradictory. Although SSA Giles states in the performance check-in that Plaintiff circumvented his chain of command, the evidence discussed above supports a reasonable inference that Plaintiff proceeded through the *correct* chain of command when he requested that SSA Carp sign his Santa Fe PRS application in SSA Giles's absence. *Id*. (citing Pl.'s AUMF ¶¶ T, CC, DD). Moreover, Plaintiff notes that, despite SSA Giles contention that Plaintiff did not effectively communicate his intention to apply for the PRS position, there is evidence in the record that, on May 3, 2021,

Plaintiff's e-mail, in which he advised A/SSA Aaron Carp of such an intention, was forwarded to SSA Giles. Dkt. No. 131-10 at 1; Hr'g at 11:23:05–11:24:17.

Viewing the totality of this evidence in the light most favorable to Plaintiff, the Court concludes that a reasonable factfinder could infer that Defendant's proffered reasons for his unfavorable performance check-in are pretext for disability discrimination. Defendant's Motion for Summary Judgment is therefore denied with respect to Plaintiff's claim that Defendant violated the Rehabilitation Act by giving him an unfavorable performance check-in.

In sum, Defendant's Motion for Summary Judgment is **DENIED IN PART** as to Plaintiff's discrimination claims in Count I and **GRANTED IN PART** for failure to exhaust as to any retaliation or reprisal claims in Count I.

***B. Count II***

Plaintiff asserts retaliation claims premised on three separate employment actions by Defendant: (1) awarding him the Santa Fe PRS position but requiring that he perform that role from Albuquerque unless he used his Office of Preference benefit and thereby revoking an informal agreement under which Plaintiff was permitted to work half-time in Santa Fe; (2) requesting additional medical documentation; and (3) failing to definitively approve his request for a transfer to Norfolk, Virginia. Dkt. No. 132 at 47–56.

To establish a prima facie case of retaliation, a plaintiff must show that he (1) engaged in protected activity; (2) suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action. *Walkingstick Dixon v. Oklahoma ex rel. Reg'l Univ. Sys.*, 125 F.4th 1321, 1339 (10th Cir. 2025); *Reinhardt*, 595 F.3d at 1131. Defendant focuses on the second and third prongs, arguing that even if Plaintiff engaged in protected activity

beginning in September 2021,[20] he cannot demonstrate an adverse employment action causally connected to that protected activity. Dkt. No. 131 at 31 (citing *O'Neal v. Ferguson Constr. Co*., 237 F.3d 1248, 1253 (10th Cir. 2001)); Dkt. No. 133 at 40. A plaintiff may establish a retaliation claim in two ways. *Twigg v. Hawker Beechcraft Corp.,* 659 F.3d 987, 998 (10th Cir. 2011) (quoting *Fye v. Okla. Corp. Comm'n,* 516 F.3d 1217, 1224–25 (10th Cir.2008)); *see also Reinhardt*, 595 F.3d at 1131 (discussing the standard for retaliation claims under the Rehabilitation Act). He may "(1) offer direct evidence that retaliation 'played a motivating part' in an employment decision adverse to [his] interests, or (2) rely upon circumstantial evidence under 'the familiar three-part *McDonnell Douglas* framework to prove that the employer's proffered reason for its decision is a pretext for retaliation.'" *Lounds v. Lincare, Inc*., 812 F.3d 1208, 1233 (10th Cir. 2015) (quoting *Fye,* 516 F.3d at 1225).

Direct evidence is that which does not require an inference to reach the conclusion that the protected activity was a motivating factor in the materially adverse employment action. *See Fischer v. Forestwood Co., Inc*., 525 F.3d 972, 986 (10th Cir. 2008). To establish a retaliation claim with direct evidence, "the plaintiff must 'present[] evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged [retaliatory] attitude." *Twigg*, 659 F.3d at 1000 (citing *Thomas v. Denny's, Inc*., 111 F.3d 1506, 1512 (10th Cir. 1997); *Fye*, 516 F.3d at 1226–27). If the plaintiff comes forward with direct evidence that retaliatory animus was the motivating factor for an adverse employment action, the

[20] Plaintiff contends that he engaged in protected activity when he filed an EEO complaint and participated in the EEO process, including an alternative dispute resolution session. Dkt. No. 132 at 45 (citing *Kelly v. City of Albuquerque*, 375 F. Supp. 2d 1183, 1226 (D.N.M. 2004); *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1151 (10th Cir. 2008)). Defendant does not disagree.

burden then shifts to the employer to demonstrate that it would have taken the same action irrespective of the retaliatory motive. *Id.* at 998.

The indirect evidence method, by contrast, permits a plaintiff to establish a retaliation claim through circumstantial evidence without proving a *direct* causal link. *Id*. Under the familiar *McDonnell Douglas* framework, once a plaintiff satisfies his prima facie burden, "the employer must then offer a legitimate, nonretaliatory reason for its decision." *Twigg*, 659 F.3d at 998 (citation omitted). If the defendant does so, the burden shifts back to the plaintiff to "show that the employer's reason is merely a pretext for retaliation." *Id.* (citation omitted). A plaintiff may demonstrate pretext by presenting evidence of temporal proximity between the protected activity and adverse action, deviations from ordinary practices and procedures, employer explanations that are unworthy of belief, or disparate treatment of similarly situated individuals. *See Twigg.*, 659 F.3d at 1000; *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1175 (10th Cir. 2006); *Reeves*, 530 U.S. at 147.

"Although the direct . . . approach and the *McDonnell Douglas*/indirect approach represent distinct methods of proving retaliation, a plaintiff may allege that [his] evidence demonstrates retaliation under both frameworks." *Twigg*, 659 F.3d at 998. In short, the plaintiff must persuade the factfinder either that the evidence demonstrates that retaliation was a motivating factor for the adverse action or that it shows the employer's reason is unworthy of belief. *Id.* at 998–99 (citing *Fye*, 516 F.3d at 1225). Regardless of whether the plaintiff relies on direct or circumstantial evidence, he must demonstrate that a causal connection exists between his protected activity and some materially adverse action. *See Twigg*, 659 F.3d at 999–1004 (analyzing a retaliation claim under a direct evidence theory); *Reinhardt*, 595 F.3d at 1131–35 (analyzing a retaliation claim under the indirect/*McDonnell Douglas* framework).

In the context of a retaliation claim, a materially adverse action is one that would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Reinhardt*, 595 F.3d at 1133 (quoting *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006)) (emphasis added). "Acts that carry 'a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects may be considered adverse actions, although a mere inconvenience or an alteration of job responsibilities will not suffice'" *Id.* (citing *Annett*, *v. Univ. of Kan.*, 371 F.3d 1233, 1239 (10th Cir. 2004)). The Tenth Circuit has emphasized that "adverse employment action" is to be "liberally" construed and not limited to monetary losses in the form of wages or benefits." *Id.* (quoting *Annett*, 371 F.3d at 1239).

**i. <u>First Retaliation Claim: Awarding PRS Role But Requiring Performance from Albuquerque</u>**

**a. Materially Adverse Employment Action**

In October 2021, Defendant awarded Plaintiff the PRS position in Santa Fe for which he applied. But, to Plaintiff's disappointment, that assignment did not also effect a transfer to Santa Fe, where Plaintiff *chose* to build a home despite being assigned to Albuquerque, and where his children were attending school. Dkt. No. 132-26 ¶ 65 (Fertitta Decl.) (explaining that when COVID caused school closures, his kids began attending parochial school in Santa Fe); Dkt. No. 133 at 41–42 (citing Def.'s UMF ¶ 65); Dkt. No. 131-2 at 77:10–18 (Kaskel Depo.); Dkt. No. 131-18 at 4 (Bujanda Decl.). Plaintiff argues that by awarding him the Santa Fe PRS position but refusing to transfer him to Santa Fe, Defendant effectively required him to perform PRS duties while supervising personnel from some 50 miles away or, alternatively, use his once-in-a-career Office of Preference benefit to move to the Santa Fe commuting area. Relatedly, he claims that by requiring him to work from Albuquerque, Defendant revoked an informal agreement he had in place for years under which he could work half-time from Santa Fe. In Plaintiff's view, "[i]t should

be for a jury to decide whether those adverse actions . . . would dissuade a reasonable person from pursuing a charge of discrimination." Dkt. No. 132 at 48–49.

Defendant, on the other hand, contends that because no duty station transfer was permitted in connection with PRS appointments, Plaintiff could not circumvent the FBI transfer policy by obtaining a Santa Fe PRS assignment. Dkt. No. 131 at 32 (citing Def.'s UMF ¶¶ 62–64); Dkt. No. 133 at 41. In Defendant's view, Plaintiff was not denied any benefit and suffered no significant harm from the Santa Fe PRS appointment; he was instead subject to the same terms of employment after his EEO complaint as he was before he filed the complaint but with the added PRS designation he sought. Dkt. No. 131 at 32–33; Dkt. No. 133 at 41.

The Court agrees with Defendant that awarding Plaintiff the Santa Fe PRS position for which he applied, without also transferring him to Santa Fe, did not constitute a materially adverse employment action. After all, revisions to the August 2021 posting made clear that Plaintiff, if he was successful in his application, would not be transferred to Santa Fe to perform the PRS role there. That Plaintiff nevertheless applied for the Santa Fe PRS position with the hope of obtaining a transfer that was explicitly foreclosed by the vacancy announcement does not render Defendant's action in awarding him the position materially adverse. As to Plaintiff's contention that he experienced humiliation due to the "inconsistency" between his designation as PRS for the Santa Fe RA and his continued assignment to Albuquerque, the Court is not convinced that the evidence supports a reasonable inference of "a *significant* risk of humiliation, damage to reputation, [or] a concomitant harm to future employment prospects," particularly in light of the announcement's caveat that transfers were not permitted. *See Reinhardt*, 595 F.3d at 1133 (emphasis added) (citation omitted).

The Court reaches a different conclusion with respect to Plaintiff's related claim that Defendant revoked a prior informal agreement, in place for years, under which he was permitted to work half-time from the Santa Fe RA and half-time from Albuquerque, where he was assigned. Dkt. No. 132 at 47–48. As to this alleged adverse employment action, the Court concludes that Plaintiff *has* raised a genuine dispute of material fact as to whether a reasonable person would be dissuaded from pursuing a charge of discrimination. Although Defendant suggests that the relevant decisionmakers were unaware of the prior informal arrangement Plaintiff alleges was in place (*see* Dkt. No. 133-2 at 148:10–150:4 (Giles Depo.)), SAC Bujanda testified that around September 2021, as a part of the EEO process, he learned of the informal half-time work arrangement between Plaintiff and his supervisors, including SSA Giles (Dkt. No. 133-1 at 81:11–82:6). And yet, after Plaintiff was awarded the Santa Fe PRS position in October 2021, he was advised he could no longer work half-time in Santa Fe. Dkt. No. 132-26 ¶ 61 (Fertitta Decl.). In other words, Plaintiff presents evidence from which a reasonable inference arises that Defendant revoked an informal but long-standing arrangement permitting him to work half-time in Santa Fe (*see* Dkt. No. 132-26 ¶¶ 4, 65 (Fertitta Decl.); Dkt. No. 132-1 at 80:25–82:6, 84:12–21 (Bujanda Depo.). In the Court's view, revoking the permission to work half of the workweek from a more convenient RA – an RA that, in Plaintiff's case, would have obviated the need for him to travel more than 100 miles roundtrip in a single workday – constitutes significant harm which might have dissuaded a reasonable employee from filing an EEO claim.

Defendant suggests that "Plaintiff's allegation that he had a 50/50 employment agreement in place that was revoked was also neither raised nor exhausted with the OEEA." Dkt. No. 133 at 40 n.4. That argument, though, appeared for the first time in Defendant's reply[21] and is not

[21] Defense counsel explained at oral argument that Defendant did not understand the revocation of the alleged 50/50 work arrangement to be among the adverse employment actions Plaintiff alleged in his Amended Complaint, and

supported by any evidence in the record demonstrating that Plaintiff's October 22, 2021 EEO complaint omitted a contention that Defendant revoked a prior informal agreement permitting half-time work from Santa Fe.[22] In the absence of such evidence, and given that failure to exhaust is an affirmative defense for which Defendant bears the burden, the Court will not dismiss Plaintiff's claim for lack of exhaustion at this juncture. This does not, however, foreclose Defendant from maintaining a failure to exhaust affirmative defense as to this claim at trial, if not before.

In sum, Defendant's Motion for Summary Judgment is **GRANTED IN PART** with respect to Plaintiff's retaliation claim premised on the award of the Santa Fe PRS position without a transfer on the basis that Plaintiff fails to show a materially adverse action.

**b. Causal Connection**

To establish a retaliation claim under the Rehabilitation Act, Plaintiff must also present evidence of a causal connection between his protected activity and the alleged materially adverse action. Plaintiff relies on both direct and circumstantial evidence in this regard. First, he presents evidence that after he was awarded the PRS position in Santa Fe, SAC Bujanda told SSRA Luther Seals, the SSRA for the Santa Fe RA, that Plaintiff was not permitted to work from Santa Fe because "we don't want to award people for making complaints" or words or a sentiment to that effect. Dkt. No. 132 at 49 (citing Pl.'s AUMF ¶ SSS). The Court considers this to be in the nature of *direct* evidence of retaliation, as it constitutes "evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged [retaliatory] attitude." *See Twigg*, 659 F.3d at 1000 (citations omitted).

---

Defendant therefore did not address such a claim in its opening brief. Hr'g at 12:14:20–12:16:33. Defense counsel conceded, however, that the 50/50 work arrangement was among the issues Plaintiff grieved. S*ee* Hr'g at 12:15:22–12:16:33.

[22] Although Defendant supplies the first page of Plaintiff's October 21, 2021 EEO Complaint as an exhibit to his Motion for Summary Judgment, he does not include the attachment referenced therein in which Plaintiff articulated how he believed he was discriminated against. *See* Dkt. No. 131-21 (Oct. 21, 2021 EEO Compl.).

Alternatively, Plaintiff relies on circumstantial evidence, which he insists establishes that Defendant's proffered reasons for requiring him to work from Albuquerque were pretext for retaliation.[23] First, to demonstrate temporal proximity, Plaintiff observes that on October 7, 2021, SAC Bujanda attended an EEO alternative dispute resolution proceeding related to Plaintiff's discrimination complaint and, within a week, he awarded Plaintiff the Santa Fe PRS position but required him to work from Albuquerque. Dkt. No. 132 at 47 (citing Pl.'s AUMF ¶¶ GGG, HHH). Second, Plaintiff attempts to show allegedly disparate treatment of FBI employees who did *not* file discrimination complaints but who he alleges were permitted to transfer to Santa Fe without using their Office of Preference benefit. Apart from evidence that these transfers took place, however, Plaintiff does not present admissible evidence to show the circumstances of the transfers or, critically, demonstrate that the transferred agents were similarly situated to him. Third, Plaintiff references what he describes as instances of employer dishonesty, including allegedly inaccurate testimony by SAC Bujanda with respect to the transfer of two other special agents and whether they occurred while he was serving as SAC. *Id*. at 50 (citing Pl.'s AUMF ¶ EEEE). Fourth, Plaintiff contends that SAC Bujanda gave contradictory testimony when he first testified that there were no negative budget constraints affecting the FBI but later testified that "[t]here was no funding that was allocated" to transfer an agent in connection with the award of a PRS designation. Dkt. No. 132-1 at 9:8–16, 90:11–16 (Bujanda Depo.). Fifth, Plaintiff alleges deviations from ordinary practices and procedures, observing that the August 12, 2021 PRS announcement was the only such announcement that specified that cost transfers were not available and that candidates needed

[23] Defendant articulates the following non-retaliatory reasons for awarding Plaintiff the Santa Fe PRS position but requiring him to perform that role from Albuquerque: "[T]he PRS designation was not meant to be a means to circumvent the FBI Transfer Policy," and "[t]he amended vacancy announcement made clear that Cost Transfers were not available under the vacancy announcement." Dkt. No. 131 at 33. Defendant emphasizes that "[s]everal employees were affected by the clarification." *Id*.

to be "assigned within the AOR", whereas the FBI policy provided that PRS opportunities were not restricted to employees assigned to the squad/unit advertising the posting. *Id*. at 51 (citing Pl.'s AUMF ¶¶ PP, RR, WW–ZZ).

Having examined the record and construed the evidence in Plaintiff's favor, the Court is satisfied that Plaintiff presents sufficient evidence to withstand summary judgment with respect to his claim that Defendant's revocation of the informal half-time work arrangement was causally connected to his protected activity. Beyond the direct evidence that Plaintiff could no longer work from Santa Fe because Defendant did not "want to award people for making complaints," some circumstantial evidence also supports a reasonable inference that Defendant's articulated reason for requiring Plaintiff to remain in Albuquerque full-time (*i.e.*, because the PRS designation could not be used to circumvent FBI transfer policy) is unworthy of belief. Perhaps most compelling is the *timing* of the alleged revocation of Plaintiff's long-standing, informal permission to work half-time in Santa Fe – within approximately one week of the EEO mediation – without any intervening circumstances to otherwise explain that revocation. Moreover, because there is no evidence to suggest that Defendant implemented a division-wide or agency-wide policy requiring agents to work only at their assigned office without splitting their time at a different RA, the revocation of Plaintiff's half-time work arrangement appears to have been targeted at him alone and shortly after his EEO activity. Construing all of the summary judgment evidence in Plaintiff's favor, he presents sufficient evidence from which a reasonable factfinder could infer that Defendant's articulated reason for revoking his half-time work arrangement was pretext for retaliation.

In sum, Defendant's Motion for Summary Judgment is **GRANTED** with respect to Plaintiff's retaliation claim premised on the award of the Santa Fe PRS position without a transfer

but **DENIED** with respect to Plaintiff's retaliation claim premised on the revocation of an informal arrangement under which he was permitted to work half-time from Santa Fe.

### i. Second Retaliation Claim: Request for Medical Documentation

Next, Plaintiff presents evidence that twelve days after he filed his formal EEO complaint, the FBI directed him to participate in a mental health evaluation and requested his VA records despite having found him fit for duty less than two months earlier. Dkt. No. 132 at 52. In addition, he presents evidence that two months after the FBI cleared him for duty on November 9, 2021, executive management requested that his physician complete a Certificate of Essential Duty Status (FD-948) form. *Id*. at 53. According to Plaintiff, these requests evidence a pattern of retaliatory behavior. *Id*.

Defendant argues, however, that the Court lacks jurisdiction over this retaliation claim because it relates to Plaintiff's security investigation. Dkt. No. 133 at 42–44. Previously, the Court determined that it "lacks jurisdiction to review Plaintiff's retaliation claims insofar as they relate to agency security referrals to the Security Division and to the process and substance of the security investigation that followed from such referrals[,] *including requests for additional medical information, including a mental evaluation*." Dkt. No. 122 at 21 (emphasis added).

It is unclear whether the challenged requests for medical documentation arose from or related to the security investigation initiated after refers to the Security Division. Their timing suggests not. *Compare* Dkt. No. 132-4 at 22:9–17, 34:18–36:25 (Price Depo.) (requests for medical documentation in November 2021 and January 2022), *with* Dkt. No. 69 at ¶ 68 (First Am. Compl.) (alleging that referrals to Security Division took place in the late summer of 2022). Moreover, Plaintiff observes that Nurse Price's communications do not specify that the requests for medical documentation were triggered by Plaintiff's security investigation. Hr'g at 12:04:30–

12:05:10. For any requests for medical documentation unrelated to the security investigation, Plaintiff must present competent evidence that those requests were materially adverse employment actions motivated by a desire to retaliate for his protected activity. *See Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008); *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1218 (10th Cir. 2003)). As discussed below, even if the Court could exercise jurisdiction, Plaintiff fails to raise a genuine dispute as to whether the requests were materially adverse.

**a. Materially Adverse Employment Action**

For his part, Defendant contends that Plaintiff has not identified any adverse action that he suffered as a result of the requests for medical documentation or examinations. Defendant emphasizes that Plaintiff was not denied the Santa Fe PRS position on grounds of a mental or medical condition, was not prohibited from returning to his FBI duty, did not have his hours reduced, and was not otherwise subjected to any significant harm to his employment with the FBI. Dkt. No. 133 at 43. Although Plaintiff suggests that the threat to initiate a mental health evaluation qualifies as an adverse action under the FBI's internal whistleblower policies, he cites no authority establishing that those internal policies determine whether such an action constitutes a materially adverse employment action *under the Rehabilitation Act*.

The Court concludes that, without more, requiring a special agent in the FBI to provide medical documentation and to undergo medical examinations – something required of all agents at various stages – does not rise to the level of a materially adverse employment action sufficient to withstand summary judgment. In other words, the evidence Plaintiff presents falls well short of raising an inference that a reasonable special agent of the FBI would be dissuaded from pursuing a charge of discrimination by requests for additional medical documentation. Thus, to the extent this subclaim for retaliation is not part and parcel of Plaintiff's now-dismissed security clearance

claims, Plaintiff has failed to create a genuine issue of material fact on the element of a materially adverse employment action. Defendant's Motion for Summary Judgment is **GRANTED IN PART** as to Plaintiff's second retaliation claim.

### ii. Third Retaliation Claim: Failing to Approve CHTR Request

The summary judgment record reflects that Plaintiff requested a Common Household Transfer ("CHTR") from Albuquerque to Norfolk on September 21, 2023, after his wife received a *Non-Bureau* Common Household Transfer ("CHTNB") from Santa Fe to Norfolk the previous year on account of Plaintiff's military service in the Norfolk area. Despite evidence in the record that SAC Bujanda approved a temporary duty assignment hardship transfer for Plaintiff to Norfolk in January 2024 (Dkt. No. 131-28 at 4 (Bujanda Decl.)), Plaintiff contends that Defendant's failure to approve his CHTR request to Norfolk constitutes retaliation in violation of the Rehabilitation Act (Dkt. No. 132 at 53). In support of this claim, Plaintiff seeks to supplement the summary judgment record by separate motion, discussed below.

#### a. Causal Connection

Assuming without deciding that failing to approve Plaintiff's CHTR request was a materially adverse employment action, Plaintiff must present evidence of a causal connection between his protected activity and Defendant's employment action. Although there are disputes of fact as to whether SAC Bujanda attempted to or did approve Plaintiff's CHTR request, there is *no genuine dispute* that shortly after he submitted the request, in September 2023, A/SC Dominique Carla Evans of HRD completed an assessment of Plaintiff's CHTR request and determined that he was *ineligible* for the requested transfer under applicable FBI policy. A reasonable inference from this ineligibility determination is that HRD would not approve Plaintiff's CHTR request even if

SAC Bujanda approved it. Relatedly, there is no dispute that, absent HRD's approval, SAC Bujanda lacked the authority to approve a full-time transfer to a new FBI location.

Although Defendant concedes that there has been some delay in communicating a decision on Plaintiff's CHTR request – with SAC Bujanda and A/SC Evans each purportedly believing the other had communicated the decision to Plaintiff – Defendant attributes the delay to miscommunication rather than retaliation. Plaintiff concedes that there is no evidence that A/SC Evans or HRD *knew* of Plaintiff's mental disability or his prior EEO activity at the time they assessed Plaintiff's CHTR request. Hr'g at 11:54:25–11:57:24. It follows that Plaintiff fails to present evidence from which a reasonable inference arises that Plaintiff's protected EEO activity caused the decisionmaker – in this case HRD – to reject his request for a CHTR to Norfolk.

As circumstantial evidence of pretext, Plaintiff points to the FBI's transfer policy, which provides that "if one of the spouses in a SA couple . . . receives a transfer, the other spouse is afforded a no-cost common household transfer [CHTR] to accompany the spouse receiving the transfer." Dkt. No. 132 at 53-54 (citing Pl.'s AUMF ¶¶ VVVV, WWWW). Plaintiff contends that the FBI's failure to approve his September 2023 request to co-locate with his spouse in the Norfolk FBI office runs counter to this policy. But because the record reflects that Plaintiff was in the Norfolk area for military service, and Plaintiff's wife received a *Non-Bureau* transfer (a CHTNB, not at the direction of the FBI) to join him there, the Court is unconvinced that HRD's ineligibility determination was contrary to FBI policy. As Plaintiff's counsel conceded at oral argument, FBI policy does *not* address a situation in which an agent spouse receives a CHTNB to join a spouse on active military duty and then the military spouse seeks his own CHTR to join the relocated spouse in the location where he was on military duty. Hr'g at 11:57:46–11:58:27. In the absence

of an applicable policy suggesting otherwise, a reasonable inference arises that once Plaintiff's military service was completed he would return to his *assigned* FBI duty station in Albuquerque.

**b. Plaintiff's Motion to Supplement**

Plaintiff asks the Court to permit him to supplement the summary judgment record[24] with an April 17, 2026 e-mail from HRD confirming that Plaintiff's 2023 request to transfer from New Mexico to Virginia was *still pending with his division*. Dkt. No. 135 (citing *Neide v. Grand Ct. Lifestyles, Inc.*, 38 F. Supp. 938, 944 (D. Kan. 1999)). Plaintiff notes that Defendant asserted in his reply that HRD reviewed Plaintiff's CHTR request and determined that Plaintiff was not eligible for the requested transfer. Dkt. No. 138 at 5. Plaintiff further explains that the April 17, 2026 e-mail was not available when he filed his April 10, 2026 response. He contends that the e-mail undermines HRD's asserted determination that he was ineligible for a CHTR under FBI policy. Dkt. No. 135 at 3 (citing Dkt. No. 133 at 44). In addition, Plaintiff contends that the e-mail supports his position that this defense was pretext and raises an issue of fact as to whether the purported HRD review actually occurred. *Id.*; Dkt. No. 138 at 5.

Defendant insists that the April 17, 2026 e-mail is untimely, inadmissible hearsay, immaterial to the issues in the case, and fails to create an issue of material fact. Dkt. No. 137 at 4. The Court agrees that the e-mail fails to create a genuine issue of material fact as to Plaintiff's third retaliation claim. The e-mail appears only to confirm that, *administratively*, Plaintiff's request for CHTR to Norfolk has neither been approved nor denied, though SAC Bujanda approved a temporary duty assignment hardship transfer for Plaintiff to Norfolk in January 2024. The Court cannot say that a reasonable factfinder would infer from the subject e-mail that HRD's prior

[24] As Defendant observes, it is not clear whether Plaintiff also seeks supplemental briefing or simply wishes to add the subject e-mail to the summary judgment record. Dkt. No. 137 at 4. In either event, Defendant urges the Court to deny Plaintiff's motion to supplement. *Id.* at 5.

analysis – that Plaintiff was ineligible for a CHTR per FBI policy – was untrue or pretext for retaliation. As such, the Court **DENIES AS MOOT** Plaintiff's request to supplement the summary judgment record.

Because Plaintiff fails to create a genuine issue for trial as to his third retaliation claim, Defendant's Motion for Summary Judgment is **GRANTED IN PART** as to that claim.

## VI. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Dkt. No. 131) is **GRANTED IN PART AND DENIED IN PART** as follows:

1. Defendant's request that the Court grant summary judgment in his favor as to Plaintiff's Discrimination Claims (Count I) on the ground of failure to exhaust is **DENIED**.
2. Defendant's request that the Court grant summary judgment in his favor as to Plaintiff's Retaliation/Reprisal Claims (Count I) on the ground of failure to exhaust is **GRANTED**.
3. Defendant's request that the Court grant summary judgment in his favor as to Plaintiff's claim alleging Defendant discriminated against him on the basis of disability by rejecting his May 2021 PRS application (Count I) is **DENIED**.
4. Defendant's request that the Court grant summary judgment in his favor as to Plaintiff's claim alleging Defendant discriminated against him on the basis of disability by giving him an unfavorable performance check-in on June 15, 2021 (Count I) is **DENIED**.
5. Defendant's request that the Court grant summary judgment in his favor as to Plaintiff's claim alleging Defendant retaliated against him by awarding him the Santa Fe PRS role but denying a transfer to Santa Fe (Count II) is **GRANTED**.

6. Defendant's request that the Court grant summary judgment in his favor as to Plaintiff's claim alleging Defendant retaliated against him by revoking an informal agreement under which he was permitted to work half-time from Santa Fe (Count II) is **DENIED.**

7. Defendant's request that the Court grant summary judgment in his favor as to Plaintiff's claim alleging Defendant retaliated against him by requiring additional medical documentation (Count II) is **GRANTED**.

8. Defendant's request that the Court grant summary judgment in his favor as to Plaintiff's claim alleging Defendant retaliated against him by failing to definitively approve his CHTR request for a transfer to Norfolk, Virginia (Count II) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike and for Leave to Supplement Pleadings (Dkt. No. 135) is **DENIED AS MOOT**.

**SO ORDERED.**

THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
***Presiding by Consent***